CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JULIA DEIXLER (Bar No. 301954)
(E-Mail: julia_deixler@fd.org)
ERIN M. MURPHY (Bar No. 285087)
(E-Mail: erin_murphy@fd.org.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ROBERT RUNDO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT RUNDO,<br><br>Defendant. | Case No. CR 18-759-CJC<br><br>**NOTICE OF MOTION; DEFENDANT ROBERT RUNDO'S MOTION TO DISMISS UNDER THE DUE PROCESS CLAUSE AND FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: February 26, 2024<br><br>Hearing Place: Courtroom of the Hon. Cormac J. Carney |

TO: UNITED STATES ATTORNEY E. MARTIN ESTRADA AND ASSISTANT UNITED STATES ATTORNEYS KATHRYNNE SEIDEN AND SOLOMON KIM:

PLEASE TAKE NOTICE that on February 26, 2024, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Cormac J. Carney, United States District Judge, defendant Robert Rundo, by and through his counsel of record, Deputy Federal Public Defenders Julia Deixler and Erin M. Murphy, will bring for hearing the following motion:

**MOTION**

Robert Rundo, through his counsel of record, Deputy Federal Public Defenders Julia Deixler and Erin M. Murphy, hereby moves to dismiss the First Superseding Indictment for failure to state a claim under Federal Rule of Criminal Procedure 12 and under the Due Process Clause of the Fifth Amendment of the United States Constitution.  This motion is based on the attached Memorandum of Points and Authorities, all files and records in this case, and any additional evidence and argument presented at or before the hearing on this motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 15, 2024          By   */s/ Julia Deixler*

ERIN M. MURPHY
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for ROBERT RUNDO

3

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 3

    A.    The District Court's Order Finding the Anti-Riot Act Unconstitutional and Dismissing the Indictment ................................................................. 3

    B.    The Ninth Circuit's Opinion Interpreting the Anti-Riot Act and Severing Portions as Unconstitutional ..................................................... 4

    C.    The First Superseding Indictment ..................................................... 5

III. ARGUMENT ...................................................................................................... 7

    A.    The Anti-Riot Act is Void for Vagueness ................................................ 7

        1.    The definition of "riot" is vague because it requires ordinary people to guess at the abilities and intentions of other people, which go beyond the elements of the offense .................................. 8

        2.    Telling people they cannot "[p]articipate" or "carry on" in a riot does not tell them exactly what activity is prohibited. .................. 10

        3.    There is no telling how long after the "use" of an interstate facility a simple assault becomes a federal crime ........................... 11

    B.    The Anti-Riot Act is Unconstitutionally Vague as Applied to Mr. Rundo. ................................................................................................. 14

    C.    The FSI Fails to State a Claim Because it Does Not Adequately Allege a Prohibited Use of Any Facility of Interstate Commerce ....................... 18

        1.    To Salvage the ARA, the Ninth Circuit Interpreted the Statute to Require Two Completed Acts in Imminent Furtherance of a Riot. ............................................................................................ 18

        2.    The FSI Fails to Allege that Mr. Rundo Travelled Interstate or Used a Facility of Interstate Commerce in Furtherance of a Riot ... 23

IV. CONCLUSION ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. of Artists & Recording Companies, Inc. v. Gen. Motors Co.*,
162 F. Supp. 3d 8 (D.D.C. 2016).................................................................. 19

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) (per curiam).......................................................*passim*

*Brown v. Gardner*,
513 U.S. 115 (1994).................................................................................... 19

*United States v. Burns*,
298 F.3d 523 (6th Cir. 2002) ...................................................................... 21

*United States v. Cerone*,
452 F.2d 274 (7th Cir. 1971) ...................................................................... 21

*City of Chicago v. Morales*,
527 U.S. 41 (1999)................................................................................... 1, 8

*United States v. Davis*,
588 U.S. ___, 139 S.Ct. 2319 (2019) ................................................... 1, 7, 9

*United States v. Dellinger*,
472 F.2d 340 (7th Cir. 1972) ............................................................ 1, 14, 18

*United States v. Doremus*,
888 F.2d 630 (9th Cir. 1989) .............................................................. 8, 14

*United States v. Dubin*,
599 U.S. 110 (2023)......................................................................... 21, 22, 25

*United States v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004) .................................................................... 22

*Giaccio v. Pennsylvania*,
382 U.S. 399 (1966)...................................................................................... 8

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...................................................................................... 8

*United States v. Harris*,
  705 F.3d 929 (9th Cir. 2013) .......................................................................... 14

*Hill v. Colorado*,
  530 U.S. 703 (2000).............................................................................. 1, 8, 11

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010).................................................................................... 1, 8

*Johnson v. United States*,
  576 U.S. 591 (2015).................................................................................. 9, 10

*United States v. Lacey*,
  423 F. Supp. 3d 748 (D. Ariz. 2019) .................................................................. 21

*United States v. Markiewicz*,
  978 F.2d 786 (2d Cir. 1992) ....................................................................... 22, 25

*United States v. Miselis*,
  972 F.3d 518 (4th Cir. 2020) .......................................................................... 1

*United States v. Rundo*,
  990 F.3d 709 (9th Cir. 2021) .................................................................*passim*

*Sessions v. Dimaya*,
  138 S.Ct. 1204 (2018) (plurality opinion) ............................................................ 9

*Sidwell v. Express Container Servs.*,
  71 F.3d 1134 (4th Cir. 1995) ......................................................................... 19

*United States v. Simms*,
  914 F.3d 229 (4th Cir. 2019) (*en banc*)................................................................ 8

*United States v. Villano*,
  529 F.2d 1046 (10th Cir. 1976) ...................................................................... 21

*United States v. Winslow*,
  962 F.2d 845 (9th Cir. 1992) ......................................................................... 20

*South Dakota v. Yankton Sioux Tribe*,
  522 U.S. 329 (1998)................................................................................... 20

**Federal Statutes**

15 U.S.C. §§ 1-38 ...................................................................................... 22

iii

18 U.S.C. § 2(a) ........................................................................................................ 3

18 U.S.C. § 16(b) ..................................................................................................... 9

18 U.S.C. § 371 ..................................................................................................... 3, 5

18 U.S.C. § 924(c)(3)(B) ......................................................................................... 9

18 U.S.C. § 1028A(a)(1) ........................................................................................ 21

18 U.S.C. § 1952 ................................................................................................ 20, 21

18 U.S.C. § 2101 ............................................................................................... *passim*

18 U.S.C. § 2102 ..................................................................................................... 9

**Other Authorities**

New Oxford Dictionary (3d ed. 2010) ................................................................. 19

1

## I. INTRODUCTION

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. ___, 139 S.Ct. 2319, 2323 (2019). The dangers of a vague law are twofold. First, it violates due process by failing to give ordinary people fair warning of what the law demands of them. *Id.* Second, it hands over the legislative responsibility of defining criminal behavior to unelected police, prosecutors and judges, and thereby "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Davis*, 139 S.Ct. at 2323. The result is a law that leaves the people "no sure way to know what consequences will attach to their conduct." *Davis*, 139 S.Ct. at 2323. As a result, they are subject to the potential of "the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

This case perfectly illuminates such dangers. Enacted in 1968 as part of the Civil Rights Act, the Anti-Riot Act, 18 U.S.C. § 2101 ("ARA" or the "Act"), received little attention or interpretation for decades. Since this case was filed in 2018, there has been a breathtaking proliferation of ARA cases filed across the country. Three circuit courts have interpreted the law in three distinct and competing ways.[1] But the Ninth Circuit declined to take up the issue of the Act's impermissible vagueness, leaving key provisions of the statute open to enough ambiguity to render it unconstitutional.

Where, as here, a statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (internal citations omitted). Even after the Ninth Circuit's opinion, the vast majority of the government's allegations in its First Superseding Indictment ("FSI") relate to speech and assembly that can at worst be interpreted as "organizing," "promoting," or "encouraging" (constitutionally protected

---

[1] *See United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972); *United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020); *United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021).

1

conduct) and that took place either well before or well after any alleged violence occurred.  The FSI itself thus demonstrates the lingering ambiguity in what conduct is actually prohibited under the ARA.  And where the ARA built a door to arbitrary enforcement, this FSI flung that door wide open.  Here, the government has elected to prosecute just one side of a politically-motivated skirmish, despite a mountain of evidence that the other side was engaged in at least similar, if not worse violence.  *See generally* Mot. to Dismiss for Selective Prosecution (concurrently filed).  This is no new habit; virtually every ARA case ever filed has a dimension of political speech that the government chose to quash.  *See id*., Ex. RR (listing prior ARA prosecutions).

Perhaps the most critical question still plaguing the ARA is the temporal relation between the element requiring the use of a facility of interstate commerce and the element requiring another overt act constituting a "completed act" of rioting.  The Ninth Circuit recognized the need to "closely connect speech and action" under the Act.  To bring the ARA into compliance with the demands of the First Amendment and *Brandenburg v. Ohio*, the Ninth Circuit significantly constricted its breadth to now require *two* completed acts of riotous conduct—one that occurs during the interstate travel or use of a facility of interstate commerce, and another one thereafter.  Without such constriction, the Act would remain impermissibly overbroad under *Brandenburg* and impermissibly vague as to the conduct it prohibits.  The FSI has failed to allege an offense within these new constructs.

This prosecution has also illustrated the danger of the government's application of the ARA to activities that are fully intrastate.  The intent of the Act was to reach out-of-state civil rights activists who travelled across state lines specifically to work other protestors up into a violent froth, and then retreat to their home state after riots broke out to avoid local prosecution.  Here, Mr. Rundo never travelled out of state to incite a riot.  At most, the government alleges he used a cellphone and social media to "recruit[] others to join RAM, update[e] members on upcoming events and trainings, and publiciz[e] events," well before or well after any alleged riot.  Dkt. 209 (hereinafter

2

"FSI") at 4 (Overt Act No. 1).  Such incidental and distant uses of a supposed facility of interstate commerce are insufficient to state a claim under the ARA.  Finding otherwise risks transforming any fight at a gathering or crowd into a federal rioting crime.  With a statute so vague that it encourages selective and arbitrary enforcement, such endless overreach into state conduct is even more dangerous to our constitutional framework. The FSI must be dismissed.

## II. FACTUAL BACKGROUND

### A.  The District Court's Order Finding the Anti-Riot Act Unconstitutional and Dismissing the Indictment

In November 2018, the government indicted Robert Rundo, Robert Boman, Aaron Eason, and Tyler Laube on one count of conspiracy to violate the ARA.  Dkt. No. 47; 18 U.S.C. §§ 371, 2101.  It also charged Mr. Rundo, Mr. Boman, and Mr. Eason with aiding and abetting each other in violating the Act.  Dkt. No. 47; 18 U.S.C. §§ 2(a), 2101.  Mr. Rundo, Mr. Boman, and Mr. Eason moved to dismiss the indictment.  Their primary argument was that the ARA is facially unconstitutional because it sweeps too broadly, criminalizing protected speech and assembly.  They also raised facial claims that the Act is a content-based restriction on expression, lacks the due process requirement of concurrence between guilty act and guilty mind, and is void for vagueness.  Finally, they challenged the statute as applied to their conduct and as charged in the indictment.  *See generally* Dkt. Nos. 134, 142.

This Court agreed that the Act is facially overbroad.  Dkt. No. 145.  Starting from the premise that "vitality of our democratic and public institutions depends on free and vigorous discussion," the Court found the ARA "threatens these important freedoms."  *Id*. at 2.  As the Court recognized, the purpose of the Act was to curb expression.[2]  Addressing the Act's specific overbreadth problem, the Court explained

---

[2] It was passed "in 1968, at the height of public advocacy over civil rights and the Vietnam War," *id*. at 2, in response to concerns "about public disturbances associated with the Civil Rights Movement and anti-Vietnam War protests." *Id*. at 10.

3

that the First Amendment protects an individual's right to advocate for the use of violence "'except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Id.* at 14 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). But "[t]he Anti-Riot Act is not limited in this way." *Id.* Instead of criminalizing "the behavior of those in the heat of a riot," it punishes "acts that have only an attenuated connection to any riot." *Id.* at 6. Indeed, "[n]o violence even need to occur. A defendant could be convicted for renting a car with a credit card, posting about a political rally on Facebook, or texting friends about when to meet up." *Id.*

Noting that "[l]aw enforcement has its pick of statutes" "to protect the public from violence or public disturbances," the Court held the ARA unnecessarily and unconstitutionally overbroad. *Id.* at 11. Because "[u]pholding the statute [would] substantially infringe[] on the rights to free speech and freedom of assembly," and "the government has sufficient means at its disposal to prevent and punish such behavior without sacrificing the First Amendment," the Court granted Defendants' motion and dismissed the Indictment. *Id.* at 11-12. Having found the statute facially overbroad, the Court did not reach Defendants' alternative arguments, including that the ARA is void for vagueness and unconstitutional as applied to their conduct. *Id.* at 12 n.3.

**B.    The Ninth Circuit's Opinion Interpreting the Anti-Riot Act and Severing Portions as Unconstitutional**

The government appealed this Court's dismissal order. On March 4, 2021, the Ninth Circuit reversed the order in part, finding that portions of the ARA were unconstitutionally overbroad, but salvaging other parts of the ARA through creative statutory construction. In severing the "constitutional defects" from the statute, the Ninth Circuit significantly limited the scope of the Act in two primary ways.

*First*, the Ninth Circuit interpreted the "overt act" provision of the Act to "refer[] to acts that fulfill the elements themselves, and not mere steps toward, or related to, one or more of those elements." *Rundo*, 990 F.3d at 716. The Court acknowledged the

4

overt act provisions could be susceptible to two possible meanings—either "only 'a step toward' one of the acts in subparagraphs (1)–(4)," or "one of the specific acts contemplated in subparagraphs (1)–(4)." *Id.* at 715-16. The Ninth Circuit adopted the latter interpretation, finding that construction is the only one that meets *Brandenburg*'s imminence requirement. *Id.* at 716. Critically, the Court held an offense under the ARA must "*closely connect*[] speech and action." *Id.* (emphasis added).

*Second*, the Ninth Circuit limited how a defendant may violate the ARA under subparagraphs (1)–(4). The original Act prohibited conduct to "incite," "organize," "promote," "encourage," "participate in," "carry on," or "commit any act of violence in furtherance of" a riot. The Ninth Circuit struck three of these terms—"organize," "promote," and "encourage," as facially overbroad, because they prohibited a substantial amount of protected speech. *Id.* Under the Ninth Circuit's reconstruction of the statute, a conviction now requires proof beyond a reasonable doubt that a defendant travelled interstate or used a facility of interstate commerce with the intent to "participate in," "carry on," or "commit any act of violence in furtherance of" a riot, and thereafter completed a *second* overt act to participate, carry on, or commit an act of violence in furtherance of a riot. *Id.* at 720-21.

The Ninth Circuit declined to reach Defendants' alternative argument regarding vagueness and their as-applied challenge. *Id.* at 712 n.3.

## C.   The First Superseding Indictment

On January 4, 2023, the government filed the FSI against Mr. Rundo, Mr. Boman, and Mr. Laube. Dkt. No. 209 (hereinafter "FSI"). Count One of the FSI charges that all three defendants conspired to commit an offense against the United States, namely, the ARA, in violation of 18 U.S.C. § 371. *Id.* Count Two of the Indictment charges Mr. Rundo and Mr. Boman with a substantive violation of the ARA, 18 U.S.C. § 2101.

The allegations in Count One concern political rallies on March 25, 2017 (Huntington Beach, CA), April 15, 2017 (Berkeley, CA), June 10, 2017 (San

5

Bernardino, CA), and August 11-12, 2017 (Charlottesville, VA).  *See* FSI at 4–10.  In essence, the government alleges Mr. Rundo and his co-defendants were members of a "white nationalist organization" called the "Rise Above Movement" ("RAM") and they conspired to engage in or incite riots at these political rallies.  *Id*. ¶¶ 1-7.  Count One alleges 48 specific overt acts were committed in furtherance of the conspiracy.  At least 38 of those overt acts describe speech or assembly — for example, registering social media accounts, posting messages or news articles on those accounts, organizing group training workouts, or attending political rallies.[3]

Count Two only concerns the rally on April 15, 2017 in Berkeley, California.  *Id*. at 13–14.  It alleges that between March 16, 2017 and April 14, 2017, Mr. Rundo and his co-defendant Mr. Boman used facilities of interstate commerce with the intent to incite and participate in a riot at the Berkeley political rally.  *Id*. ¶ 9.  Count Two further alleges that on April 15, Mr. Rundo and Mr. Boman "incited, participated in, and carried on a riot, committed acts of violence in furtherance of a riot, and aided and abetted other persons" in the riot.  *Id*. ¶ 10.  As for the interstate commerce element, Count Two alleges the following:

- Defendants and their co-conspirators "presented RAM publicly, through various social-media platforms and other means, as a combat-ready, militant group of a new nationalist white supremacy and identity movement," *id.* ¶ 2;

- Defendants and their co-conspirators posted on the internet photos and videos of themselves training in hand-to-hand combat and "assaulting people at political events," along with political messages, *id*. ¶ 3;

---

[3] *See* alleged Overt Act Nos. 1-6, 10-14, 17, 21-29, 31-38, 40-48.  Overt Act Nos. 15 and 16 allege that RAM members used a credit card to rent a van to drive intrastate from Southern California to Berkeley and to purchase a hotel room in Richmond, California.

- Mr. Boman and an unidentified "RAM member" sent text, Twitter, and Facebook messages to recruit individuals to attend the political rally in Berkeley, *id.* ¶ 9(a);

- Mr. Rundo sent messages through social media to coordinate attendance at the Berkeley rally and to arrange combat training events, *id.* ¶ 9(b); and

- Defendants used a credit card to reserve a hotel room in California.  *Id*. ¶ 9(c).

### III. ARGUMENT

This case must be dismissed.  Either the ARA remains so vague that it is irredeemably unconstitutional, or, accepting the Ninth Circuit's limited construction, the statute only applies to an extremely narrow set of facts that the government cannot prove here.  Regardless, both counts must be dismissed for vagueness and because the government fails to allege—and cannot possibly prove at trial—that Mr. Rundo used a facility of interstate commerce as required under the Ninth Circuit's new standard.

### A.     The Anti-Riot Act is Void for Vagueness.

The well-established doctrine prohibiting vague laws "rests on the twin constitutional pillars of due process and separation of powers."  *Davis*, 139 S.Ct. at 2321 (citing *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212-13 (2018) (plurality opinion)).  The "'first essential of due process of law' [is] that statutes must give people 'of common intelligence' fair notice of what the law demands of them."  *Davis*, 139 S.Ct. at 2325 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)).  The separation of powers problem arises because only Congress has the "power to write new federal criminal laws," but a vague law means "unelected prosecutors and judges" instead of the legislature take "responsibility for defining criminal behavior."  *Id*.  The void-for-vagueness doctrine thus "ensures citizens have fair notice of prohibited conduct, guards against discriminatory enforcement of ambiguous laws, and respects the foundational principle that only Congress—not the executive or the courts—is empowered to establish the bounds of proscribed conduct."  *United States v. Simms*, 914 F.3d 229, 234 (4th Cir. 2019) (*en banc*).

7

A statute is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "For statutes . . . involving criminal sanctions the requirement for clarity is enhanced." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989) (quotation omitted). "A statute can be impermissibly vague for either of two independent reasons":  (1) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732 (citing *Morales*, 527 U.S. at 56).  Where a law is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits, it fails to meet the requirements of due process.  *See Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966).  A "more stringent vagueness test should apply" when a statute "interferes with the right of free speech or of association." *Humanitarian Law Project*, 561 U.S. at 19. "[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Morales*, 527 U.S. at 52 (citing *Kolender*, 461 U.S. 352 at 358); *see also Doremus*, 888 F.2d at 634.

In dismissing the initial Indictment, this Court did not decide the issue of whether the ARA is unconstitutionally vague.  The Ninth Circuit therefore did not take up that issue and there is no binding authority on this question.  Mr. Rundo submits that the statute is void for vagueness, for several reasons.

1. **The definition of "riot" is vague because it requires ordinary people to guess at the abilities and intentions of other people, which go beyond the elements of the offense.**

First, the Act is void for vagueness because the term "riot" is not sufficiently defined.  The Act defines riot as "an assemblage of three or more persons" that creates a "public disturbance" involving "an act or acts of violence" or "a threat or threats of the commission of an act or acts of violence by one or more persons . . . having . . . the

1 | ability of immediate execution of such threats, where the performance of the threatened
2 | act or acts of violence would constitute a clear and present danger of, or would result
3 | in, damage or injury" to a person or property.  18 U.S.C. § 2102(a).

4       The Ninth Circuit interpreted "riot" to require "true threats" of violence, i.e., the
5 | person subjectively intends to carry out their threat.  *Rundo*, 990 F.3d at 719.  Even
6 | with this interpretation, though, a defendant must (1) read a person's mind to know they
7 | are making an actual threat rather than puffing or posturing, and (2) know that person
8 | can "immediately execute" that threat.  Thus, the determination of whether an act
9 | constitutes a threat of violence requires inquiry beyond the elements of the crime.  That
10 | is, it requires an abstract assessment of "some not-well-specified-yet-sufficiently-large
11 | degree of risk":  whether the person threatening an act of violence not only means to
12 | carry out the threat, but actually can.  *Davis*, 138 S.Ct. at 2326.

13       The Supreme Court has found several statutes requiring similar risk assessments
14 | to be unconstitutionally vague.  *See Johnson v. United States*, 576 U.S. 591 (2015)
15 | (holding that the residual clause of the Armed Career Criminal Act, defining "violent
16 | felony" as any felony that "otherwise involves conduct that presents a serious potential
17 | risk of physical injury to another," as unconstitutionally vague); *Sessions v. Dimaya*,
18 | 584 U.S. __, 138 S.Ct. 1204 (2018) (part of 18 U.S.C. § 16(b) that defined violent
19 | felony was unconstitutionally vague); *Davis*, 138 S.Ct. 2319 (holding that 18 U.S.C. §
20 | 924(c)(3)(B), which defined "crime of violence" as one that "involves a substantial risk
21 | that physical force against the person or property of another may be used in the course
22 | of committing the offense" as unconstitutionally vague).[4]  Like assessing a "substantial
23 | risk" or "potential risk of physical injury to another," assessing the ability to execute a
24 | threat requires abstraction and "both denies fair notice to defendants and invites
25 | arbitrary enforcement by judges."  *Johnson*, 584 U.S. at 597.

---

[4] Although these cases were analyzed through the categorical approach, the due process concern is the same as here:  people must know precisely what they are convicted of just as much as they must know what is illegal before they do it.

9

### 2.   Telling people they cannot "[p]articipate" or "carry on" in a riot does not tell them exactly what activity is prohibited.

The terms to "participate in" and "carry on" a riot are also unconstitutionally vague.  By declining to excise these terms from the ARA, the Ninth Circuit determined that they were not so overbroad as to sweep in a substantial amount of protected speech or expressive conduct.  *See Rundo*, 990 F.3d at 721.  But, as the Ninth Circuit was only resolving the First Amendment protections affected by the statute, its opinion did nothing to clarify the conduct actually prohibited under these terms of the ARA.  Nor are they defined in the statute.  Neither term, under its plain meaning, requires that a person actually commit an act of violence or property destruction, or aid or abet another in doing so.  Both terms are vague because they do not clearly indicate the specific conduct that a person must engage in to "participate in" or "carry on" a riot.

For example, without defining the specific conduct prohibited by these terms, it is unclear how far criminal liability extends in a crowd where violence has broken out.  Is an individual cheering on the fighting "participating in" the riot?  Are people who insert themselves into the violence to break up the fight participating in or carrying on the riot?  What about an individual who is initially attacked but fights back out of self-defense or in defense of others?  Even if each of these imaginary individuals traveled to and initially attended the riot with the requisite intent, their actual conduct differs greatly.  Have each of these individuals "participat[ed] in" or "carr[ied] on" the riot?

Because the Ninth Circuit ruled that the ARA is not an attempt statute, and that any overt act must be a *completed* act of rioting, being able to understand these terms is critical to anticipating criminal liability.  But neither the statute, nor the Ninth Circuit's attempt to salvage it, answers what a completed act of rioting actually means and whether each of these hypothetical individuals have accomplished it.  Ordinary people cannot be expected to know what level of "participation" at a violent public disturbance is prohibited, and the ARA is open to arbitrary and discriminatory enforcement based on the interpretations of unelected law enforcement officers.  *See Hill*, 530 U.S. at 732

10

(citing *Morales*, 527 U.S. at 56). For both of these reasons, the ARA is impermissibly vague, and the FSI must be dismissed.

**3.    There is no telling how long after the "use" of an interstate facility a simple assault becomes a federal crime.**

The statute still fails to inform both ordinary people and law enforcement how close in time any riotous activity must be to their use of a facility of interstate commerce to engage in speech. This mystery springs from the vagueness in the word "thereafter" in § 2101(a), and the Ninth Circuit's attempt to salvage § 2101(a) itself. As severed by the Ninth Circuit, the Act now criminalizes:

> Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent–
> > (1) to incite a riot; or
> > (2) to participate in, or carry on a riot; or
> > (3) to commit any act of violence in furtherance of a riot; or
> > (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
> ***and*** who either during the course of any such travel or use or ***thereafter*** performs or attempts to perform ***any other overt act*** for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph[.]

*Rundo*, 990 F.3d at 720–21 (emphasis added).

On appeal, the defense argued "the travel in or use of any facility of interstate or foreign commerce and 'any other overt act for any purpose specified in subparagraph [(1), (2), (3), or (4)] of [subsection (a)]' are too far removed in time from any riot to satisfy *Brandenburg*'s imminence requirement." *Rundo*, 990 F.3d at 715. The Ninth Circuit agreed that if the Act only requires a mere "step toward" one of the riotous acts in subparagraphs (1) through (4), then the Act would run afoul of *Brandenburg*'s imminence requirement. *Id.* at 716. This makes sense because, after all, a mere "step toward" could occur at any point before the riotous act, and *Brandenburg* plainly requires more. *See Brandenburg*, 395 U.S. at 447-48. Instead, the Ninth Circuit interpreted the Act so it "*closely connects* speech and action such that any First

11

Amendment concerns would arise from the conduct criminalized in subparagraphs (1)–(4), rather than the overt act provision itself." *Rundo*, 990 F.3d at 716. (emphasis added). To resolve the *Brandenburg* imminence issue, it held "the overt act requirement refers to acts that fulfill the elements themselves, and not mere steps toward, or related to, one or more of those elements." *Id*. It also held that "the Act prohibits unprotected speech that instigates (incites, participates in, or carries on) an imminent riot." *Id*. at 721.

There are only two ways to reconcile this holding and the now-severed statute. One way is there must be *two* completed overt acts of riotous conduct—one that occurs during the travel or use of an interstate facility of commerce (i.e., imminently riotous speech), *and* one that occurs after that which actually results in riotous conduct under an element of § 2101(a)(1) through (4). This interpretation extremely restricts the conduct captured by the statute but accomplishes the Ninth Circuit's goal of "closely connect[ing]" the speech and action and only prohibiting speech that instigates imminent violence. After all, if the use of the interstate facility must accomplish one of the elements of § 2101(a)(1) through (a)(4), then there is no imminence problem between the use of the interstate facility (i.e., the speech), and the actual riotous conduct; they either merge or necessarily exist so close in time that there is no opportunity for lengthy gaps in time to accrue.

Played out in real life, this interpretation would look like this: a man learns about a rally against police brutality happening in the next hour, and he wants to start a riot, so he texts his four friends to say "let's go burn the city down to the ground." They then go join the protest and start destroying business property during the rally. He has arguably (1) used a facility of interstate commerce (the cell phone) with the intent to start a riot, (2) that use fulfilled one or more of the elements under § 2101(a) by inciting his friends to participate in a riot, and (3) he completed another overt act after the use of an interstate facility by going and participating in the riot himself.

1  There is no imminence issue under *Brandenburg* with this interpretation because the

2  use of an interstate facility—the speech element—constitutes riotous conduct itself.

3        There is only one other way of interpreting the Ninth Circuit's holding, and the

4  statute:  a completed riotous act must occur during or "thereafter" the use of the facility

5  of interstate commerce with the intent to complete a riotous act.

6        If this latter interpretation is accepted, though, there is an unfixable vagueness

7  problem with the statute.  After all, how long after the use of an interstate facility is

8  "thereafter"?  Is it *right* thereafter?  Or could it be several *weeks* thereafter?  Months?

9  Neither the Ninth Circuit's opinion, nor the text of the severed statute tell a reasonably

10  intelligent person how long their use of an interstate facility like a credit card, email, or

11  Facebook post could hook them into a federal Anti-Riot Act charge.  Nor do they

12  provide law enforcement with cognizable standards in deciding who to charge.

13        For example, let's imagine a citizen who is upset with a new water use restriction

14  in her town.  She knows there will be an election for the restriction in six months.  She

15  posts to Facebook, "I'm going to show up to that election and cause some trouble, mark

16  your calendars and join me!"  Six months later, she shows up to the election to protest

17  and gets into a fistfight with one of the proponents of the new water restriction.  The

18  Act could not have reasonably informed this citizen that her fistfight actually ripened as

19  a federal crime six months *before* she got into the fight, when she posted her thoughts

20  to Facebook.  If it did inform her of such, then that must mean that "thereafter" literally

21  means *anytime* after someone uses the phone or internet to share their thoughts or

22  intentions to do something that could be riotous at a distant time in the future.  But this

23  is the exact type of speech the Ninth Circuit said was protected under *Brandenburg*.

24  Unless the Ninth Circuit meant that a completed overt riotous act must occur *during* the

25  use of the interstate facility *and* another overt riotous act must occur thereafter, which

26  would more closely connect the speech and action, then the Act is unconstitutionally

27  vague as to when it is violated.

28

**B.      The Anti-Riot Act is Unconstitutionally Vague as Applied to Mr. Rundo.**

Even if the Court does not find that the ARA is facially void for vagueness, the FSI must be dismissed because the statute is unconstitutionally vague as applied to the circumstances in this case.  In an as-applied vagueness challenge, the Court's inquiry turns on whether the legal framework "provided adequate notice to [a particular defendant] that his particular conduct was proscribed."  *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013); *see also Doremus*, 888 F.2d at 634.

Given the First Amendment concerns with the ARA, the few courts interpreting the statute have commented on the importance of distinguishing between mere advocacy, on the one hand, and speech that is both identified with action and "sufficiently likely to propel the violent action," on the other.  *Dellinger*, 472 F.2d at 360-61; *see also Rundo*, 990 F.3d at 718 (striking portion of the Act prohibiting advocacy of violence because "[t]he First Amendment protects that kind of advocacy").  But where these lines are drawn under the Act is perilously ambiguous, and courts have acknowledged the dangers in applying the Act to specific conduct.  For example, the Northern District of California in *In re Shead* upheld the ARA against a vagueness challenge at the pre-indictment stage but declined to answer "the more difficult problem of applying the Act to a specific case."  302 F. Supp. 560, 567 (N.D. Cal. 1969).  The court cautioned that the prosecution could be found invalid if indictments "fail[ed] to refine the distinction between mere advocacy and incitement to imminent lawless action."  *Id.* (citing *Brandenburg*, 395 U.S. at 447).

The government fails to make such refinements in this case.  At its core, the FSI alleges that Defendants or other alleged "RAM members" communicated over text message and social media to organize their attendance at lawful political rallies, committed or aided and abetted in assaults at those rallies, and thereafter texted or posted on social media boasting about those assaults.  But even after the Ninth Circuit's interpretation of the ARA, the FSI is rife with constitutional land mines, and the FSI

14

itself evidences the uncertainty with which even the government views the scope of the statute.  The ARA is vague as applied to Mr. Rundo, for several reasons.

**First**, the Ninth Circuit struck from the statute the overt acts to "organize," "promote," or "encourage" a riot, but the vast majority of allegations in the FSI still consist of that constitutionally protected conduct.[5]  Thus, if the government maintains that all of these alleged acts were completed overt acts under the Ninth Circuit's narrow construction of the ARA, then the statute is impermissibly vague because it fails to adequately notify Mr. Rundo what the law demands of him.

**Second**, several of the FSI's allegations relate to communications made long before any act of violence was committed.  Incredibly, the FSI claims that "[b]eginning no later than on a date unknown but not later than in or around **October 2009**, and continuing until on or about May 2018," the defendants opened and used social media accounts "for the purpose of recruiting others to join RAM[.]"  FSI at 4:15–19.  In other words, the government seems to think this conspiracy to start a riot in 2017 began almost **eight years** before, simply because the defendants allegedly had social media accounts in 2009.  The First Amendment dangers of this are clear, especially when viewed alongside the claim of selective prosecution here:  by its own example, the

---

[5] *See, e.g.,* FSI at Overt Act Nos. 1 (Defendants "registered and operated social media accounts for the purpose of recruiting others to join RAM, updating members on upcoming events and trainings, and publicizing events"); 2 (messages regarding training sessions); 3 (training session); 4 (sending messages inviting others to training sessions); 5 (Rundo sent a message stating he would bring a banner to a political rally); 10 (Boman posted an article on his Facebook account); 11 (Boman posted a photograph to his Facebook account); 12 (sending messages inviting others to attend and provide security at political rally); 13 (sending Twitter message stating RAM members were attending Berkeley political rally); 14 (Rundo sent social media message regarding combat training); 17 (Rundo sent messages on social media "to coordinate their activities at the Berkeley rally"); 25 (Rundo sending text message thanking "RAM member" for attending rally and inviting him to combat training and lunch); 26 (Facebook messages inviting others to participate in another Berkeley rally); 27 (text message inviting others to participate in rally); 28 (Facebook message stating RAM members were planning to "take over" a political march and "shar[ing] photographs of signs that RAM members planned to carry at the march"); 31 (photograph from San Bernardino rally posted on Instagram); 34 (two unnamed "RAM members" exchanged text messages regarding attending Unite the Right rally in Charlottesville seven weeks before rally).

government can focus on a disfavored group's actions at a political rally, go endlessly backward in time to dredge up everything they said or did that reflect their unpopular views, and use it as proof that they intended to riot all along.

As to the Berkeley rally, which is the sole "riot" alleged in Count Two, the FSI alleges that "[b]etween March 18, 2017 and April 15, 2017, defendant Rundo sent messages through the online social media platform to coordinate RAM members' attendance at the Berkeley Rally and to arrange combat training events to prepare RAM members and associates to engage in violence at the Berkeley Rally." FSI at ¶ 9(b). Count Two also alleges that Mr. Boman sent Facebook messages recruiting others to attend the Berkeley demonstration between March 16 and April 14. *Id*. at ¶ 9(a).

The government seems to believe that, despite their temporal distance from any actual riot, all of these communications satisfy the first element of the ARA and, by extension, both *Brandenburg*'s imminence requirement and the Ninth Circuit's recent holding that a violation under the Act must "closely connect[] speech and action." *Rundo*, 990 F.3d at 716. If the use of a social media websites over a nearly month-long period does indeed satisfy the ARA, no person could possibly know when their communications cross the line from protected speech to illegal preparations to riot.

***Third***, and further demonstrating the absurdity of such an unfettered scope, the FSI bases its claims in other large part on messages and social media postings made long *after* the purported riots had concluded. Even if Defendants had fair warning that engaging in fights is illegal (at least under state law), what of discussing a purported assault *after* it occurred? In fact, nearly half (21 of 48) of the FSI's allegations in Count One consist of claims that Defendants posted content to social media websites or sent messages discussing political rallies after the fact. *See* FSI (Overt Act Nos. 10, 11, 13, 21-25, 31-33, 35-37, 40-45, 48). From the government's view, it seems anything anyone ever says over the phone or internet about an event where a riot later (or earlier) occurs is fair game under the ARA. But the ARA gives no notice of this incredibly broad scope, or that these particular posts and messages could fall within it.

16

The endless temporal scope of the ARA as applied in this case renders other ambiguities even more dangerous.  The government appears to view the use of the internet to communicate with others as sufficient "use" of an interstate facility, regardless of how remote in time it is from any riot.  With this interpretation, the federal government can use the ARA against practically anyone who is politically active within their community and attends a rally where violence or property destruction occurs.  As evidenced in the concurrently filed Motion to Dismiss for Selective Prosecution, social media is a tool used widely by people of every political persuasion.  *See* Mot. to Dismiss for Selective Prosecution at 29-30.  And the federal government possesses powerful tools to track, record, and even predict a private citizen's social media activity.  *Id*.  If social media posts like these satisfy the interstate commerce element of the ARA, the statute's reach is so far that it is essentially standardless.

It should be undisputed that none of the messages cited in the FSI actually *incited* a riot or constituted an act of rioting themselves.  At worst, assuming *arguendo* the truth of the government's allegations about Mr. Rundo's intent, a few messages could rise to organizing or recruiting others to participate in a riot.  But that is protected conduct, per the Ninth Circuit.  Yet Mr. Rundo now faces prosecution, in part, for messages allegedly sent a month before any violence, and weeks or months later, including for a protest he did not even attend (*i.e.*, Charlottesville).  If the FSI stands, the legal framework under the ARA has not provided Mr. Rundo with fair notice as to which of his innumerable texts, chats, and social media posts were criminal.

If the FSI's sweeping allegations do in fact fall within the ARA's reach, it is impossible to draw a distinction between lawful organization, promotion, or encouragement (i.e., constitutionally protected speech and assembly) on the one hand, and unlawful incitement or participation on the other.  The ARA is impermissibly vague as applied in this case, and the FSI must be dismissed.

17

**C.**      **The FSI Fails to State a Claim Because it Does Not Adequately Allege a Prohibited Use of Any Facility of Interstate Commerce.**

As discussed above, there are only two ways to interpret the Ninth Circuit's ruling in this case. *See supra* III.A.3. Under one interpretation, the statute only requires one overt act of rioting to occur sometime "thereafter" the use of a facility of interstate commerce. But with this framework, the statute is unconstitutionally vague as to the how long after the use of the internet or telephone a person must act in order to violate the ARA. This interpretation also stands in direct contradiction to *Brandenburg* and the Ninth Circuit's explicit holding that the elements of the offense must "more closely connect the speech and action." *Rundo*, 990 F.3d at 716.

The more likely interpretation is the only one that salvages the ARA from completely violating *Brandenburg*: to violate the statute, there must be *two* completed overt acts of rioting—one that occurs during the travel or use of an interstate facility of commerce (i.e., imminently riotous speech), *and* a second act that completes an act of incitement, participation, or violence within the meaning of §2101(a)(1) through (4). This second interpretation may (in the Ninth Circuit's view) save the statute from unconstitutional overbreadth, but it also extremely restricts the ARA's reach. Under this framework, the FSI fails to state a claim against Mr. Rundo and must be dismissed.

     **1.**      **To Salvage the ARA, the Ninth Circuit Interpreted the Statute to Require Two Completed Acts in Imminent Furtherance of a Riot.**

         a.      *The use of a facility of interstate commerce element of the offense must be a "completed act" in furtherance of a riot.*

The ARA criminalizes the commission of two acts—the use of any facility of interstate commerce with the intent to incite, organize, or participate in a riot, plus an additional "overt act" for the same purposes listed in subsections 2101(a)(1)-(4). In interpreting the statute, the Ninth Circuit recognized that substantial swaths of the law would be in peril if "overt act" meant something less than fulfillment of one of the acts in (a)(1)-(4). *Rundo*, 990 F.3d at 716; *see also Dellinger*, 472 at 362. If "overt act"

18

requires only an outward manifestation of the riot plan in motion, then *Brandenberg*'s imminence requirement is not met as to any of the provisions.  Thus, although the Ninth Circuit acknowledged that the term "overt act" is frequently applied to require only "a step toward" a criminal goal, it held that the term as used in the ARA "refers to acts that fulfill the elements themselves, and not mere steps toward, or related to, one or more of those elements." *Rundo*, 990 F.3d at 716.  Accordingly, under the Ninth Circuit's holding, the statute requires a completed act of incitement or violence or participation in a riot.

What follows from the Ninth Circuit's construction is that both of the requisite acts under the ARA—the use of a facility of interstate commerce and the "other overt act"—implicate subparagraphs (a)(1)-(4) not as goals but as "themselves the required overt acts." *Id*.  This is evident from Congress's insertion of "other" before "overt act."  To give meaning to "other" in "any *other* overt act," the interstate commerce act must be considered an overt act; there cannot be an "*other*" overt act without a first overt act. *See Sidwell v. Express Container Servs.*, 71 F.3d 1134, 1139 (4th Cir. 1995) (whatever follows "other" should accord with scope and nature of preceding words); New Oxford Dictionary (3d ed. 2010) ("another" is "an additional . . . thing of the same type as one already mentioned. . ."). *Cf. All. of Artists & Recording Companies, Inc. v. Gen. Motors Co.*, 162 F. Supp. 3d 8, 18 (D.D.C. 2016) (finding that the use of the word "another" necessarily requires a first, "otherwise, the word 'another' would serve no purpose in the sentence") (internal citations omitted).

Here, the term "overt act" cannot mean one thing with respect to the interstate commerce element and something else with respect to the conduct element.  "[T]here is a presumption that a given term is used to mean the same thing throughout a statute, . . . a presumption surely at its most vigorous when a term is repeated within a given sentence . . . ." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).  If, as the Ninth Circuit has held, "the overt act described in paragraph (1) of subsection (a)" means a completed act that actually fulfills one of the purposes in (a)(1)-(4)," then that

19

requirement must also apply to the interstate commerce element the clause describes. Thus, under the Ninth Circuit's interpretation, the ARA requires *two* completed acts in furtherance of a riot that actually occurs.

A comparison of the language used in the ARA with a similarly structured statute, 18 U.S.C. § 1952 (the Travel Act), further supports the interpretation that the statute requires two completed acts of rioting. The Travel Act prohibits interstate travel or transportation in aid of racketeering enterprises. The statute states, in relevant part:

> **(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--
>
> > **(1)** distribute the proceeds of any unlawful activity; or
> >
> > **(2)** commit any crime of violence to further any unlawful activity; or
> >
> > **(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform--
>
> > **(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . .

18 U.S.C. § 1952. Like the ARA, the Travel Act requires two basic steps: (1) travel or use of a facility of interstate commerce; and (2) a separate overt act. But the Travel Act refers to the second step as "*an* act," while the Anti-Riot Act refers to the second step as "any *other* overt act." Section 1952's description ("*an* act") suggests that the overt act prong is the *first* criminal act the defendant must complete. And that "overt act" need not be a completed criminal act, nor even a substantial step in furtherance of the criminal act; all that is required is "a subsequent overt act in furtherance of the unlawful activity." *United States v. Winslow*, 962 F.2d 845, 851 (9th Cir. 1992). The ARA is distinguishable, both under the Ninth Circuit's reading and in the plain language of the statute (drafted just seven years after section 1952)[6] imposing the word "*other* overt act," indicating it was the second required overt act to violate the statute. *See South*

---

[6] *See* 18 U.S.C. § 1952 (Added Pub.L. 87-228, § 1(a), Sept. 13, 1961, 75 Stat. 498); 18 U.S.C. § 2101 (Added <u>Pub.L. 90-284, Title I, § 104(a)</u>, Apr. 11, 1968, 82 Stat. 75).

*Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 347 (1998) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court avoids interpreting statutes in a way that 'renders some words altogether redundant.'").

There is a legitimate basis for the different requirements under the ARA and the Travel Act. As the Ninth Circuit recognized, the ARA, as originally drafted, impermissibly infringed upon speech and expressive conduct protected by the First Amendment. The only way to uphold the statute was to interpret the *Brandenberg* imminence requirement into the text and to require a defendant to actually complete one of the illegal acts enumerated in the statute, not merely take a step in furtherance of them. But the same First Amendment concerns are not raised by the Travel Act. *See United States v. Villano*, 529 F.2d 1046, 1055 (10th Cir. 1976) ("[W]e feel such conduct [prohibited by the Travel Act] is not sheltered by the First Amendment."); *United States v. Cerone*, 452 F.2d 274, 286 (7th Cir. 1971) (rejecting First Amendment overbreadth claim to Travel Act); *United States v. Lacey*, 423 F. Supp. 3d 748, 765 (D. Ariz. 2019) (same). In turn, courts have consistently held that the Travel Act does *not* require the unlawful act to "be consummated for the overt act element to be satisfied; rather, after the travel, the Government need only prove some overt act in furtherance of the unlawful activity." *United States v. Burns*, 298 F.3d 523, 538 (6th Cir. 2002).

      b.   *The use of a facility of interstate commerce must be at the crux of the alleged Anti-Riot Act offense*.

This construction of the interstate commerce element is also supported by the Supreme Court's recent decision in *United States v. Dubin*, 599 U.S. 110 (2023). There, the Court held that under the federal aggravated identity theft statute, 18 U.S.C. § 1028A(a)(1), a defendant "uses" another person's means of identification "in relation to" a predicate offense only when the use is at the crux of what makes the conduct criminal. *Id.* at 114. The Court rejected the government's argument that the use of identification element was met simply "if the use of that means of identification 'facilitates or furthers' the predicate offense in some way." *Id.* at 117 (citing Brief for

21

1   United States).  Instead, the Court interpreted the term "use" within the context of the

2   statute "centered around the ordinary understanding of identity theft."  *Id*. at 120.  In so

3   doing, the Court held that the use of identification could not simply be ancillary to the

4   criminal transaction, but the crux of the fraud itself.

5        The same reasoning should be applied to the "use of any facility of interstate

6   commerce" element of the ARA.  Unlike other statutes, such as the Hobbs Act or RICO

7   statute, which "require a showing of only a de minimis effect on interstate commerce to

8   meet the respective jurisdictional elements," *United States v. Fernandez*, 388 F.3d

9   1199, 1218 (9th Cir. 2004), the ARA requires "[t]he use of a facility of interstate

10  commerce [as] an essential element" of the offense, *United States v. Markiewicz*, 978

11  F.2d 786, 813 (2d Cir. 1992).  An indictment must therefore "include more than 'a

12  mere allegation of a relationship to interstate trade or commerce.'"  *Fernandez*, 388

13  F.3d at 1218 (quoting *United States v. ORS, Inc.*, 997 F.2d 628 (9th Cir. 1993)

14  (involving an indictment for violations of the Sherman Act, 15 U.S.C. §§ 1-38)).

15       Further, the crux of the ARA cannot be ignored by permitting *any* use of a

16  facility of interstate commerce to meet the first element of the offense.  The Ninth

17  Circuit has substantially narrowed the scope and purpose of the Act to target not the

18  speech and organization prior to a riot, but rather speech and acts imminently

19  instigating or furthering a riot.  *See Rundo*, 990 F.3d at 721 ("With the above

20  construction and severance, the Act is not facially overbroad.  Rather, the Act prohibits

21  unprotected speech that instigates (incites, participates in, or carries on) an imminent

22  riot, unprotected conduct such as committing acts of violence in furtherance of a riot,

23  and aiding and abetting of that speech or conduct.").  The phrase "use of any facility of

24  interstate commerce" must therefore be read with that purpose in mind and must have

25  "a genuine nexus" to the unprotected conduct.  *See Dubin*, 599 U.S. at 117.

26       The *Dubin* Court feared that without narrowing the aggravated identity theft

27  statute to require use of an ID to be at the crux of the offense, the scope of the statute

28  would become nearly limitless in medical fraud cases, where nearly every transaction

requires the use of a person's identification.  The same overbreadth fears are implicated here.  Since the permeation of cellphones and the internet, hardly an hour passes in the day when the ordinary person goes without using a facility of interstate commerce.  In this context, to require anything less than conduct imminent to a riot under the interstate commerce element would stretch federal jurisdiction beyond recognition— texts or social media posts with no immediate connection to violent activity could be elevated to a federal offense.  And given the broad First Amendment activity laden in the use of a facility of interstate commerce (namely, use of the phone or internet), the interpretation described herein is the only one that satisfies the constraints of *Brandenburg* and gives full force to the Ninth Circuit's construction of the ARA.

### 2.     The FSI Fails to Allege that Mr. Rundo Travelled Interstate or Used a Facility of Interstate Commerce in Furtherance of a Riot.

Under the Ninth Circuit framework, the FSI fails to adequately allege the required interstate commerce element of the ARA.  As discussed above, the only specific allegations with respect to the use of a facility of interstate commerce prior to the Berkeley rally are that:  (1) Mr. Rundo and his co-defendant each sent text and social media messages to coordinate other people's attendance at the Berkeley rally, (2) Mr. Rundo used text and social media to "arrange combat training events," and (3) Mr. Rundo and his co-defendant used a credit card to reserve a hotel room.  FSI at ¶ 9(a)-(c).  The messages were allegedly sent between March 16 and April 15.  The FSI also broadly alleges that on unspecified dates, RAM members used social media to promote the group as a "combat-ready, militant group" and to post photos and videos of the group engaging in prior acts of combat training and violence.  *Id*. at ¶¶ 2-3.

None of these allegations come close to meeting the standard established by the Ninth Circuit.  This strict standard only prohibits speech that "instigates (incites, participates in, or carries on) an imminent riot."  *Rundo*, 990 F.3d at 721.  Broad allegations that Mr. Rundo and/or his co-conspirators used social media in the month leading up to a political rally (or worse still, at unknown dates) allege nothing more

than speech and assembly that the Ninth Circuit has already ruled are constitutionally protected.  And none of the allegations regarding the use of a facility of interstate commerce encompass the crux of the criminal conduct: an act of inciting, participating, carrying on, or committing an act of violence in furtherance of a riot.

The first allegation regarding use of the internet alleges RAM presented itself on social media "as a combat-ready, militant group," FSI at ¶ 2, which fails to assert any connection to a riot at all.  The next allegation is that RAM posted images on social media *after* assaults occurred after political events.  *Id.* ¶ 3.  This too plainly fails to allege the interstate commerce element, which must occur either imminently before or simultaneously with the "other overt act" in furtherance of a riot.  18 U.S.C. § 2101(a).

The next two allegations implicate constitutionally protected speech and assembly and fail to assert any completed act of rioting.  These are the claims that Mr. Boman sent Facebook messages to recruit individuals to attend the political rally in Berkeley, *id*. ¶¶ 1, 9(a), and that Mr. Rundo sent messages through social media to coordinate attendance at the Berkeley rally and to arrange combat training events, *id*. ¶¶ 1, 9(b).  The FSI does not specifically allege Mr. Boman and Mr. Rundo sent these unidentified messages with the intent to later participate in a riot at Berkeley.  But even assuming that they did, the messages were not imminent to any violence and do not themselves constitute inciting, participating in, carrying on, or committing an act of violence in furtherance of a riot.  These messages reflect, at worst, acts of organizing or encouraging—conduct unambiguously struck from the statute by the Ninth Circuit.  *See Rundo*, 990 F.3d at 717.  But even still, the organizing and encouraging Defendants are accused of here are so far removed from the riot itself as to fall outside of *Brandenberg*'s limitations.

Finally, the allegation that Defendants used a credit card to reserve a hotel room to travel wholly within the state plainly fails to meet the requirements of the interstate commerce element established by the Ninth Circuit.  *See* FSI ¶ 9(c).  Use of a credit card, while possibly sufficient to show a de minimis effect on interstate commerce, is

24

insufficient to assert an essential element of the offense here.  *See Markiewicz*, 978 at 813; *see also Dubin*, 599 U.S. at 132.  And the purchase of a hotel room does not come close to meeting any of the acts required under subsections (a)(1)-(4).[7]

Because the FSI fails to allege that Mr. Rundo used a facility of interstate commerce in imminent furtherance of a riot, it has not alleged an essential element and therefore fails to state an offense.  The FSI must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Mr. Rundo respectfully requests that the Court dismiss the First Superseding Indictment.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 15, 2024          By  */s/ Julia Deixler*
_____
                                  ERIN M. MURPHY
                                  JULIA DEIXLER
                                  Deputy Federal Public Defenders
                                  Attorneys for ROBERT RUNDO

---

[7] This Court has previously recognized the use of a credit card here was remote to the violence at the rally:

> Just consider the way in which the government applies the Anti-Riot Act in its own Indictment.  Defendants are charged with renting a van with a credit card and sending text messages to one another *weeks* before the Berkeley political rally.  These acts cannot reasonably be thought to pose an *imminent* threat of violence or lawless conduct.

Dkt. No. 145 at 9.