E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
SOLOMON KIM (Cal. Bar No. 311466)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0631/2450
    Facsimile: (213) 894-2979
    E-mail:    kathrynne.seiden@usdoj.gov
            solomon.kim@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-759(A)-CJC |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR SELECTIVE PROSECUTION |
| v. | |
| ROBERT RUNDO, and ROBERT BOMAN, | Hearing Date: February 21, 2024 Hearing Time: 9:00 a.m. Location:    Courtroom of the Hon. Cormac J. Carney |
| Defendants. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kathrynne N. Seiden and Solomon Kim, hereby files its Opposition to Defendants' Motion to Dismiss for Selective Prosecution.

//

//

1    This Opposition is based upon the attached memorandum of points

2  and authorities, the declaration of Kathrynne N. Seiden attached

3  hereto, the files and records in this case, and such further evidence

4  and argument as the Court may permit.

5  Dated: February 5, 2024          Respectfully submitted,

6                                   E. MARTIN ESTRADA
                                     United States Attorney
7
                                     CAMERON L. SCHROEDER
8                                    Assistant United States Attorney
                                     Chief, National Security Division
9

10                                   _____/s/_____
                                     KATHRYNNE N. SEIDEN
11                                   SOLOMON KIM
                                     Assistant United States Attorneys
12
                                     Attorneys for Plaintiff
13                                   UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                                      PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.     INTRODUCTION.................................................1

II.    STATEMENT OF FACTS...........................................2

       A.    The FBI Begins to Investigate RAM After Its Co-Founder
             Brags Publicly About Inciting Violence at a Deadly
             Protest...............................................2

       B.    The FBI Identifies Particular Members of RAM Who
             Trained for and Engaged in Repeated Acts of Violence......4

       C.    Defendants Brag Publicly About Using Violence to
             Suppress Opposing Viewpoints..........................6

       D.    The FBI Presents Certain Members of RAM for
             Prosecution...........................................7

III.   DEFENDANTS ARE NOT ENTITLED TO DISCOVERY BECAUSE THEY HAVE
       NOT ESTABLISHED CREDIBLE EVIDENCE OF A PROSECUTORIAL POLICY
       WITH A DISCRIMINATORY EFFECT OR PURPOSE......................8

       A.    Defendants Have Not Presented Credible Evidence of a
             Discriminatory Effect.................................11

       B.    Defendants Have Not Demonstrated a Discriminatory
             Purpose...............................................21

IV.    CONCLUSION..................................................31

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

**Cases**

<u>United States v. Adams</u>,
  388 F.3d 708 (9th Cir. 2004) ................................... 19

<u>United States v. Aguilar</u>,
  883 F.2d 662 (9th Cir. 1989) ............................... passim

<u>United States v. Alameh</u>,
  341 F.3d 167 (2d Cir. 2003) .................................... 29

<u>United States v. Arenas-Ortiz</u>,
  339 F.3d 1066 (9th Cir. 2003) ........................... 10, 15, 21

<u>United States v. Armstrong</u>,
  517 U.S. 456 (1996) ....................................... passim

<u>United States v. Bass</u>,
  536 U.S. 862 (2002) ................................ 10, 15, 29, 30

<u>United States v. Bourgeois</u>,
  964 F.2d 935 (9th Cir. 1992) ....................... 11, 13, 25, 27

<u>United States v. Brantley</u>,
  803 F.3d 1265 (11th Cir. 2015) ................................ 17

<u>United States v. Chem. Found.</u>,
  272 U.S. 1 (1926) ............................................. 9

<u>United States v. Finn</u>,
  2022 WL 1047230 (9th Cir. Apr. 7, 2022) ...................... 17

<u>United States v. Greene</u>,
  698 F.2d 1364 (9th Cir. 1983) ............................ 10, 31

<u>United States v. Lyles</u>,
  2009 WL 3400918 (9th Cir. Oct. 16, 2009) ..................... 31

<u>United States v. Mathur</u>,
  2012 WL 3135548 (D. Nev. June 8, 2012) ...................... 31

<u>United States v. Ruiz</u>,
  665 F. App'x 607 (9th Cir. 2016) ......................... 20, 27

<u>United States v. Rundo</u>,
  497 F. Supp. 3d 872 (C.D. Cal. 2019) ................. 24, 27, 33

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

<u>United States v. Rundo</u>,
   990 F.3d 709 (9th Cir. 2021) ...................................... 24

<u>United States v. Sellers</u>,
   906 F.3d 848 (9th Cir. 2018) .................................. 10, 14

<u>United States v. Smith</u>,
   231 F.3d 800 (11th Cir. 2000) ................................ 11, 15

<u>United States v. Steele</u>,
   461 F.2d 1148 (9th Cir. 1972) ..................................... 8

<u>United States v. Thorpe</u>,
   471 F.3d 652 (6th Cir. 2006) ..................................... 29

<u>United States v. Turner</u>,
104 F.3d 1180 (9th Cir. 1997)......................... 17, 18, 26, 28

<u>United States v. Washington</u>,
   869 F.3d 193 (3d Cir. 2017) ...................................... 30

<u>United States v. Waw</u>,
   2010 WL 11545324 (S.D. Cal. Feb. 10, 2010) ...................... 10

<u>United States v. Wilson</u>,
   639 F.2d 500 (9th Cir. 1981) ............................ 16, 23, 24

<u>Veloria v. United States</u>,
   2008 WL 4055819 (D. Haw. Aug. 28, 2008) ......................... 15

<u>Wayte v. United States</u>,
   470 U.S. 598 (1985) .......................................... passim

<u>Yick Wo v. Hopkins</u>,
   118 U.S. 356 (1886) .......................................... 28, 29

**Statutes**

18 U.S.C. § 2101...................................... 1, 15, 24, 28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.  INTRODUCTION**

3       In connection with the extremist group known as the Rise Above

4  Movement ("RAM"), defendants and their associates traveled to various

5  protests to violently oust those whose viewpoints they found

6  objectionable.  Defendants routinely bragged about their violent

7  conduct in public and online.  Along with other RAM members,

8  defendants trained together, recruited together, traveled together,

9  and conducted vicious assaults as a group.  As one local police

10 officer observed, defendants "would pick a person" and then "go after

11 the person as a group, pulling the person out, isolat[ing] them, and

12 then attacking them."  (Def't Ex. G at 2.)

13      Following RAM's participation in a deadly protest in

14 Charlottesville, Virginia, the FBI opened an investigation into the

15 group and eventually referred some of its members to the United

16 States Attorney's Office for the Central District of California (the

17 "USAO") for prosecution.  In 2018, the USAO charged defendants and

18 two other members of RAM with rioting and conspiracy to riot under

19 the Anti-Rioting Act ("ARA"), 18 U.S.C. § 2101 et seq.

20      Downplaying their dangerous conduct and public proclamations of

21 their violent objectives, defendants now seek to use their

22 controversial viewpoints to immunize themselves from prosecution,

23 claiming that the USAO prosecuted them in retaliation for engaging in

24 protected First Amendment speech.  Defendants' motion fails because

25 they have not shown that "a federal prosecutorial policy had a

26 discriminatory effect and that it was motivated by a discriminatory

27 purpose."  United States v. Armstrong, 517 U.S. 456, 463 (1996).

28 Defendants' claim of discriminatory effect is based on nothing more

than a conclusory assertion that the USAO did not bring ARA charges against members of Antifa or other "far left" groups who engaged in violence during the same time period.  But defendants have not specifically identified a single individual whom the USAO could have so charged, let alone one materially similar to either defendant. Nor have defendants presented any evidence whatsoever that the government charged them because of their protected speech, rather than because they engaged in repeated acts of violence and publicly documented their criminal intent.  Because defendants fail to make their showing under either prong, the Court should deny their motion.

## II.   STATEMENT OF FACTS

### A.   The FBI Begins to Investigate RAM After Its Co-Founder Brags Publicly About Inciting Violence at a Deadly Protest

In August 2017, hundreds of white nationalists gathered at a rally in Charlottesville, Virginia to protest the removal of a Confederate statue.  During the rally, a white supremacist purposefully drove his car into a crowd of counter-protestors, killing 32-year-old Heather Heyer.  The rally received international media coverage, in part due to the violence between protestors and counter-protestors that resulted in Heyer's death.

The government's investigation into RAM began just weeks later, when a complainant contacted the Los Angeles Field Office of the FBI to say that someone in his bar (later identified as RAM co-founder Ben Daley) had been "gleeful[ly] bragging" about having "cause[d] havoc during the riots" in Charlottesville.  (Ex. 5 at USAO_00003006.)[1]  Daley made clear that his conduct had not been a

---

[1] References to "Ex." are exhibits to the Declaration of Kathrynne N. Seiden, attached hereto.  References to "Def't Ex." are to exhibits attached to defendants' motion.

1    one-time occurrence; he also "bragged about hitting a guy and
2    punching a girl in the face during [] protests" in Berkeley,
3    California, months earlier.  (Id.)  Although the complainant
4    acknowledged that Daley's group (later identified as RAM) "appeared
5    to be right-wing and did not favor minorities," the group differed
6    from those who showed up in Charlottesville to exercise their First
7    Amendment right to protest.  (Id. at USA_00003007.)  Specifically,
8    the group "did not care about the issues" regarding the "statues in
9    Charlottesville," but rather "enjoyed going to protests just to raise
10   havoc, cause trouble, and fight."  (Id.)  The complainant further
11   stated that on multiple occasions, Daley and his associates had used
12   the bar to recruit associates to join RAM.  (Id. at USA_00003006;
13   Ex.6 at USA_00003024.)

14        In January 2018, after learning that RAM was based in Southern
15   California, the Los Angeles Field Office of the FBI opened a full
16   investigation into "active members [] located in the greater Los
17   Angeles area."  (Id. at USA_00003018.)  The agent who authored the
18   report wrote that the FBI was investigating the targets "for actively
19   recruiting, training, facilitating, and engaging in activity
20   promoting violence and civil disorder at protests."  (Id.)  Under
21   "background on ideology," the agent noted that RAM was an "anti-
22   semitic organization with an emphasis on street activism,
23   preparation, defense and confrontation with the intent to protect and
24   defend their right wing brethren" and that its founders possibly
25   "aspire[d] to build RAM into a militant group focused on provoking
26   attacks at rallies and protests in order to utilize combative
27   tactics."  (Id. at USA_00003019.)  Finally, the opening report
28   explicitly stated that neither RAM nor its members were being

3

investigated for engaging in protected First Amendment activity,
noting:

> Individuals or groups named in this [report] have been
> identified as participating in activities that are protected by
> the First Amendment to the U.S. Constitution.  Their inclusion
> here is not intended to associate the protected activity with
> criminality or a threat to national security, or to infer that
> such protected activity itself violates federal law.  However,
> based on known intelligence and/or specific, historical
> observations, it is possible the protected activity could invite
> a violent reaction towards the subject individuals or groups, or
> the activity could be used as a means to target law enforcement.
> In the event no violent reaction occurs, FBI policy and federal
> law dictates that no further record be made of the protected
> activity.

(Id. at USA_00003017.)

### B.   The FBI Identifies Particular Members of RAM Who Trained for and Engaged in Repeated Acts of Violence

During its investigation, FBI learned that Rundo, Boman, and
their eventual codefendants, Tyler Laube and Aaron Eason, lived in
the Los Angeles area.  Although the protests RAM attended typically
erupted into violence from both protestors and counter-protestors,
defendants repeatedly appeared at the forefront of that violence,
often seeking out physical confrontations.  For example, the FBI
obtained footage of a March 2017 protest in Huntington Beach,
California which showed all four defendants pursuing and taunting
counter-protestors as they walked away from defendants.  (Ex. 1 at
0:00-00:33.)  That footage depicted Boman kicking and shoving
counter-protestors in the back, Laube repeatedly punching a
journalist in the face, and Rundo attacking a counter-protestor from
behind, then punching and elbowing him as he laid on the ground in a
defensive position.  (Id. at 00:31-00:50); Ex. 2 at 9:14-9:45, 7:55-
8:45, and 9:40-10:11.)   The FBI obtained similar videos of a protest

4

that occurred just weeks later in Berkeley, California, in which Rundo and Boman violently assaulted counter-protestors repeatedly throughout the day by punching them in the face and head.  (Ex. 3 at 00:45-1:09; Ex. 4 at 4:07-4:47.)  After Rundo was arrested for punching a police officer, Eason and other RAM members chased counter-protestors out of the park, chanting "hey, hey, hey, Goodbye."  (ECF No. 1 ¶ 40.)

The FBI also obtained information from various police departments around California documenting RAM's consistent attempts to incite violence at the protests they attended.  For example, a police officer present for the Berkeley protest told the FBI that Eason was "antagonizing and challenging members of the Left-side to fight" and that members of RAM, who appeared to be "tactically trained," were "working together as cells," "fight[ing] as a group," and "were the first to cross the barriers" separating the two sides. (Def't Ex. F at 2.)  The same officer noted that the RAM members did not seem to be "protect[ing] or defend[ing] any public speakers," but were rather "antagonizing, pursuing, and fighting those on the Left-side throughout the day."  (Id. at 3.)  Another police officer present at the same protest similarly noted that "throughout the day, the RAM group would antagonize and then fight with counter-protestors," engaging in a repeated hunting ritual whereby "they would pick a person and then go after the person as a group, pulling the person out, isolat[ing] them, and then attacking them."[2]  (Def't

---

[2] Defendants' coconspirators later corroborated those officers' observations.  For example, in pleading guilty to rioting, Daley later admitted that at the Berkeley rally, he and fellow RAM members followed protestors who were leaving the area and attacked, punched, kicked, and stomped on them.  United States v. Daley et al., 3:18-CR-00025-NKM-JCH, ECF No. 111 (W.D. Va. May 3, 2019).

Ex. G. at 2.)  A police officer who observed RAM at a protest in San Bernardino, California two months later noted that members of RAM confronted counter-protestors aggressively "in an apparent attempt to provoke and intimidate them."  (Ex. 13 at USA_00029851.)  The officer reported that RAM members then pursued their opponents across the street, "chasing counter protestors to their vehicles" and "hitting [the] vehicles with flag poles."  (Id. at USA_00029851-52.)

### C. Defendants Brag Publicly About Using Violence to Suppress Opposing Viewpoints

Defendants openly and publicly bragged about how their violent and aggressive tactics successfully silenced their opponents at the protests they attended.  For example, the day after the Huntington Beach protest, Boman posted a link to an article titled "Trumpenkriegers Physically Remove Antifa Homos in Huntington Beach," along with the caption "We did it fam," to his Facebook page.  (Ex. 7 at 8302-8303.)  Similarly, following the Berkeley protest, Boman posted photographs of himself physically attacking and stealing flags away from counter-protestors.  (Id. at 5066, 5089.)  Boman also posted a screen shot of a journalist's twitter feed in which the journalist noted that Boman and Rundo had shoved him at the Berkeley rally.  (Id. at 5099-5100.)  Boman captioned the post: "Oh waaaah goyim.  You come face to face with the enemy, what do you expect.. .". (Id.)

Like Boman, Rundo used RAM's Instagram account to repeatedly display photographs of himself and Boman engaged in violence at various protests.  As one example, in March 2017, Rundo posted a photograph of himself punching a man in the side of the face at the Huntington Beach rally, with the words "physical removal"

superimposed across the top.  (Ex. 9 at USA_00070474.)  As another

example, in May 2017, Rundo used the account to post a photograph of

Boman assaulting counter-protestors at the Berkeley rally with the

words "THERE CAN BE NO UNDERSTANDING BETWEEN YOU AND ME, NOR MAY

THERE BE ANY COVENANTS BETWEEN US, TILL ONE OR THE OTHER SHALL FALL"

superimposed across the image.  (Id. at USA_00070445.)  A month

later, Rundo posted a photo of himself and Boman wearing skull face

masks with a caption reading "#riseabovemovement" and "#riot".  (Id.

at USA_00070458-59.)

### D.   The FBI Presents Certain Members of RAM for Prosecution

In August 2018, the United States Attorney's Office for the

Western District of Virginia charged four members of RAM who had

attended the riot in Charlottesville, including Daly, with rioting

and conspiracy to riot under the ARA, based in part on their conduct

at the Berkeley and Huntington Beach protests.  See United States v.

Daly et al., 3:18-cr-25-NKM, ECF No. 3 (W.D. Va. 2018).[3]

That same month, agents from the Los Angeles Field Office of the

FBI met with Assistant United States Attorneys for the USAO to

present additional members of RAM for prosecution.  (Ex. 8 at

USA_00008879-80.)  In October 2018, the USAO charged defendants,

Laube, and Eason by criminal complaint with conspiracy to riot.  (ECF

No. 1.)  The complaint described how these four defendants engaged in

_____

[3] All four have since pled guilty. In doing so, Daley admitted
that RAM was a combat-ready militant group which engaged in hand-to-
hand and combat training to prepare to engage in violent
confrontations with protestors at "purported 'political' rallies,"
that he and his coconspirators attended these rallies with the
expectation that physical conflict with counter-protestors would
occur, that they "celebrated violence when it happened," and that
they used the media coverage of themselves assaulting counter-
protestors to recruit members to engage in violent confrontations at
future events.  Daley et al., 3:18-CR-00025-NKM-JCH at ECF No. 111.

1   repeated acts of violence by punching, kicking, and hitting

2   protestors at the Huntington Beach and Berkeley protests.  (Id.

3   ¶¶ 18-28, 37-40.)

4       Shortly thereafter, a grand jury returned an indictment charging

5   defendants with conspiracy to riot and a substantive count of

6   rioting.  (ECF No. 47.)  The USAO did not charge all members of RAM

7   of whom it was aware, nor did it charge every person who espoused a

8   white supremacy ideology and engaged in violence at the same protests

9   as RAM.  (Ex. 6 at USA_00003018, 3021, 3023.)

10  **III.  DEFENDANTS ARE NOT ENTITLED TO DISCOVERY BECAUSE THEY HAVE NOT
         ESTABLISHED CREDIBLE EVIDENCE OF A PROSECUTORIAL POLICY WITH A
11       DISCRIMINATORY EFFECT OR PURPOSE**

12      Although a decision to prosecute may not be based on race,

13  religion, or the exercise of a constitutional right, federal

14  prosecution necessarily involves decisions to prosecute only some

15  conduct that violates federal criminal statutes.  Indeed, the system

16  would collapse were it otherwise.  Selection is inherent, but "[m]ere

17  selectivity in prosecution creates no constitutional problem."

18  United States v. Steele, 461 F.2d 1148, 1159 (9th Cir. 1972).

19  Rather, "[i]n our criminal justice system, the Government retains

20  broad discretion as to whom to prosecute."  Wayte v. United States,

21  470 U.S. 598, 607 (1985) (cleaned up).

22      As the Supreme Court has recognized, prosecutorial discretion

23  reflects a number of factors, such as "the strength of the case, the

24  prosecution's general deterrence value, the Government's enforcement

25  priorities, and the case's relationship to the Government's overall

26  enforcement plan," which are "not readily susceptible to the kind of

27  analysis the courts are competent to undertake."  Id.  Thus, the

28  broad discretion afforded to prosecutorial decisions "rests largely

8

on the recognition that the decision to prosecute is particularly ill-suited to judicial review." Id. "Judicial supervision in this area, moreover, entails systemic costs of particular concern," including delaying the prosecution, chilling law enforcement by "subjecting the prosecutor's motives and decisionmaking to outside inquiry," and "undermin[ing] prosecutorial effectiveness by revealing the Government's enforcement policy," all of which are "substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute." Id. The Court has therefore determined that "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Id.

Because a selective prosecution claim "asks a court to exercise judicial power over a 'special province' of the Executive," courts are required to "presume that [prosecutors] have properly discharged their official duties." Armstrong, 517 U.S. at 463. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "'clear evidence to the contrary.'" Id. at 465 (quoting United States v. Chem. Found., 272 U.S. 1, 14–15 (1926)). Specifically, a defendant claiming selective prosecution must clearly demonstrate that a "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." Armstrong, 517 U.S. at 465 (cleaned up). The standard is a "demanding" one, "designed to minimize interference with the prosecutorial function." United States v. Arenas-Ortiz, 339 F.3d 1066, 1069 (9th Cir. 2003).

1    Because the constitution constrains only prosecutions which are
2    "deliberately based upon an unjustifiable standard," Wayte, 470 U.S.
3    at 608 (emphasis added), the "ultimate inquiry in a selective
4    prosecution case is on the [Assistant United States Attorney's]
5    decision to prosecute." United States v. Waw, Case No. 09CR3138-LAB,
6    2010 WL 11545324, at *2 (S.D. Cal. Feb. 10, 2010) (citing United
7    States v. Greene, 698 F.2d 1364, 1368 (9th Cir. 1983) ("[E]ven
8    assuming that [the agent's] initial role in referring the matter for
9    prosecution involved an improper discriminatory motive, such a
10   showing would be 'insufficient to taint the entire administrative
11   process.'")); see also United States v. Sellers, 906 F.3d 848, 852-53
12   (9th Cir. 2018) (explaining that unlike a selective enforcement
13   claim, a selective prosecution claim involves an examination of
14   "prosecutorial decisions").

15       Finally, recognizing that "discovery imposes many of the costs
16   present when the government must respond to a prima facie case of
17   selective prosecution," the Supreme Court has held that "the
18   justifications for a rigorous standard of proof for the elements of
19   such a case [] require a correspondingly rigorous standard for
20   discovery in aid of it." Armstrong, 517 U.S. at 457. Thus, "in
21   order to establish entitlement to such discovery, a defendant must
22   produce credible evidence" as to both prongs. Id.; see also United
23   States v. Bass, 536 U.S. 862, 863 (2002) (per curiam) (noting that
24   "raw statistics regarding overall charges say nothing about charges
25   brought against similarly situated defendants"). The threshold is
26   intentionally "high" and requires a defendant to provide "specific
27   facts, not mere allegations." United States v. Bourgeois, 964 F.2d
28   935, 939 (9th Cir. 1992). Thus, "it will be the rare defendant who

presents a sufficiently strong case of selective prosecution to merit

discovery of government documents." Id.

**A. Defendants Have Not Presented Credible Evidence of a Discriminatory Effect**

Defendants' motion fails because they have not pointed to any

prosecutorial pattern or policy, let alone one with a discriminatory

effect on those engaged in the same kind of constitutionally

protected activity as defendants.  To carry their burden of

demonstrating a discriminatory effect, defendants must point to

individuals who were "similarly situated" to defendants but were not

prosecuted. See Armstrong, 517 U.S. at 465.  A "similarly situated"

individual is one who is the same as defendant "in all relevant

respects, except that defendant was, for instance, exercising his

First Amendment rights." United States v. Aguilar, 883 F.2d 662, 706

(9th Cir. 1989); see also United States v. Smith, 231 F.3d 800, 809-

10 (11th Cir. 2000) ("[W]e define a similarly situated person . . .

as one who engaged in the same type of conduct, which means that the

comparator committed the same basic crime in substantially the same

manner as the defendant.").  Because he or she is similar to a

defendant in all relevant respects, a "similarly situated" individual

is necessarily someone who the government "could have [] prosecuted

for the offense for which defendants were charged," but chose not to.

Armstrong, 517 U.S. at 470.

In Armstrong, defendants charged with drug crimes moved for

discovery or dismissal of the indictment, arguing they were selected

for federal prosecution because they were black.  Id. at 458-59.

Defendants offered an affidavit by a paralegal for the Public

Defender's office and a list of all defendants whose drug charges had

11

1  been closed by that office during the prior year, all of whom were

2  black.  Id.  Defendants also submitted affidavits and articles

3  showing generally that Caucasians equaled minorities in terms of drug

4  dealing and that many nonblacks were prosecuted for those crimes in

5  state court, suggesting that the government had chosen not to

6  prosecute those same defendants federally.  Id. at 460-61.  The

7  district court granted defendants' motion in part and ordered the

8  government to provide discovery regarding that office's charged

9  cases.[4]  After the government indicated that it would not comply with

10  the discovery order, the district court dismissed the case and the

11  Ninth Circuit affirmed.  Id. at 461.  The Supreme Court reversed,

12  rejecting defendants' "personal conclusions based on anecdotal

13  evidence" and holding that defendants "had failed to satisfy the

14  threshold showing" for discovery because "they failed to show that

15  the Government declined to prosecute similarly situated suspects of

16  other races."  Id. at 458 (emphasis added).  Similarly, newspaper

17  articles which discussed the discriminatory effect of federal drug

18  sentencing laws were simply "not relevant to an allegation of

19  discrimination in decisions to prosecute."  Id. at 470 (emphasis

20  added).  And although defendants had proffered statistics showing the

21  government consistently prosecuted black defendants for drug crimes,

22

23  ───────────────

24      [4] Notably, the district court ordered the government to produce
a set of discovery much narrower than that defendants seek here, to
include a list of cases from the prior three years in which that

25  specific United States Attorney's office had charged both cocaine and
firearm offenses, the race of the defendants in those cases and which

26  levels of law enforcement were involved, and an explanation of the
office's criteria for deciding to prosecute each of those defendants.

27  Armstrong, 517 U.S. at 461.  In contrast, here defendants seek
discovery related to virtually any Assistant United States Attorney's

28  involvement and evaluation regarding any potential rioting suspect in
this District over a ten-year period.  (Def't Ex. PP at 3-4.)

those statistics did not suffice because they "failed to <u>identify</u>
<u>individuals</u> who were not black and <u>could have been prosecuted</u> for the
offenses for which respondents were charged, but were not so
prosecuted." <u>Id.</u> (emphasis added).

Like the defendants in <u>Armstrong</u>, defendants provide pages of
conclusory assertions that the government chose not to prosecute "far
left" protestors, citing generally to a compendium of articles and
hearsay statements about the role of Antifa and other "far left"
groups in perpetuating the civil unrest that unfolded nationwide in
2017.  Stripped of its rhetoric and generalizations, defendants'
motion boils down to the sweeping assertion that there must have been
someone from a "far left" group whom the USAO could have prosecuted
for rioting.  But defendants' "personal conclusions based on
anecdotal evidence" are exactly what the Supreme Court rejected in
<u>Armstrong</u>.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Bourgeois</u>, 964 F.2d at 941 (rejecting
allegation that "government must have known . . . of non-black felons
who possessed firearms" as an insufficient and "factually devoid"
allegation).  Rather, to meet their burden, defendants must point to
specific individuals, similarly situated to themselves, whom the USAO
could have charged with rioting and elected not to.  Defendants have
not pointed to a single one.

Defendants' motion identifies just 13 individuals of whom the
FBI became aware through its investigation into RAM.  (Def't Exs. A-
E, H-P.)  At the outset, defendants' motion fails because it does not
demonstrate that the FBI presented those individuals to the USAO for
prosecution, such that the government can reasonably be said to have
"declined" prosecution.  <u>See</u> <u>Armstrong</u>, 517 U.S. at 456; <u>see also</u>
<u>Sellers</u>, 906 F.3d at 852-53 (distinguishing selective enforcement

1   from selective prosecution).  While there is no evidence of selective

2   enforcement or selective prosecution, defendants overlook the

3   distinction between the two.  Without identifying similarly situated

4   individuals whom the USAO "declined to prosecute," defendants cannot

5   make their threshold showing.  See Armstrong, 517 U.S. at 456.

6       Even if defendants could establish that the USAO considered

7   these individuals for prosecution and declined to charge them, which

8   they cannot, defendants' motion would still fail.  Defendants have

9   not demonstrated that the USAO could have prosecuted most of those

10  individuals at all, let alone for the same offenses for which

11  defendants were charged.  For example, defendants specifically

12  identify ten individuals who were arrested at the Berkeley rally and

13  complain that the USAO did not charge any of them with rioting.

14  (Mot. at 16, Def't Exs. A-B, H-M, O-P.)  But as their arrest reports

15  make clear, none of those individuals lived within the Central

16  District of California.  (Id.)  Defendants do not assert that any of

17  them attended any protests in this District or otherwise engaged in

18  any activity here, such that the USAO would have had venue to charge

19  them.[5]  The government is not required to pursue meritless charges to

20  circumvent claims of selective prosecution.[6]  See Smith, 231 F.3d at

21

22  [5] Similarly, defendants cannot establish that a U.C. Berkeley
    professor who apparently participated in protests in Berkeley and
23  Sacramento, and to whom defendants repeatedly refer throughout their
    motion, was "similarly situated" to defendants because defendants
    have not established that the professor had any connection whatsoever
24  to the Central District of California.  Even if defendants could
    establish as much, defendants have not established that the FBI ever
25  presented the professor to the USAO as a possible subject for
    prosecution.  Accordingly, like the subjects whose arrest reports are
26  attached to defendants' motion, the U.C. Berkeley professor discussed
    in defendants' motion is not "similarly situated" to defendants.

27  [6] Defendants may argue that another United States Attorney's
28  Office should have charged these individuals, but a selective
                                                    (footnote cont'd on next page)

14

810-811 (noting that for someone to be similarly situated, the evidence against that person must be "as strong or stronger than that against the defendant"); see also Veloria v. United States, Crim. No. 00-00145 SOM, Civ. No. 08-00019 SOM/BMK, 2008 WL 4055819, at *16 (D. Haw. Aug. 28, 2008) (where evidence tying someone else to drugs "was lacking," that person was not similarly situated to defendant charged with possessing those drugs).

Defendants point to just three individuals who bore any connection to the Central District of California: J.A., J.F., and J.M.A., each of whom was arrested at the protest in Huntington Beach in March 2017. (Mot. at 9-11; Def't Exs. C-E.)  But defendants have not demonstrated that the government could have charged any of those individuals with rioting under the ARA, which requires the government to prove beyond a reasonable doubt that defendants (1) traveled interstate or used a facility of interstate commerce with the specific intent to incite a riot; and (2) committed an overt act to incite, participate in, carry on, or commit an act of violence in furtherance of a riot.  18 U.S.C. § 2101; see Arenas-Ortiz, 339 F.3d at 1068-69 (to demonstrate discriminatory effect, the defendant was required to identify non-Hispanic males who were not prosecuted even though they met each individual element of the crime for which defendant was charged).  For example, while the reports suggest that J.A. and J.M.A. may have committed battery while engaged in a brawl at the Huntington rally, there is nothing to suggest that any of J.A., J.M.A., or J.F. traveled interstate or used a facility of

---

prosecution claim focuses on the decisionmakers in a particular case. See Bass, 536 U.S. at 863-64 (holding that defendant was required to make a "showing regarding the record of the decisionmakers in [his] case.)  Thus, defendants cannot impute the charging decisions of another United States Attorney's Office onto the USAO.

1    interstate commerce with the intent to incite a riot.  At best,

2    defendants assert that J.A. "coordinated attending rallies with at

3    least two other counter-protestors who were also arrested that day"

4    and that J.F. "contacted [people] to make sure that they were going"

5    to the protest.  (Mot. at 10-11).  But those facts fall significantly

6    short of suggesting that J.A. or J.F. did more than coordinate with

7    friends to attend a protest, which could likely be said about anyone

8    in attendance.  Defendants cannot meet their burden simply by

9    pointing to others the government could have investigated; rather,

10   they must demonstrate at the outset that those individuals "could

11   have been prosecuted for the offenses for which respondents were

12   charged, but were not[.]"  Armstrong, 517 U.S. at 470; United States

13   v. Wilson, 639 F.2d 500, 504 (9th Cir. 1981) (defendants charged with

14   tax violations could not show that others were similarly situated

15   just by showing that their tax forms might have warranted further

16   investigation).

17        While defendants fail in the first instance to point to

18   individuals whom the USAO could have prosecuted under the ARA, even

19   that showing would not be enough to render those individuals

20   "similarly situated" within the narrow construction of that term.

21   Defendants must point to individuals who are the same as them "in all

22   relevant respects."  Aguilar, 883 F.2d at 706 (holding that not all

23   persons who break immigration laws are similarly situated).  Put

24   differently, that the USAO could have prosecuted someone else is a

25   necessary, but not sufficient, showing for defendants to meet their

26   burden.  The Ninth Circuit has explained that the "goal of

27   identifying a similarly situated class of lawbreakers" is "to isolate

28   the factor allegedly subject to impermissible discrimination."  Id.

Only "[i]f all other things are equal" can the "prosecution of only those persons exercising their constitutional rights give[] rise to an inference of discrimination."  Id.; United States v. Brantley, 803 F.3d 1265, 1272 (11th Cir. 2015) (requiring the comparator to be "nearly identical" to prevent the court from "second-guess[ing] the prosecutor's exercise of charging discretion.").  "[W]here the comparison group has less in common with defendant, then factors other than the protected expression may very well play a part in the prosecution."  Id.  Accordingly, someone is not "similarly situated" to a defendant where there are "material difference[s] in [their] conduct."  See United States v. Finn, No. 20-10297, 2022 WL 1047230, at *1 (9th Cir. Apr. 7, 2022) (holding that women who engaged in similar fraud as defendant were not similarly situated because one earned less money and cooperated, one participated in only one transaction, and one had a materially different role in the scheme).

In United States v. Turner, five defendants charged with distributing crack cocaine, all members of street gangs, sought discovery in furtherance of their claim that the government had selectively prosecuted them based on their race.  104 F.3d 1180, 1181-82 (9th Cir. 1997).  In addition to "newspaper anecdotes," "hearsay," and the same kind of statistics offered in Armstrong, the defendants offered a report which showed that the state of California had prosecuted approximately 250[7] white crack cocaine sellers during a four-year period and that none of those defendants had been charged federally.  Id. at 1182, 1185.  The district court granted

---

[7] Specifically, the study showed "3% of 8,250 persons charged with the sale of crack by the Los Angeles District Attorney to be Anglo."  Turner, 104 F.3d at 1182.

1 defendants' motion for discovery and dismissed the case when the
2 government refused to comply. Id. at 1181. The Ninth Circuit held
3 that even though the defendants had pointed to a significant number
4 of non-prosecuted, white individuals who had also dealt crack, the
5 district court abused its discretion because there was no indication
6 those individuals were "gang members who sold large quantities of
7 crack." Id. at 1184-85. Observing that gang membership was "more
8 heinous and more dangerous than the single sale of cocaine by
9 individuals," the court concluded that gang membership was a
10 "neutral, nonracial" basis to prosecute. Id. at 1185. Thus, in
11 "omit[ting]" information about whether the non-prosecuted individuals
12 had the same "principal characteristics of the federal defendants,"
13 i.e., gang membership, the defendants could not make the "threshold
14 showing" that those individuals were similarly situated. Id. at
15 1184-85.

16     Here, defendants' selective prosecution claim suffers from the
17 same infirmity because defendants cannot identify any individuals who
18 shared defendants' most notable characteristics. Defendants did not
19 merely commit a single act of battery at an isolated protest; they
20 worked together as a violent extremist group to engage in a
21 coordinated campaign of violence throughout 2017. Defendants used
22 social media to recruit new members, trained together to engage in
23 combat fighting, traveled throughout the state and across the country
24 to deliberately assault those who did not share their viewpoints, and
25 bragged in person and online about their victories. None of the
26 information provided about J.A., J.F., or J.M.A. reflects that they
27 engaged in any such coordinated group efforts to amplify their
28 violent impact, let alone that they trained together to engage in

1    combat fighting, used social media to recruit soldiers, or traveled
2    to multiple protests to assault people.  (Def't Exs. C-E.)  Like in
3    Turner, defendants have not shown that J.A., J.F., or J.M.A. shared
4    the viewpoint-neutral qualities that rendered defendants' organized
5    conduct dangerous.  Thus, just as the defendants in Turner could not
6    meet their burden simply by identifying non-black persons who had
7    dealt crack cocaine, here, defendants cannot meet their burden simply
8    by identifying "left wing" individuals who participated in some form
9    of violence at a protest.  See United States v. Adams, 388 F.3d 708,
10   712-13 (9th Cir. 2004) (government's decision to issue ticket to
11   event organizer over other participants was not sufficient to show
12   discriminatory effect because "[b]y [that] argument, the government
13   would always be required to ticket all persons violating a law or
14   ticket no one").
15        Additionally, the little substantive information defendants
16   provide suggests that even at the rallies they did attend, J.A.'s,
17   J.F.'s, and J.M.A.'s conduct diverged significantly from that of
18   defendants.  For example, J.F. told the officers he "came to
19   protest," "not to fight personally," that he pepper-sprayed the crowd
20   when he saw his friend get "punched in the face," and that he wore a
21   mouth guard and pepper spray for his "personal protection."  (Def't
22   Ex. C. at 4.)  The police officer who authored J.F.'s arrest report
23   noted that J.F. did not pursue an altercation; rather, when one
24   erupted, J.F. ran away, "being followed by a group from the event."
25   (Id. at 3.)  Whatever J.F.'s true intention, his conduct
26   distinguishes him facially from defendants, whom officers on the
27   ground described as a "tactically trained" group that was
28   "antagonizing and challenging members of the Left-side to fight,"

19

repeatedly the "first group to cross the barriers," and on multiple occasions, "pick[ed] a person and then [went] after the person as a group, pulling the person out, isolating them, and then attacking them."  (Def't Exs. F-G.)  Those statements reflect that like the defendants in Turner, defendants were more violent, persistent, and dangerous than others as a result of their coordination and planning. Thus, even viewed through the narrow lens of a single protest, defendants' conduct reflects obvious differences that preclude a "reasonable inference of invidious discrimination." See Aguilar, 883 F.2d at 706; see also United States v. Ruiz, 665 F. App'x 607, 610 (9th Cir. 2016) (no showing of discriminatory effect where two non-Hispanic defendants who were not prosecuted criminally differed from defendants as to the extent of the fraud, the degree of sophistication required, the number of persons involved, and the prior histories of certain members of the scheme).

Finally, defendants may complain that without discovery, they are unable to meet their burden of establishing that the government declined to prosecute similarly situated persons.  That argument is foreclosed by Armstrong and has been uniformly rejected by the courts who have considered it.  Armstrong makes clear that the defendants must make a threshold showing that the government declined to prosecute similarly situated suspects in order to obtain discovery on selective prosecution.  Armstrong, 517 U.S. at 458 (concluding that the defendants were not entitled to discovery on selective prosecution due to their failure to "satisfy the threshold showing" that "the Government declined to prosecute similarly situated suspects of other races").  Moreover, the Ninth Circuit has consistently held that a defendant is not entitled to discovery just

1   because it would be "an 'insuperable task' to produce the evidence

2   required by the court to justify discovery." Arenas-Ortiz, 339 F.3d

3   at 1070-71.  The standard is intentionally "rigorous," designed to

4   "minimize interference with the prosecutorial function," and "[i]t is

5   in the nature of a standard that there will be times when that

6   standard cannot be met."  Id. at 1069.  "Merely demonstrating that

7   better evidence cannot be obtained without discovery does not

8   suddenly render otherwise insufficient evidence sufficient." Id. at

9   1071.

10      Because defendants have not pointed to any similarly situated

11  individuals the government declined to prosecute, they have not met

12  their threshold showing.  The Court can and should deny their motion

13  on that basis, alone.

14      **B.   Defendants Have Not Demonstrated a Discriminatory Purpose**

15      Even if defendants could demonstrate a discriminatory effect,

16  they have not provided any evidence, whether credible or otherwise,

17  that they were prosecuted because they engaged in protected speech.

18  "Discriminatory purpose implies more than intent as awareness of

19  consequences.  It implies that the decisionmaker selected or

20  reaffirmed a particular course of action at least in part because of,

21  not merely in spite of, its adverse effects upon an identifiable

22  group."  Wayte v. United States, 470 U.S. 598, 610 (1985).  Thus, a

23  defendant cannot meet his burden simply by showing that the USAO knew

24  its prosecution would have a disproportionate impact on those engaged

25  in protected First Amendment activity.  Id.  Rather, the defendant

26  must present evidence that he was prosecuted because of his or her

27  protected activity.  Id.

28

21

In Wayte, the Selective Service employed a passive enforcement policy through which it investigated and prosecuted only those who advised they had failed to register for the draft or whom others reported as having failed to do so. Id. at 601. The government then sent multiple letters to those men asking that they register and the President announced a grace period which would afford nonregistrants a chance to register without penalty. Id. at 601-03. Finally, the Department of Justice ("DOJ") began prosecuting nonregistrants. Id. at 603. Defendant claimed he had been selectively prosecuted for exercising his First Amendment rights, citing strong statistics that out of an estimated 674,000 nonregistrants, he and the approximately 13 others who had been indicted were all vocal nonregistrants. Id. at 604. The Supreme Court disagreed. Although DOJ correspondence reflected that the government knew its system was likely to result in the prosecution of those who were "vocal proponents of nonregistration" or "those with religious or moral objections," the government's awareness of that consequence was not enough to show that it prosecuted defendant because of his protest activities. Id. at 603, 610 (emphasis added). Notably, the government had not prosecuted everyone who engaged in the same speech as defendants, such as those who protested registration but did not affirmatively report themselves as being noncompliant, or those who reported themselves as noncompliant but eventually registered. Id. at 610. Thus, even if the passive enforcement policy had a discriminatory effect and the government was "aware that the passive enforcement policy would result in prosecution of vocal objectors," defendant had not shown that the government "intended such a result." Id. There were no facts to suggest that the government "subject[ed] vocal

22

1    nonregistrants to any special burden." Id.  Rather, "those

2    prosecuted in effect selected themselves for prosecution by failing

3    to register after being reported[.]" Id.

4         Similarly, in Wilson, 639 F.2d at 501, defendants charged with

5    tax code violations claimed the government selectively prosecuted

6    them for their vocal protest of the income tax.  The defendants

7    presented "evidence suggesting that all 'tax protestors' [in the area

8    were] prosecuted and that the IRS ha[d] not prosecuted any

9    nonprotestors." Id. at 504.  The defendants also made a showing that

10   they were among just a small handful of tax protestors who had been

11   prosecuted in the Tucson area in the last several years and that

12   there were others whose tax forms warranted investigation, but whom

13   the government had not prosecuted.  Id.  Still, the Ninth Circuit

14   held defendants had not met their burden of proving that the

15   government prosecuted them because they exercised their

16   constitutional rights.  Id.  The Ninth Circuit reasoned that only a

17   very small number of potential tax cases could be prosecuted, given

18   that many thousands of returns could reveal "some basis for further

19   investigation" and investigators and United States Attorneys had

20   "limited resources." Id. at 504-505.  It was "not surprising that

21   the limited enforcement resources [would be] deployed to develop the

22   strongest cases for prosecution" or that "the strongest cases would

23   be those where protestors, through their various attention-getting

24   devices," succeeded in drawing enforcement attention to their willful

25   conduct.  Id. at 505.  Thus, it was "to be expected that a

26   disproportionate number of tax protestors [would] be prosecuted."

27   Id.  Because defendants could not show "that the tax laws [were]

28

                                    23

deployed against protestors in retaliation for the exercise of their rights," their motion failed.  Id.

Like in Wayte and Wilson, the genesis of the investigation here reflects that defendants effectively selected themselves for prosecution by publicly boasting about the group's deliberate incitement of violence at various protests, including multiple protests within this District.  As outlined in Section III.A, defendants have not pointed to any other similarly situated individuals whom the USAO could have charged under the ARA.  But even if they had, the statute is a complex one which holds the government to a high burden of proving defendants' subjective and specific intent.  18 U.S.C. § 2101; see United States v. Rundo, 990 F.3d 709, 719 (9th Cir. 2021).  It is not surprising that the USAO reserved charges under that statute for defendants who flagrantly publicized their intention to incite violence and their success in doing so. See Wilson, 639 F.2d at 504-505 ("the strongest cases would be those where protestors, through their various attention-getting devices," succeeded in drawing enforcement attention to their willful conduct); see also Wayte, 470 U.S. at 610.

To be sure, prosecutions under the ARA will have a disproportionate impact on those engaged in First Amendment activity, given that "rioting, in history and by nature, almost invariably occurs as an expression of political, social, or economic reactions, if not ideas." United States v. Rundo, 497 F. Supp. 3d 872, 880 (C.D. Cal. 2019).  And undoubtedly, the USAO would have been aware that charging a single ARA case against four members of RAM would mean that those sharing RAM's unified ideology would bear the exclusive impact of that prosecution.  But like in Wayte and Wilson,

1    the USAO's awareness of consequences is insufficient to demonstrate

2    that it prosecuted defendants in "retaliation" for their protected

3    speech, rather than because they engaged in repeated acts of

4    coordinated violence.  See Bourgeois, 964 F.2d at 941 (holding that

5    the defendant failed to establish colorable basis that government

6    acted with a racial motive in targeting a gang whose members were

7    often armed and violent).

8         Defendants not only lack evidence that the USAO purposefully

9    discriminated against them for their constitutionally protected

10   speech, but also ignore inconvenient evidence which undermines such

11   an inference.  Specifically, the discovery in this case reflects that

12   the USAO was aware of, but did not charge, numerous individuals who

13   shared defendants' political beliefs, despite those individuals'

14   participation in, and sometimes violent conduct at, one or more

15   protests.  (Ex. 6 at USA_00003018, 3021, 3023).  Like the "far left"

16   protestors whom defendants complain the USAO declined to prosecute,

17   some of those subjects who shared defendants' political beliefs were

18   arrested by local authorities for engaging in violent conduct at the

19   same protests defendants attended.  (Def't Ex. TT at 1, 3; Exs. 10-

20   12.)[8]  As in Wayte, the fact that the government elected not to

21   charge other individuals who engaged in the same protected speech for

22   which defendants claim to have been persecuted undercuts any

23   reasonable inference that defendants were prosecuted for their views,

24

25   _____

26   [8] The arrest reports for many of these individuals were provided
     to defendants along with those attached to their motion.  By cherry-
27   picking arrest reports only for "left-wing" protestors the USAO did
     not prosecute, defendants misleadingly convey that the USAO
     prosecuted every "right-wing" protestor who engaged in violence at
28   these events, while ignoring all those on the "left."  As defendants
     well know, the record supports no such inference.

rather than because, for example, the government had venue over their conduct, strong evidence of their intent to riot and incite violence, and a legitimate interest in targeting violent groups. See Wayte, 470 U.S. at 610; see also Turner, 104 F.3d at 1185 (gang membership was a permissible basis to target certain defendants, given that drug sales by gang members are "more heinous and more dangerous than the single sale of cocaine by individuals").

Moreover, defendants insist that the USAO fixated myopically on those it believed to be white supremacists, ignoring Antifa and other "left wing" groups that engaged in violent protests. However, the position taken by the Office of the Federal Public Defender in another case suggests the opposite: namely, that the USAO has consistently prosecuted individuals "associated with Black Lives Matter, Antifa, and the 'radical left'" where those individuals engaged in illegal conduct within this District that allowed for and warranted federal prosecution. United States v. Wilson, 2:20-CR-00516-FMO, ECF No. 130 at 12 (C.D. Cal. 2021) (claiming the USAO selectively prosecuted defendant and others[9] because of their perceived "far left" views).

Recognizing the inconsistency of that position, defendants insist that the Court should ignore the USAO's prosecution of "left-leaning [groups], or even Antifa members" because the riots which spurred those prosecutions "involve[d] only one identifiable group of

---

[9]In Wilson, the Office of the Federal Public Defender also cited to United States v. Alvarado, 20-CR-0331-RGK (C.D. Cal. 2020); United States v. Tillmon, 20-CR-00289-MWF (C.D. Cal. 2020); and United States v. Espriu, 20-CR-0171-PA (C.D. Cal. 2020), all prosecutions premised on purportedly "left-wing" protestors' illegal conduct during riots in the wake of the George Floyd protests, to support its claim that the USAO selectively prosecuted defendants based on their far left views.

people engaged in the riot." (Mot. at 28.) In other words, defendants ask the Court to find that the USAO should have charged members of Antifa specifically for <u>this</u> set of protests.[10] But the Ninth Circuit has repeatedly held that such a "narrow [] focus is untenable," as it would "severely limit law enforcement efforts directed at specific groups of criminals." <u>Bourgeois</u>, 964 F.2d at 940. In other words, unless a "district court properly focuse[s] its inquiry on prosecutions over a reasonable period of time," it could infer invidious discrimination any time an operation targets a gang or criminal group, as such prosecutions are "likely to result in the prosecution of several people of the same [protected status]." <u>Id.</u>; <u>see also</u> <u>Aguilar</u>, 883 F.2d at 707-08 ("[Defendants'] suggested focus exclusively upon agricultural employers seeks to distract attention away from the fact that the government generally <u>does</u> prosecute organized alien smugglers[.]").

   Here, the salient point is that the USAO has consistently used the federal statutes at its disposal to "protect the public [in this District] from violence or public disturbances" perpetrated by criminals across a range of viewpoints. <u>Rundo</u>, 497 F.Supp.3d at 880. Defendants cannot credibly maintain that the USAO retaliated against them for their particular speech when it has similarly prosecuted individuals with opposing views. <u>See</u> <u>Ruiz</u>, 665 Fed. App. at 610 (holding there was no "evidence supporting nor grounds for further discovery on defendants' conclusory claim of impermissible motive"

---

   [10] As explained in Section III.A., that insistence is particularly misplaced given that defendants have not identified similarly situated individuals for whom the USAO had viable charges.

based on his race where government pointed to three OID fraud cases involving defendants "with seemingly non-Hispanic surnames").

Defendants' position is further weakened by their inability to point to any pattern of prosecution or prosecutorial policy.  Lacking direct evidence of discrimination, defendants ask the court to infer discrimination from the fact that "100 percent of the ARA charges in this district are against alleged white supremacists."  (Mot. at 27.) But as defendant acknowledges, "[i]n the last 20 years, the United States Attorney's Office for the Central District of California has filed only one case alleging a violation of the ARA, 18 U.S.C. § 2101: this one."  (Id. at 21.)  Because a selective prosecution claim is a claim that the government has violated equal protection, a defendant must demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons with a mind so unequal and oppressive that the system of prosecution amounts to a 'practical denial' of equal protection of the law." Armstrong, 517 U.S. at 465-66 (quoting Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886)).  Accordingly, courts analyzing selective prosecution claims have required defendants to point to a "federal prosecutorial policy," or at least a pattern of enforcement, which is consistently directed at "a particular class of persons," such that it begs an inference of discrimination.  Id. at 457.  Here, defendant's sample size of one is simply insufficient to demonstrate that the USAO has engaged in any "system of prosecution," let alone a system directed "so exclusively" and "with a mind so unequal and oppressive" as to amount to a practical denial of equal protection of those sharing defendants' viewpoints.  Id. at 465-66; Turner, 104 F.3d at 1185 (study assessing the racial composition of 43 persons

charged federally with selling crack was "based on a statistically unimpressive number of federal defendants").

Defendants contend that a court may infer discriminatory purpose from statistics. (Mot. at 27.) Of course, as the Supreme Court has highlighted, "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." Bass, 536 U.S. at 863. Moreover, in two of the three cases defendants cite, courts rejected the proffered statistics as insufficient to raise an inference of invidious discrimination, noting that it is "exceedingly rare" for statistical evidence of discriminatory effect to "raise an inference of discriminatory intent." United States v. Thorpe, 471 F.3d 652, 661 (6th Cir. 2006) (declining to infer purposeful discrimination from statistics showing that a particular United States Attorney's office had brought firearm charges "almost exclusively against non-Caucasian defendants"); United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003) (rejecting statistics which relied on defendant's speculative assessment of whether persons fell within protected class, and thus suffered from "serious methodological difficulties"). Defendants cite to only one case in which a court inferred invidious discrimination from statistics, but that case is inapposite. In Yick Wo, 118 U.S. at 374, the Supreme Court inferred a discriminatory purpose from the San Francisco board of supervisor's decision to deny permits to all 200 laundromat operators of Chinese descent and to grant those same permits to all 80 non-Chinese operators. The court found there was no plausible reason for that statistic, "except hostility to the race and nationality to which the [defendants] belong[.]" Id. Defendants' sample size of a single prosecution within this district cannot raise

any such inference here.  Defendants' violent and coordinated

conduct, the evident nature of their intent, and the fact that they

lived and operated primarily in this District make plain the reason

for their prosecution over the unspecified persons defendants

complain were not charged.

Finally, unable to point to any pattern of prosecution by the

USAO (let alone a discriminatory one), defendants cite to

prosecutions nationwide.  But under Armstrong, a defendant's showing

"cannot generally be satisfied with nationwide statistics."  United

States v. Washington, 869 F.3d 193, 215 (3d Cir. 2017) (citing Bass,

536 U.S. at 863-64 (holding that defendant was required to make a

"showing regarding the record of the decisionmakers in [his] case"

and could not establish discriminatory motive with "nationwide

statistics demonstrating that the United States charges blacks with a

death-eligible offense more than twice as often as it charges

whites")).  Even if defendants could somehow use nationwide

statistics to impute a discriminatory motive to the office that

charged this case, those statistics do not help defendants here.  As

defendants' own evidence shows, the government has consistently

brought ARA charges against defendants across the spectrum of

political viewpoints.  (Mot. Ex. RR.)

In sum, despite having received hundreds of thousands of pages

of discovery and having providing hundreds of pages of documentation

in an attempt to support their motion, defendants have not pointed to

a single piece of evidence[11] suggesting that the prosecutors in this

---

[11] Defendants claim that the FBI employed "Orwellian" methods to investigate individuals who purchased ideological merchandise from Rundo's company, and thus used "innocuous expressions of belief" to

*(footnote cont'd on next page)*

30

case deliberately targeted defendants because they engaged in

constitutionally protected activity.  Thus, defendants' motion

"essentially asks the court to speculate about the motives of the

USAO prosecuting [them]."  United States v. Mathur, 2012 WL 3135548,

at *10 (D. Nev. June 8, 2012).  That speculation is simply

insufficient for the Court to set aside the presumption that the

prosecutors who charged this case "properly discharged their official

duties."  Armstrong, 517 U.S. at 463.  Defendants were not charged

for their speech, but for deliberately and repeatedly engaging in

violence in an attempt to silence their opponents.  The Court should

not allow them to weaponize the First Amendment to immunize their

illegal conduct.  See Wayte, 470 U.S. at 614 (rejecting a view that

would "allow any criminal to obtain immunity from prosecution" by

flouting the law and claiming to have done so as an act of free

speech); see also United States v. Lyles, 2009 WL 3400918, at *2 (9th

Cir. Oct. 16, 2009) ([W]hile Lyles had a "First Amendment right to

associate with the [Hells Angels]," he could not use that right to

"immunize him[self] from criminal prosecution.").

**IV.  CONCLUSION**

Defendants are entitled neither to discovery on selective

prosecution nor dismissal of the indictment because they have not

shown that the government declined to prosecute similarly situated

individuals and have not presented credible evidence of

---

"profile innocent people" based on their views.  (Mot. at 30.)  In
other words, defendants ask the Court to read invidious motive into
an agent's routine investigation into the contacts of a violent
extremist engaged in criminal conduct.  Putting aside the obvious
danger which would accompany such a finding and the fact that there
is no evidence that the agents here engaged in selective enforcement,
a selective prosecution claim analyzes prosecutorial decisions.  See
Greene, 698 F.2d at 1368.

31

discriminatory effect and discriminatory motive.  Defendants were not prosecuted for their political viewpoints or any protected First Amendment activity, but for their brazen and coordinated campaign to incite and engage in violence.  The Court should deny their motion in its entirety.