Name  AUSA Solomon Kim
Address  312 N. Spring St.
City, State, Zip  Los Angeles, CA 90012
Phone  (213) 894-2450
Fax  (213) 894-0141
E-Mail  solomon.kim@usdoj.gov
☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | CR 18-00759-CJC |
| v. | |
| ROBERT RUNDO AND ROBERT BOMAN | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____ United States of America _____ hereby appeals to
                                          *Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:


**Criminal Matter**                    ~~**Civil Matter**~~

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]        ☒ Order (specify):
☐ Conviction and Sentence                           Order Regarding Motions to Dismiss; CR No. 333;
☐ Sentence Only (18 U.S.C. 3742)                    Filed on 2-21-24
☐ Pursuant to F.R.Cr.P. 32(j)(2)                 ☐ Judgment (specify):
☐ Interlocutory Appeals
☐ Sentence imposed:

                                                 ☐ Other (specify):

☐ Bail status:



Imposed or Filed on _____ 2-21-24 _____. Entered on the docket in this action on 2-21-24 _____.

A copy of said judgment or order is attached hereto.


_2-21-2024_____        s/ Solomon Kim_____
Date                             Signature
                                 ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the
          attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number
          of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

# JS-3

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

ROBERT RUNDO AND ROBERT BOMAN,

      Defendants.

Case No.: CR 18-00759-CJC-1-2

**ORDER REGARDING MOTIONS TO DISMISS [Dkts. 281, 286]**

## I. INTRODUCTION

Freedom of speech and the right to assemble are bedrocks of our Nation. The First Amendment guarantees those freedoms and ensures that the people of the United States may always advocate for what they believe is right. Our Founders recognized that true liberty and justice cannot be achieved without free speech and assembly.

Protecting First Amendment rights, however, is not always easy.  People sometimes use their First Amendment rights to spread vitriolic and hateful ideas and beliefs.  The struggle of preserving the First Amendment in the face of speech many find outright dangerous is pronounced during times of uncertainty, division, polarization, and fear—challenges we unfortunately face today.  But the answer cannot be for the government to single out and punish the speech that it and many in the country understandably find repugnant.  As Justice Brandeis recognized nearly 100 years ago, "[i]f there be time to expose through discussion, the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."  *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), *overruled by Brandenburg v. Ohio*, 395 U.S. 444 (1969).

This case puts our Nation's fidelity to that principle to the test.  In it, the government uses the Anti-Riot Act, a once-rarely-used criminal statute, to prosecute members of the Rise Above Movement ("RAM"), a group of far-right, white supremacist nationalists, who attended several rallies and protests during which they engaged in violent acts.  At the same time, the government chose not to prosecute far-left extremist groups, such as Antifa, that went to the same protests and rallies and engaged in the same violent acts as alleged against the Defendants in this case, Robert Rundo and Robert Boman.  By many accounts, members of Antifa and related far-left groups engaged in worse conduct and in fact instigated much of the violence that broke out at these otherwise constitutionally protected rallies to silence the protected speech of the supporters of President Trump.  That is constitutionally impermissible.  The government cannot prosecute RAM members such as Defendants while ignoring the violence of members of Antifa and related far-left groups because RAM engaged in what the government and many believe is more offensive speech.

While Defendants openly promoted ideas the Court finds reprehensible, and likely committed violence for which they deserve to be prosecuted, this case is about something more important.  It is about upholding the free speech and assembly rights guaranteed to all of us.  It does not matter who you are or what you say.  It does not matter whether you are a supporter of All Lives Matter or a supporter of Black Lives Matter.  It does not matter whether you are a Zionist professor or part of Students for Justice in Palestine.  It does not matter whether you are a member of RAM or Antifa. All are the same under the Constitution, and all receive its protections.  It is those protections that will ensure our democracy endures.  We must never abandon any of them.

Now before the Court are two motions to dismiss.  In their first motion, Defendants argue the First Superseding Indictment must be dismissed because the Anti-Riot Act is unconstitutionally vague.  Constitutional due process requires that criminal statutes give people fair notice of prohibited conduct and provide sufficient standards to limit arbitrary enforcement by the government.  But Defendants' challenge to the Anti-Riot Act on vagueness grounds is barred because their conduct is clearly covered by the Anti-Riot Act.  Though there may be questions in another case as to what constitutes a violation of the Anti-Riot Act, this is not that case.  Defendants clearly used a facility of interstate commerce shortly before they engaged in riotous activity as proscribed by the Anti-Riot Act.

In their second motion, Defendants argue the First Superseding Indictment also must be dismissed because the government selectively prosecuted them for their far-right, white supremacist speech and beliefs.  The equal protection component of the Due Process Clause of the Fifth Amendment does not allow the government to prosecute certain individuals over similarly situated people on unjustifiable bases such as race, religion, or the exercise of constitutionally protected rights.  Rightly, out of respect for

the separation of powers, the bar is high for a court to exercise judicial power over charging decisions, a special province of the executive branch.  To meet that bar criminal defendants must submit clear evidence that their prosecution violates equal protection.  Defendants have done so here.

The government prosecutes Defendants because they committed violence at political rallies with the alleged intent of shutting down speech with which they disagreed.  While the allegations against Defendants may well be true, Defendants offer considerable evidence that members of Antifa and related far-left groups did the same, if not worse, at those same political rallies.  Members of Antifa and related far-left groups attended the political rallies and physically assaulted and injured innocent civilians, many of whom were supporters of President Trump and were peacefully exercising their First Amendment rights.  Nonetheless, the government did not use the Anti-Riot Act to prosecute *any* members of Antifa or related far-left groups.  Such selective prosecution leaves the troubling impression that the government believes speech on the left more deserving of protection than speech on the right.  The government remains free to prosecute those, like Defendants, who allegedly use violence to suppress First Amendment rights.  But it cannot ignore others, equally culpable, because Defendants' speech and beliefs are more offensive.  The Constitution forbids such selective prosecution.

## II.   BACKGROUND

### A.   *Factual Background*

The lead up to and aftermath of the 2016 United States presidential election were marked by growing division between the left and right.[1]  As our country grew

---

[1] Unless otherwise indicated, the Court references Dkt. 281-3 Exhibit S for background information.

increasingly polarized, extremists on both sides emerged and grew in prominence. Factions of both the far left and far right entered the mainstream. These two groups frequently opposed each other in public demonstrations, rallies, and protests. Sadly, despite political speech being a lynchpin of our Nation, these events often ended in violence. At times, far-right groups were responsible for causing or escalating violence, but at others, far-left groups were equally or more responsible.

Antifa is a "loose affiliation of mostly far-left activists." (Dkt. 281 at 4.) A manual with instructions on how to form an Antifa group lays out the obligations of anyone in a local Antifa group. (Dkt. 281-5 Ex. U.) These directives include "[t]racking white nationalist, Far Right, and fascist activity," "[o]pposing public Far Right organizing," and "[b]uilding a culture of non-cooperation with law enforcement" because "[t]he cops will be Trump supporters." (*Id.* at 3–4.) But the directives are not limited to political organizing—they also "recommend regular martial arts training for anti-fascists, as well as for the larger radical community" and "to practice with, and carry, everything that is legal, whether that is pepper spray, retractable clubs, or other devices." (*Id.* at 7–8.) By way of example, in February 2016 at a Ku Klux Klan rally in Anaheim, "[s]everal dozen Antifa extremists initiated an altercation with the Klansmen that led to multiple injuries and three stabbings." (Dkt. 281-4 Ex. T at 1.)



(Dkt. 281-3 Ex. S at 184 [an individual armed and dressed as a member of Antifa].)

Another far-left group, By Any Means Necessary ("BAMN"), engages in similar tactics.  In opposing a planned June 2016 neo-Nazi rally in Sacramento, California, which it linked to the rise of "Trumpism," BAMN instructed its members that "[t]hese racist, would-be murderers have no right to organize their racist violence in California or anywhere.  Their rally must be stopped by any means necessary. . . . Only an organized, mass militant, integrated youth-led movement that is politically independent can mobilize the social forces necessary to defeat the Nazis/KKK, stop the rise of 'Trumpism,' and finally put this nation on the road to progress once more." (Dkt. 281-6 Ex. V at 2.)  At that rally, violence broke out "almost immediately," and seven people were stabbed. (Dkt. 281-3 Ex. S at 2.)  When asked by a reporter about what transpired, a leading BAMN member bragged, "They were not able to hold any kind of demonstration on the west steps or any steps of the Capitol.  And that was absolutely because of the militant, integrated, direct action of the people who came out.  BAMN mobilized to get people out here to shut them down. . . . To us, there's no free speech for fascists." (Dkt. 281-7 Ex. W at 1.)  When asked if BAMN members "may have traveled from all over the state," the member confirmed, "Absolutely.  This was a very widespread mobilization.  People came from all over California.  In fact, some places outside of California. . . . [T]hat's what building a mass militant movement takes." (*Id.* at 2.)  Finally, responding to the reporter's observation that lives were threatened, the member doubled down, explaining the neo-Nazis "are dangerous and we need to keep building this movement. . . . This is about building a militant integrated movement that's independent, organizes masses of people and takes militant direct action to stop it." (*Id.* at 3–4.)

These acts of violence continued throughout 2016 and onwards.  And they were not solely directed at Klansmen and neo-Nazis (which the far-left activists frequently linked to Trump supporters).  Violence erupted at election and other political events,

where it was directed at Trump supporters and other conservatives to purposefully shut down speech-oriented events.  In February 2017, BAMN encouraged its members to shut down an event at UC Berkeley hosting Milo Yiannopoulos, a controversial right-wing political commentator.  Shortly before the event was set to begin, "100 to 150 agitators had smashed a half a dozen windows with barricades, launched fireworks at police and toppled a diesel-powered klieg light, which caused it to burst into flames."  (Dkt. 281-3 Ex. S at 50.)  They "marched onto UC Berkeley's Sproul Plaza like a paramilitary force armed with bats, steel rods, fireworks, and Molotov cocktails," where they proceeded to "tackl[e] and assault[] Yiannopoulos supporters."  (*Id.* at 49, 59.)  The result: UC Berkeley canceled the speech and removed Yiannopoulos from the campus out of concern for public safety.  (*Id.* at 63.)  A BAMN flier later reviewed by the FBI proudly proclaimed, "Victory! Neo-Fascist Milo Yiannaopoulos *Shut Down*" and "invite[d] all who support building the mass, militant movement that can defeat Donald Trump and win full equality to join BAMN."  (Dkt. 281-9 Ex. Y.)

   This pattern of far-left violence directed at Trump supporters and others associated with the right continued to the three events that form the basis for the charges against Defendants.

   Beginning in or around February 2017, Defendants, along with others, participated in a white nationalist organization that came to be known as the "Rise Above Movement" or "RAM."[2]  (Dkt. 209 at 1.)  Defendants presented RAM through various social-media platforms and other means "as a combat-ready, militant group of a new nationalist white supremacy and identity movement."  (*Id.*)  They used the internet to show themselves

---

[2] The Court accepts the government's factual allegations as true unless otherwise indicated.  *See United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014) ("accept[ing] the truth of the allegations in the indictment" in reviewing an order on a motion to dismiss).

training in hand-to-hand combat, interspersed with pictures and clips of themselves assaulting members of Antifa and related far-left groups at political events.  (*Id.* at 2.)

Beginning around March 2017, Defendants agreed to riot at political rallies and organized demonstrations, where they would assault individuals they believed were associated with Antifa and related far-left groups.  (*Id.* at 3–4.)  Defendants carried out this plan at a minimum of three events:  March 25, 2017, in Huntington Beach, California; April 15, 2017, in Berkeley, California; and June 10, 2017, in San Bernardino, California.[3]  (*Id.* at 4–10.)

For instance, the indictment alleges that "[o]n or about April 15, 2017, defendant RUNDO exchanged messages on a social media platform with the leader of another organization to coordinate [RAM's] activities at the Berkeley Rally."  (*Id.* at 7.)  On the same day, Defendants "committed, participated in, and aided and abetted one or more acts of violence against individuals at the Berkeley Rally[.]"  (*Id.*)  And notably, the alleged uses of interstate commerce were not limited to speech:  "On or about April 14, 2017, defendants RUNDO and BOMAN used and caused to be used a Visa credit card belonging to an associate to reserve hotel rooms for themselves at a Courtyard by Marriott hotel in Richmond, California, to facilitate their attendance at the Berkeley Rally."  (*Id.*)

After engaging in rioting, RAM bragged about their violence and touted themselves as victors in a bevvy of social media posts.  (*See, e.g., id.* at 8 ["Total Aryan victory."].)  Defendant Rundo used these perceived successes to recruit trainees to commit violence.  (*See, e.g., id.* ["On or about April 19, 2017, defendant RUNDO sent a text message to another RAM member to thank him for attending the Berkeley Rally, and

---

[3] The First Superseding Indictment does not appear to allege that Defendant Boman attended the San Bernardino event.  (Dkt. 209 at 9–10.)

then invited him to combat training and offered to buy lunch for all who attend."].)
RAM's combat training continued after the events described above, and RAM and
Defendant Rundo planned future actions.  (*Id.* at 11–12.)

But members of RAM were not the only ones using violence to silence their
opposition.  Antifa and related far-left groups did it too.

On March 25, 2017, supporters of President Trump came together for a "Make
America Great Again" rally to march through Huntington Beach.  An organizer of the
march explained that it was a "means to support local police, fire, and fire responder
agencies."  (Dkt. 281-2 Ex. D. at 11.)



(Dkt. 104-6 Ex. 9 [an image of Trump supporters at the Huntington Beach rally,
including an alleged RAM member (center, wearing red MAGA cap) charged in this case
who has since passed away].)

Prior to the event, law enforcement officers were "warned that protesters may try
to stop the event and may use violence or riotous techniques to stop the event."  (Dkt.
281-2 Ex. C at 3.)  Ultimately, there were nearly 30 protestors who "appeared to want to
agitate and annoy the participants of the march."  (Dkt. 281 at 9–10.)  In the words of a

police officer at the event, "a riotous situation erupted." (Dkt. 281-2 Ex. E at 3.) Fights broke out and a video captured the violence that members of Antifa and related far-left groups inflicted upon the Trump supporters. (*Id.* at 10.) A black-clad protestor, J.A., pepper sprayed a 48-year-old Trump supporter, the march organizer, who was trying to break up a fight, and then when another 56-year-old tried to grab J.A., she pepper sprayed him, too. (*Id.*)



(Dkt. 104-7 Ex. 9A [an image of a pepper spray victim at Huntington Beach]; *see also* Dkt. 281-2 Ex. D [an image of the same victim shortly after being sprayed].)

J.A. was not at the rally alone. She was joined by, at least, J.M.A. and J.F., who had coordinated to attend the event together. (Dkt. 281 at 10–11.) As skirmishes broke out, they continued to pepper spray Trump supporters, in addition to kicking and punching those around them. (*Id.*) One law enforcement officer observing J.M.A. and his compatriots "began to become seriously concerned for members of the public in and around the incident." (Dkt. 281-2 Ex. E at 5.) When J.M.A. was eventually detained, law enforcement officers searched him and found a black colored pepper spray canister, a black folding knife, a grey mask, and black goggles. (*Id.* at 6.)



(*Id.* at 4 [an image of the seized Antifa paraphernalia].)

J.A., J.M.A., and J.F. were all arrested for inciting a riot, battery, and illegally using tear gas.  (Dkt. 281 at 10–11.)  But none were charged federally for violating the Anti-Riot Act.  (*Id.*)  Only Defendants and other members of RAM were charged with violating it.

A few weeks after the Huntington Beach rally, supporters of President Trump planned a pro-Trump rally on April 15, 2017 in Berkeley styled as a "free speech" rally. The event was related to a previous "March 4 Trump" rally also in Berkeley, which had ended in violence and arrests.  Antifa and related far-left groups decided they needed to "shut this down."  (*Id.* at 13.)  Organizers on the left "urge[d] all in Northern California and beyond to converge in Berkeley on Saturday April 15th and deny the far-Right an opportunity to grow and expand their movement that is killing, burning, and bombing its way across the U.S."  (Dkt. 281-13 Ex. CC at 2.)  Members of far-left groups like Antifa and BAMN heeded the call.



(Dkt. 104-4 Ex. 7 at 2 [an Antifa member pouring water on a disabled veteran at the Berkeley rally].)

They came prepared for violence, bringing weapons including pepper spray, fireworks, knives, and homemade bombs.  (Dkt. 281 at 14–15.)  And they used those weapons, as well as their bodies, against Trump supporters and law enforcement.  (*Id.* at 14–16.)  One man punched a Trump supporter, threw him onto a park bench to continue the beating, and was in the process of striking him until law enforcement intervened.  (*Id.* at 16 [collecting evidence].)  Another threw eggs across fences to where Trump supporters had congregated.  (*Id.*)  A young woman used pepper spray and hit Trump supporters, explaining that she felt "like fighting a white bitch today."  (*Id.*)  Police detained one Antifa member who had an improvised explosive device and was planning "to do what it took because the police weren't 'doing shit.'"  (*Id.*)  "[H]e wasn't inciting the riot, he was going to end the riot."  (*Id.*)



(Dkt. 104-3 Ex. 5 [an Antifa member striking a Trump supporter with a skateboard at the Berkeley rally].)

Of the 20 people arrested at the April 2017 Berkeley rally, the government charged only Defendants and other members of RAM under the Anti-Riot Act.  (Dkt. 281 at 17.) The government charged no members of Antifa, BAMN, or other far-left groups under the Anti-Riot Act for their use of violence to shut down the rally.



(Dkt. 104-11 Ex. 13F [a man injured by Antifa at the Berkeley rally].)

Nearly three months later, on June 10, 2017, demonstrators held protests across the country against Islamic law, including in San Bernardino, California.  Organizers on the left in the San Bernardino area put out the call to "SHUT the anti-muslim march DOWN."  (Dkt. 281-17 Ex. GG.)  They linked the protest to President Trump and his supporters.  (*Id.*)



(*Id.* [an image of the website organizing a response to the San Bernardino demonstration].)

Members of RAM and left-wing counter-protestors attended the event, which led to violence and acts of vandalism.  (Dkt. 281 at 17–18.)  Three people were arrested for vandalism.  The government did not charge any members of Antifa or related far-left groups under the Anti-Riot Act.  Once again, the government charged only Defendants and other members of RAM with violating the Anti-Riot Act.

**B.**     *Statutory and Procedural Background*

The Anti-Riot Act, passed in 1968, is a once-rarely-used statute with a checkered history.  The 1960s, the backdrop for the Anti-Riot Act, were defined by the Civil Rights Movement, the Vietnam War and antiwar protests, and political assassinations.  Much like today, tensions were high, and society was faced with the difficult task of balancing legitimate political speech with the significant and real risk of violence.

Congress, perhaps because of differing views as to the cause of the social unrest, struggled to pass anti-riot legislation. *See* Marvin Zalman, *The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory*, 20 Vill. L. Rev. 897, 911 (1975). Despite earlier attempts, Congress did not adopt federal anti-riot legislation until 1968, when Senators Frank Lausche and Strom Thurmond offered their proposal, which Congress passed as part of the Civil Rights Act of 1968.  *Id.* at 912.

In short, the Anti-Riot Act was "focus[ed] on establishing a federal mechanism to target the speech and conduct of so-called 'outside agitators,' specifically, Black political leaders and Communists, who were supposedly able to evade existing state anti-riot statutes." *First Amendment—Federal Anti-Riot Act—Fourth Circuit Finds the Anti-Riot Act Partially Unconstitutional.*—United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020)*, 134 Harv. L. Rev. 2614, 2617 (2021); *see also* Zalman, *supra*, at 916 ("[T]he legislative history of the Anti-Riot Act manifests an intent on the part of a legislative faction to destroy what was believed to be a close-knit group of outside agitators fomenting disorder.  Although some legislators believed that certain individuals and groups were communist inspired traitors, they could not muster the strength to directly repress their conduct by branding them as traitors. . . . The only method to legally repress these groups was indirectly through the use of the American counterpart of constructive treason—

criminalize their behavior behind the screen of a measure overtly attempting to deal with the problem of massive urban rioting.").

While by no means exhaustive, representative examples of legislators' views on the target of federal anti-riot legislation make clear that they intended to use the eventual Anti-Riot Act as a weapon against political dissidents, with a focus on Black leaders. Representative Albert W. Watson, a Republican from South Carolina, stated in his support of anti-riot legislation, "[c]ertainly we are aware of who we are dealing with. The opening pronouncements of anarchy by so-called black power advocates clearly indicate that they are dedicated to the overthrow of law and order in this country." *Congress & Federal Anti-Riot Proposals, Pro-Con*, 47 Cong. Dig. 99, 118 (1968) (hereinafter *Anti-Riot Pro-Con*). Or in the words of Representative William G. Bray, a Republican from Indiana, "[h]aranguing his audience with the cry of 'police brutality,' the wandering agitator is deliberately inciting and invoking the infinitely more hideous brutality of the riot, with its attendant horrors of arson, looting, death, and destruction. . . . It is time to bring the full weight of the law to bear on those who would destroy us from within as surely as foreign enemies would destroy us from without." *Id.* at 110. In explaining his support for a federal anti-riot act, Representative Henry C. Schadeberg, a Republican from Wisconsin, stated, "[c]ommunists and other subversives and extremists strive and labor ceaselessly to precipitate racial trouble and to take advantage of racial discord in this country." *Id.* at 120. Representative Fletcher Thompson, a Republican from Georgia, argued that federal anti-riot legislation, rather than funding for education or welfare, was necessary, noting "[s]ome of the worst riot-inciters in the country are relatively well-educated individuals. For example, arrested included an assistant school principal, a public school teacher, a board of education custodial engineer, a Navy management analyst, and a welfare department clerk. The charges against these Negroes ranged from plotting murders to advocating anarchy. None of them was educationally deprived or poverty stricken." *Id.* at 126.

In general, the legislative history, clearly motivated by racial bias, is rife with words like "harangue," "spew," "promote," "preach," and "rant"— rather than focusing on the violence of riots, many legislators were focused on speech. *See generally id.* It thus appears that the Anti-Riot Act is "a law designed not to quell riots, against which there were adequate state laws, but to discourage legitimate political dissent." Zalman, *supra*, at 910.

One year after Congress passed the Anti-Riot Act, the United States Supreme Court decided the landmark First Amendment decision, *Brandenburg v. Ohio*, 395 U.S. 444 (1969). In *Brandenburg*, a Klu Klux Klan leader was convicted under the Ohio criminal syndicalism law for his participation in a Klu Klux Klan rally. *Id.* at 444–45. The Supreme Court considered a film of the rally, in which the leader stated:

> This is an organizers' meeting. We have had quite a few members here today which are—we have hundreds, hundreds of members throughout the State of Ohio. I can quote from a newspaper clipping from the Columbus, Ohio Dispatch, five weeks ago Sunday morning. The Klan has more members in the State of Ohio than does any other organization. We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.

> We are marching on Congress July the Fourth, four hundred thousand strong. From there we are dividing into two groups, one group to march on St. Augustine, Florida, the other group to march into Mississippi. Thank you.

*Id.* at 446. In addition to the speech, the film also showed various guns and ammunition. *Id.* at 445. Despite the speaker's hateful and inflammatory rhetoric coupled with the presence of weapons, the Supreme Court declared Ohio's criminal syndicalism law violated the First Amendment. *Id.* at 449. *Brandenburg* established "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy

is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action." *Id.* at 447 (emphasis added).

It is not difficult to see that *Brandenburg* was inconsistent with a law "aimed at those professional agitators and their organizations who either operate from States outside the jurisdiction of local law enforcement officials or who come into a jurisdiction, inflame the people therein to violence, and then leave the jurisdiction before the riot begins or, remain in the jurisdiction but away from the riot area as well as those who participate." *Anti-Riot Pro-Con* at 112.  Therefore, it is unsurprising that the Anti-Riot Act, though rarely used, has been repeatedly challenged on First Amendment and other constitutional grounds.

One of the earliest challenges involved three related cases stemming from the prosecution of the group that has come to be known as the "Chicago Seven"—a group of anti-Vietnam war protesters and proponents of the 1960s counterculture. *See Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934 (7th Cir. 1969); *United States v. Hoffman*, 334 F. Supp. 504 (D.D.C. 1971); *United States v. Dellinger*, 472 F.2d 340, 348 (7th Cir. 1972) (describing case against the Chicago Seven).  In *Dellinger*, after conducting the most thorough analysis of the Anti-Riot Act, the Seventh Circuit overturned the defendants' convictions but split two to one to uphold the constitutionality of the Anti-Riot Act.  472 F.2d at 364, 409.  The Seventh Circuit construed the act narrowly to survive scrutiny under *Brandenburg* but "acknowledge[d] the case is close," recognizing "the first amendment problems presented on the face of this statute." *Id.* at 362.

Since *Dellinger* and until recently, the Anti-Riot Act was rarely used.  (Dkt. 281 at 21); Petition for Writ of Certiorari, *Miselis v. United States* (hereinafter "Miselis Petition"), 2021 WL 916349 (U.S.), at *13 ("Prior to the prosecution of the petitioner,

only one prosecution under the law had ever produced a conviction not overturned on appeal.  Instead, the more typical use of the law has been to obtain search warrants or compel grand jury testimony where no charges ever resulted.  The number of times this broad law has been used in these ways is knowable only to the government.").  But that changed when the government decided to charge members of RAM.

In the fall of 2018, the government charged two groups of RAM members under the Anti-Riot Act.  The government charged one group for interstate travel with the intent to riot related to their attendance at the Unite the Right Rally in Charlottesville, Virginia. The government charged Defendants in this case, who did not attend the Unite the Right Rally, for using facilities of interstate commerce with the intent to riot at the political rallies in Huntington Beach, Berkeley, and San Bernardino.  (*See* Dkt. 1 [Complaint]); Miselis Petition, 2021 WL 916349, at *13.  Both groups challenged the constitutionality of the Anti-Riot Act.[4]

In this case, the Court found that the Anti-Riot Act criminalized a substantial amount of protected speech and assembly and was thus facially overbroad in violation of the First Amendment.  (*See* Dkt. 145); *United States v. Rundo*, 497 F. Supp. 3d 872 (C.D. Cal. 2019), *rev'd and remanded*, 990 F.3d 709 (9th Cir. 2021).  On appeal, the Ninth Circuit agreed that the Anti-Riot Act "ha[s] some constitutional defects" but determined the "remainder of the Act may be salvaged by severance."  *United States v. Rundo*, 990 F.3d 709, 714, 720 (9th Cir. 2021).  The Ninth Circuit reversed this Court's dismissal of the indictment and remanded.

So severed, the Anti-Riot Act now criminalizes:

---

[4] The Fourth Circuit ultimately held portions of the Anti-Riot Act were overbroad but concluded it was constitutional after severance.  *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020).

> Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent–
>
> > (1) to incite a riot; or
> > (2) to participate in, or carry on a riot; or
> > (3) to commit any act of violence in furtherance of a riot; or
> > (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph [1], [2], [3], or [4].

*Rundo*, 990 F.3d at 720–21.  In short, the Anti-Riot Act now criminalizes interstate travel or the use of any facility of interstate commerce (the "Commerce Act") with the intent to commit one of the four listed overt acts (the "Riotous Acts") whenever somebody either during *or after* the Commerce Act performs or attempts to perform one of the Riotous Acts (which themselves all require specific intent related to a riot).  The Riotous Acts consist of either conduct or "closely connect[] speech and action" such that "*Brandenburg*'s imminence requirement is not violated."  *Id.* at 716.

## III.   MOTION TO DISMISS FOR VAGUENESS AND FAILURE TO STATE AN OFFENSE

Defendants move to dismiss the First Superseding Indictment on the grounds that the Anti-Riot Act is both facially and as applied impermissibly vague in violation of the Due Process Clause, and in the alternative, the First Superseding Indictment fails to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v).  The Court addresses each argument in turn.

**A.    *Vagueness***

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 595 (2015) (quoting *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926)).  Indeed, "a stricter vagueness test applies where criminal penalties are involved."  *United States v. Doremus*, 888 F.2d 630, 635 (9th Cir. 1989).

A statute is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.  "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Supreme Court] ha[s] recognized . . . that the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.  Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983).  Notably, the Supreme Court has explicitly rejected the proposition that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602; *see Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) ("Specifically, the Court rejected the legal standard that a statute is void for vagueness only if it is vague in all its applications.") (internal quotation marks and citation omitted).

"Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.   If, for example, the law interferes with the right of free

speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  This is because "the freedoms to speak and assemble which are enshrined in the First Amendment are of the utmost importance in maintaining a truly free society." *Rundo*, 990 F.3d at 721.

Defendants argue the Anti-Riot Act is unconstitutionally vague on its face because the definition of "riot" requires guessing at the abilities and intentions of other people, "participate" or "carry on" do not inform individuals of what is prohibited, and the statute fails to establish within what time frame after a Commerce Act a person must commit a Riotous Act to be convicted.  (Dkt. 286 at 7–11.)  Under binding precedent, Defendants' arguments fail.

First, Defendants' vagueness challenges are barred because "even to the extent a heightened vagueness standard applies, a [defendant] whose speech [or conduct] is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010).  The Ninth Circuit continues to recognize this longstanding rule outside of narrow exceptions not applicable here.  *See Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019) ("In sum, we are not persuaded by plaintiffs' contention that we may cast aside the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge."); *see also United States v. Espinoza-Melgar*, 2023 WL 5279654, at *14 (D. Utah Aug. 16, 2023) (summarizing state of the law across circuits).

There is no real dispute that Defendants' alleged conduct falls clearly within the scope of the Anti-Riot Act.  The First Superseding Indictment charges Defendants with committing actual acts of violence at multiple rallies.  It further charges that they attended those rallies with the advertised goal of committing violence—that is they

intended exactly what ultimately happened.  And it charges that they used facilities of interstate commerce in the days leading up to the rallies with that same clear intent to commit violence in furtherance of riots.  It is hard to imagine any conduct that would be a clearer violation of the Anti-Riot Act.

Second, even if the Court overlooked Defendants' bar from challenging the statute on vagueness grounds, Defendants' most compelling vagueness argument conflates Due Process vagueness with First Amendment overbreadth.  The Anti-Riot Act criminalizes the commission of a Commerce Act with the intent to commit a Riotous Act, when the Riotous Act is performed either "during" the Commerce Act or "thereafter."  "Thereafter" means "[a]fterward; later." *Black's Law Dictionary* 1517 (8th ed. 2004).  On its face, the relative timing of the Commerce Act and the Riotous Act is quite clear—the Riotous Act just needs to happen either during *or* after the Commerce Act.

Defendants, notwithstanding the clear meaning of "thereafter," argue that "thereafter" cannot mean *any time* after a Commerce Act because that would violate *Brandenburg*.  (*See* Dkt. 286 at 13 [arguing that if "'thereafter' literally means *anytime* after someone uses the phone or the internet to share their thoughts or intentions to do something that could be riotous at a distant time in the future," then that "is the exact type of speech the Ninth Circuit said was protected under *Brandenburg*"]; *see also* Dkt. 324 at 4 [arguing that the "interpretation of 'thereafter' is by no means obvious" because of *Brandenburg*'s imminence requirement].)  But in *Holder*, the Supreme Court held that the Ninth Circuit erred when it "merged [a] vagueness challenge with . . . First Amendment claims, holding portions of the . . . statute were unconstitutionally vague because they applied to protected speech—regardless of whether those applications were clear."  561 U.S. at 19.  That is what Defendants urge the Court to do here.  The meaning of "thereafter" is clear, but Defendants believe that it runs afoul of the First Amendment. *Holder* teaches that "[s]uch a [person] may have a valid overbreadth claim under the First

Amendment, but [the Supreme Court's] precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression." *Id.* at 20.

Third, even if the Court were to treat Defendants' challenge as a facial First Amendment overbreadth challenge to sidestep *Holder*, it is bound by the Ninth Circuit's ruling in this case. The Ninth Circuit expressly considered Defendants' argument "*that the travel in or use of any facility of interstate or foreign commerce* and 'any other overt act for any purpose specified in subparagraph [(1), (2), (3), or (4)] of [subsection (a)]' are *too far removed in time from any riot* to satisfy *Brandeburg*'s imminence requirement." *Rundo*, 990 F.3d at 715 (emphases added). The Ninth Circuit rejected that argument and stated that, after severance, "the Act is not facially overbroad." *Id.* at 715–16, 721. While the Ninth Circuit's analysis focused on the timing of the Riotous Act relative to violent conduct, it also necessarily rejected the argument that *Brandenburg* applies to the Commerce Act such that the Commerce Act (to the extent it consists of speech at all) must immediately precede or accompany violent conduct.

That is not to say, though, that there is no necessary relationship between the intent at the time of the Commerce Act and the intent at the time of the Riotous Act.[5] In *Dellinger*, the Seventh Circuit held that the Anti-Riot Act "[r]easonably construed . . . surely does not require that the situation, nature, and details of the riot contemplated at the time of travel remain exactly identical until the time of the overt act, but does . . . require that they be sufficiently similar so that it is reasonable to say the later is the same

---

[5] *But see Dellinger*, 472 F.2d at 414 (Pell, J., concurring in part) ("There is no required causal relationship between the travel with intent and the riot actually incited. No necessary connection whatsoever need be shown between them nor is there any time limitation as to when the overt act shall take place with relationship to the travel. I cannot conceive the constitutional validity of a statute which in this open-ended manner punishes a person at the federal level for what would otherwise be a local crime only because at some time in his past he had crossed a state line or had used a facility of interstate commerce with a nefarious intent.").

as or the evolving product of the one intended earlier.  This substantial identity is essential to avoid having this statute impinge on the right to travel, and to tie the interstate travel, which is the basis of federal legislative jurisdiction, to some socially harmful consequence."  472 F.2d at 394–95; *United States v. Markiewicz*, 978 F.2d 786, 813 (2d Cir. 1992) (holding the same).  Though not expressly articulated by the Ninth Circuit, the government concedes that such a reading of the Anti-Riot Act is necessary. (Dkt. 306 at 14.)  The Court is unaware of the textual basis for such an interpretation, yet cannot help but conclude, particularly given the Ninth Circuit's adoption of *Dellinger*'s reasoning, that the Ninth Circuit would agree that the intended riot at the time of the Commerce Act must be sufficiently similar so that it is reasonable to say the actual riot is the same as or the evolving product of the one intended earlier.  *See United States v. Daley*, 378 F. Supp. 3d 539, 551 (W.D. Va. 2019), *aff'd sub nom. United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), *and aff'd sub nom. United States v. Gillen*, 2022 WL 4395695 (4th Cir. Sept. 23, 2022) ("Other courts have interpreted the statute as requiring a substantially similar intent both at the point of interstate travel or the use of facilities thereof and at the time of the requisite overt act(s), and the Court finds these longstanding interpretations of § 2101 persuasive.").  With such an understanding, Defendants' conduct is clearly proscribed by the Anti-Riot Act.

At the end of the day, the parties are well aware that the Court has significant concerns about the constitutionality of the Anti-Riot Act.  *See Rundo*, 497 F. Supp. 3d at 874–75.  But Defendants' vagueness challenges are squarely foreclosed by United States Supreme Court precedent.  *See Holder*, 561 U.S. at 19–20.  And to the extent Defendants in effect re-raise a First Amendment overbreadth challenge, the Ninth Circuit has already addressed that issue.  "[D]istrict courts are not free to decide issues on remand that were previously decided either expressly or by necessary implication on appeal."  *Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir. 1988).  The Ninth Circuit squarely held

that the Anti-Riot Act, as severed, "is not unconstitutional on its face." *Rundo*, 990 F.3d at 72.

### B. *Failure to State an Offense*

Defendants argue that because, in their mind, the most straightforward reading of the Ninth Circuit's interpretation of the Anti-Riot Act is unconstitutionally vague, the only alternative is a strained reading of the Anti-Riot Act, which would require the Commerce Act occur at essentially the same time as the Riotous Act.  (Dkt. 286 at 18–23.)  In other words, Defendants argue the Ninth Circuit held that the Commerce Act itself must also be a Riotous Act.  And under that reading, the First Superseding Indictment fails to allege Defendants committed sufficient Commerce Acts.

The Ninth Circuit defined "overt act" as a Riotous Act, one of the specific acts listed in the Anti-Riot Act, rather than "a step toward" those acts.  *Rundo*, 990 F.3d at 716.  Defendants argue that Congress's use of the phrase "any *other* overt act" means that the Commerce Act, and not just the Riotous Act, must be an overt act because otherwise, "other" is rendered superfluous.  (Dkt. 286 at 19.)  If the Commerce Act must also be an "overt act" to give "other" meaning, Defendants assert "the term 'overt act' cannot mean one thing with respect to the interstate commerce element and something else with respect to the conduct element."  (*Id.*)   According to Defendants, the Commerce Act itself must also be one of those listed acts, e.g., the use of a facility of interstate commerce must also constitute an act of inciting a riot.  (*See id.* 18.)  But this contradicts other text of the Anti-Riot Act, which states that the relevant timing of the Riotous Act is "either *during* the course of any such travel or use *or thereafter*."  *See* 18 U.S.C. § 2101(a) (emphases added).  Defendants' interpretation of the statute effectively deletes "or thereafter" because it requires the Commerce Act to take place "imminently before and during the riot," which is the same time frame for a Riotous Act.  (*See* Dkt. 324 at

13.)  And as explained above, the Ninth Circuit held that "or thereafter" does not pose any *Brandenburg* problem.  Defendants' reading also largely eliminates interstate travel as a basis for a Commerce Act, as it is difficult to conceive of interstate travel which would itself include, for instance, participating in a riot.[6]

The Ninth Circuit never stated that the Commerce Act must itself be a Riotous Act.  And to read the Ninth Circuit's opinion that way would so narrow the scope of the statute such that it would border on non-existent.  Such a reading would be inconsistent with the Ninth Circuit's holding that the Anti-Riot Act, including the language regarding interstate travel, "is not unconstitutional on its face" because the government must be allowed to "act before it is too late."  *Rundo*, 990 F.3d at 721.

Because the Court rejects Defendants' reading of the statute, it likewise rejects their argument that the First Superseding Indictment fails to state a claim.  As explained above, the allegations, assuming their truth, represent conduct that clearly violates the Anti-Riot Act.

## IV.    MOTION TO DISMISS FOR SELECTIVE PROSECUTION

Defendants also move to dismiss the First Superseding Indictment because of selective prosecution.  (Dkt. 281.)  In short, Defendants argue that the government chose to charge only Defendants for their conduct at political rallies even though Antifa and related far-left groups engaged in identical, if not worse, misconduct at those same

---

[6] Confusion regarding Congress's choice to use the word "other" may stem from the Seventh and Ninth Circuit's specific definition of "overt act" as compared to how the phrase is typically understood.  *Compare Rundo*, 990 F.3d at 715 ("We adopt the Seventh Circuit's approach to the 'overt act' provisions."), *with Miselis*, 972 F.3d at 534 ("In our view, the presence of an overt-act element (or two, in fact), together with specific intent to incite or engage in a riot, simply indicates that the Anti-Riot Act was drafted as an attempt offense, of which it bears all the classic hallmarks, rather than a commission offense.").

political rallies.  (*Id.* at 23.)  The reason for this disparity, according to Defendants, is that the government targeted them for their far-right and white supremacist speech.  (*Id.* at 27.)

"In our criminal justice system, the executive branch has broad discretion to decide whom to prosecute.  However, prosecutorial discretion is not unfettered, and selectivity in the enforcement of criminal laws is subject to constitutional constraints." *United States v. Culliton*, 328 F.3d 1074, 1081 (9th Cir. 2003) (internal quotation marks and citation omitted).  "[A]n indictment that results from selective prosecution will be dismissed." *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007).  "To establish a claim of selective prosecution, a defendant must show both discriminatory effect and discriminatory purpose." *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018).  A defendant "must demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive." *United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007).  Impermissible motives "includ[e] the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985).  Out of respect for the separation of powers, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Defendants have established selective prosecution.  There is no doubt that the government did not prosecute similarly situated individuals.  Antifa and related far-left groups attended the same Trump rallies as Defendants with the expressly stated intent of shutting down, through violence if necessary, protected political speech.  At the same Trump rallies that form the basis for Defendants' prosecution, members of Antifa and related far-left groups engaged in organized violence to stifle protected speech.  And, unsurprisingly in the modern age, they used facilities of interstate commerce to carry out their goals.

The closer question is whether Defendants have demonstrated that their prosecution was based on their protected political speech and beliefs.  But in light of the record before the Court, the only conclusion is that they have.  First, the timing of the investigation into Defendants suggests that they were prosecuted, at least in part, for their speech.  The far-right Charlottesville rally resulted in tragedy when a white supremacist not affiliated with RAM killed a counter-protester.  Rightfully, after Charlottesville, there was a backlash against white supremacist groups in the United States.  During that period, the government investigated, and ultimately chose to prosecute, members of RAM.[7]  And while the public backlash against white supremacist speech and ideology is exactly how our country should react to such hateful beliefs, the government cannot make charging decisions based solely on Defendants' reprehensible speech and beliefs.

Second, the federal government did not prosecute far-left activists who were also responsible for violence at political rallies in the period and places at issue.  Indeed, shortly before Charlottesville, the Department of Homeland Security issued a bulletin stating "that anarchist extremists' use of violence as a means to oppose racism and white supremacist extremists' preparation to counterattack anarchist extremists are the principal drivers of violence at recent white supremacist rallies." (Dkt. 281-18 at 1.)  The bulletin explained that far-left "[a]narchist extremists planned to violently oppose the rallies via social media and flyer campaigns." (*Id.*)  Despite the involvement of both the far left and far right, the federal government never charged far-left activists under the Anti-Riot Act for their violence at these political rallies.  To put it simply, RAM and Antifa, which both appear to use violence to silence protected speech, are identical in material respects—the only difference is their speech and beliefs.  Because the government has only prosecuted RAM members and not prosecuted *any* members of Antifa or related far-left groups in connection with violence at pro-Trump and far-right political rallies, the Court must

---

[7] The government makes clear that the investigation into RAM was initiated because of Charlottesville. (*See* Dkt. 307 at 2–3.)

conclude that the government prosecuted RAM members because of the sole distinguishing feature between them and members of Antifa and related far-left groups— their far-right and white supremacist speech and ideology. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) (explaining discriminatory intent can be inferred from disparate treatment when "[n]o reason for it is shown, and the conclusion cannot be resisted that no reason for it exists except hostility to the [protected characteristic].")

The government denies selectively prosecuting Defendants and contends that Defendants have failed to present credible evidence of both discriminatory effect and discriminatory purpose. It focuses on three individuals, J.A., J.F., and J.M.A., which it asserts are the only relevant comparators to Defendants in assessing discriminatory effect because they are the only individuals who have a connection to the Central District of California. (Dkt. 307 at 15.) Even accepting the premise of the government's argument as true, the government's failure to prosecute J.A., J.F., or J.M.A. still demonstrates discriminatory effect.[8]

As an initial matter, the Court notes that the government was aware of these three individuals and their misconduct because the government produced their police reports in discovery. (Dkt. 323 at 8.) Therefore, the government knew that J.A., J.F., and J.M.A. were at the Huntington Beach rally, dressed in typical Antifa clothing to hide their identities (for example, a long sleeve black hooded jacket with a hood, a black bandana to cover the face, and swim style dark googles), identified as "activists," and engaged in violence to stifle political speech, such as pepper spraying and punching Trump supporters in the face. (Dkt. 281-2 Exs. C–E.)

---

[8] The government argues that the only relevant comparators are those with ties to the Central District of California because "a selective prosecution claim focuses on the decisionmakers in a particular case." (*See* Dkt. 307 at 14–15 n.6.) The Court notes, however, that the prosecution of RAM was coordinated across multiple United States Attorney's Offices, thus the relevant decisionmakers are not limited to a single United States Attorney's Office. (*See id.* at 7.)

J.A., J.F., and J.M.A clearly committed a Riotous Act.  They pepper sprayed and punched Trump supporters to disrupt the Huntington Beach rally, leading to their arrest for, among other crimes, inciting a riot.  (*Id.*)  And they also committed a Commerce Act. J.F., who had previously been convicted under state law for remaining at the scene of a riot, admitted that he was an activist who had been to numerous protests and attended the Huntington Beach rally with the other people that had been arrested for pepper spraying the crowd.  (*Id.* Ex. C at 4.)  He "contacted them before the event to make sure that they were going."  (*Id.*)  The only logical assumption from such an admission is that J.F., J.A., and J.M.A. communicated by using a facility of interstate commerce.  Using a facility of interstate commerce to coordinate attendance at a political rally is precisely the type of act the government believes is a sufficient federal hook to bring an Anti-Riot Act charge in this case.  Indeed, J.F.'s admission mirrors many of the Commerce Act allegations in the First Superseding Indictment.  (*See, e.g.*, Dkt. 209 at 13 ["defendant BOMAN sent Facebook messages to recruit RAM members and others to attend an organized demonstration in Berkeley, California, on April 15, 2017"].)

The government attempts to distinguish J.A., J.F., and J.M.A. from Defendants by arguing that J.A., J.F., and J.M.A. may not have intended to commit violence and were less violent and less organized than RAM.  (Dkt. 307 at 18–20.)  This assertion is belied by the police reports, which unequivocally state that the far-left activists present at the Huntington Beach rally intended to commit violence.  To the extent one of the group claimed to be prepared for violence only for self-defense, Defendant Boman made that same assertion but faces prosecution nonetheless.  (*See* Dkt. 238 at 26–28 [claiming that Defendants Boman and Rundo acted to defend a young Black man wearing a "Defend America" hat from being attacked by 10–15 Antifa members, and Defendants "never went there to have a mind to fight or have an altercation"].)  And the government cannot view J.A., J.F., and J.M.A's acts at the Huntington Beach rally in isolation, just like it does not view RAM's acts in isolation.  Antifa and related far-left groups were, at a

minimum, at least as organized and widespread as RAM, and the record is clear that both state and federal law enforcement were aware that Antifa and related far-left groups were equally culpable in starting riots at pro-Trump and conservative events across California by committing acts of violence against Trump supporters.

The government also argues that Defendants have failed to demonstrate a discriminatory purpose. (Dkt. 307 at 21.)  Specifically, the government asserts that it did not prosecute Defendants for their beliefs and protected speech but rather "because they engaged in repeated acts of coordinated violence." (*Id.* at 25; *see also id.* at 29 [referencing "Defendants' violent and coordinated conduct"].)  But this completely ignores that Antifa and related far-left groups did precisely the same thing.  What is more, Antifa and related far-left groups attended pro-Trump or far-right political events to disrupt protected political activity.  Defendants did not attend a Trump rally at Huntington Beach to shut down the rally—it was J.F., J.A., and J.M.A. who intended to disrupt the rally, following Antifa's playbook.

The government points to other cases in which the Office of the Federal Public Defender has taken the position "that the USAO has consistently prosecuted individuals associated with Black Lives Matter, Antifa, and the 'radical left' where those individuals engaged in illegal conduct within this District that allowed for and warranted federal prosecution." (Dkt. 307 at 26 [internal quotation marks and citation omitted].)  But those cases are inapposite—they involved arson and anti-government behavior.  (*See* Dkt. 323 at 18–19.)  The issue in this case is the use of violence to disrupt protected First Amendment speech at political rallies.  The government only targeted individuals, like Defendants, who expressed far-right beliefs.  No individuals associated with the left, who engaged in anti-far-right speech and violently suppressed the protected speech of Trump supporters, were charged with a federal crime for their part in starting riots at political events.  That is textbook viewpoint discrimination. *See Rosenberger v. Rector & Visitors*

*of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.").

Lastly, the government argues that Defendants have failed to "point to any pattern of prosecution or prosecutorial policy." (Dkt. 307 at 28.)  This argument may hold water when dealing with a commonly deployed criminal statute.  But in this case, it misses the mark.  Until recently, the Anti-Riot Act was almost never used.  If the Court were to accept the government's position, it would mean that the government could prosecute somebody based wholly on a constitutionally protected characteristic or activity, but so long as the government brought the charges under a rarely used statute, that individual could never prevail on a selective prosecution motion.  To the extent a pattern is required, it only makes sense for such a pattern to include the non-prosecution of similarly situated individuals, rather than multiple cases in which defendants were selectively prosecuted.

Most telling in this case is the government's silence as to why it never pursued a case against a single member of Antifa or related far-left groups with respect to their violent conduct at pro-Trump events.  To be sure, the government provides many facially neutral reasons why it pursued prosecutions against RAM members such as Defendants. But when examined, each of those reasons apply, often to a greater extent, to Antifa and related far-left groups.  The government alleges RAM used social media to recruit new members. (*See id.* at 18.)  Antifa and related far-left groups did the same. (*See* Dkt. 281 at 4, 13–14.)  The government alleges RAM trained together to engage in combat fighting. (*See* Dkt. 307 at 18.)  Antifa and related far-left groups did the same. (*See* Dkt. 281 at 4, 10–11, 14, 16–17.)  The government alleges RAM traveled throughout the state and across the country to deliberately assault those who did not share their viewpoints. (*See* Dkt. 307 at 18.)  Antifa and related far-left groups did the same. (*See* Dkt. 323 at 16.)  The government alleges RAM bragged in person and online about their victories.

Case 2:18-cr-00759-CJC   Document 333   Filed 02/21/24   Page 34 of 35   Page ID #:3048

(*See* Dkt. 307 at 18.)  Antifa and related far-left groups did the same.  (*See* Dkt. 323 at 16–17.)

In sum, RAM members, such as Defendants, and members of Antifa and related far-left groups, such as J.F., J.A., and J.M.A., are mirror images of each other.  They use violence to shut down political speech with which they disagree.  Really, Defendants are not just similarly situated to members of Antifa and related far-left groups, they are materially identical.  At least based on the allegations in this case, the only difference appears to be that they did not attend far-left rallies; rather they went to pro-Trump and far-right rallies planning to inflict violence on counter protesters.  It was groups like Antifa that went to pro-Trump rallies with the intent to use violence to disrupt protected political speech.

Unprovoked violence is always abhorrent.  The use of violence to shut down speech is particularly dangerous and runs counter to the basic principles upon which our Nation is founded.  The Court cannot and does not fault the government for using the Anti-Riot Act, which the Ninth Circuit held to be constitutional, to address the real problem of dangerous violence breaking out at political events.  Indeed, the Court commends the United States Attorney's Office for its goal of "us[ing] the federal statutes at its disposal to protect the public in this District from violence or public disturbances," particularly when protected political speech is threatened.  (*See* Dkt. 307 at 27 [internal quotation marks and citation omitted].)  But prosecuting *only* members of the far right and ignoring members of the far left leads to the troubling conclusion that the government believes it is permissible to physically assault and injure Trump supporters to silence speech.  It is only when those tactics are deployed against those on the left that the government brings charges under the Anti-Riot Act.  That is not permissible under our Constitution.  There seems to be little doubt that Defendants, or at least some members of RAM, engaged in criminal violence.  But they cannot be selected for prosecution because

of their repugnant speech and beliefs over those who committed the same violence with the goal of disrupting political events.  Because Defendants and members of the far left engaged in the same conduct at political rallies and "are the same in all relevant respects," their prosecution "gives rise to an inference of discrimination." *See United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989).

## V.    CONCLUSION

When announcing this case, the United States Attorney for the Central District of California at the time explained this case was initiated because of "an orchestrated effort to squelch free speech as members of the conspiracy travelled to multiple locations to attack those who hold different views."  Press Release, Four Local Members of White Supremacy Group Face Federal Charges in Attacks at Political Rallies across California, U.S. Att'y's Off., Cent. Dist. of Cal. (Oct. 24, 2018), available at https://www.justice.gov/usao-cdca/pr/four-local-members-white-supremacy-group-face-federal-charges-attacks-political-rallies.  The problem in this case, though, is that sentiment equally describes Antifa and other extremist, far-left groups.  Neither RAM nor Antifa have "the right to violently assault their political opponents." *Id.*  Although Defendants' motion to dismiss for vagueness and failure to state an offense is **DENIED**, their motion to dismiss for selective prosecution is **GRANTED**.


DATED:    February 21, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE