E. MARTIN ESTRADA
United States Attorney
DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
ANNA P. BOYLAN (Cal. Bar No. 322791)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0631/2170
    Facsimile: (213) 894-0141
    E-mail:    kathrynne.seiden@usdoj.gov
               anna.boylan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:18-759(A)-JLS-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ROBERT RUNDO |
| v. | |
| ROBERT RUNDO, | Hearing Date: December 13, 2024<br>Hearing Time: 8:30 a.m.<br>Location:      Courtroom of the Hon. Josephine L. Staton |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kathrynne N. Seiden and Anna P. Boylan, hereby files its sentencing position for defendant Robert Rundo ("defendant").

//

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the exhibits attached hereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 26, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
KATHRYNNE N. SEIDEN
ANNA P. BOYLAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Robert Rundo ("defendant") co-founded and led the Rise Above Movement ("RAM"), a militant white supremacist group whose members traveled to public rallies in California and Virginia throughout 2017, where they carried out violent assaults against those they perceived as their ideological opponents.  Defendant trained his followers to fight, brought them to rallies ready to commit violence, committed violence himself at multiple rallies, and celebrated his and his followers' violence in social media posts to recruit more followers.  For his conduct, defendant has pleaded guilty to one count of conspiracy to riot, in violation of 18 U.S.C. § 371.

The government agrees with Probation's calculation of defendant's Guidelines range as 24 to 30 months.  (Dkt. 440 (Presentence Report).)  The government disagrees, however, with Probation's recommendation to impose a downward variance and a sentence of 18 months.  (Dkt. 439 (Recommendation).)  Instead, consistent with the terms of the plea agreement, the government recommends the Court impose a sentence of 24 months' imprisonment, followed by two years of supervised release.  (Dkt. 433 (Plea Agreement).)  Probation's proposed variance is based in part on its inaccurate cabining of defendant's violence to a single victim at a single rally.  In fact, defendant assaulted multiple victims at multiple rallies, and the followers that he trained and brought to the rallies committed numerous acts of violence in furtherance of the criminal conspiracy he led.

Furthermore, while several years have passed since defendant committed the criminal conduct in this case, he has not renounced the violent extremist ideology that motivated that conduct.  Before his arrest in Romania and extradition to the United States, defendant knowingly evaded prosecution, hiding in Europe under a fake identity while continuing to promote militant extremism.  While the government recognizes the mitigating personal circumstances set forth in the Presentence Report, the government submits that a sentence at the low end of the Guidelines range adequately balances those circumstances with the aggravating factors in this case.  Based on the totality of the facts, and consistent with the plea agreement, the government respectfully requests that the Court sentence defendant to 24 months' imprisonment, two years of supervised release, and a $100 mandatory special assessment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Defendant Stabs a Victim Repeatedly in a Gang-Related Assault[1]

In 2009, defendant and four associates approached a victim in a store, asked the victim why he was wearing blue, and displayed knives to the victim.  When the victim attempted to flee the store, defendant and his associates chased the victim until he tripped and fell to the ground.  Defendant then used a knife to stab the victim repeatedly all over his body, including on his hand, elbow, arm, the back of his neck, and his chest.  (Ex. 1 at 1.)  Defendant pled

---

[1] The government provides this information to supplement and, to the extent necessary, correct the PSR, in which Probation characterized defendant's prior conviction as having been sustained "during [an] instance [where] his friend's home was shot up" and noted that it lacked further information about the conviction.  (PSR ¶¶ 68, 88.)

1  guilty to gang assault with the intent to cause serious physical

2  injury and was sentenced to two years' imprisonment.  (PSR ¶ 68.)

3  While incarcerated, defendant tattooed the numbers "88" with one "8"

4  on each shoulder -- a neo-Nazi symbol signifying "HH" or "Heil

5  Hitler"[2] -- which he later admitted was a "symbol[] of white pride."

6  (Ex. 2 at 1-2.)

7  **B.   Defendant Moves to California and Forms the Rise Above
       Movement as a Militant Wing of a White Nationalist Group**

8

9        In 2016, defendant moved to California.  In early 2017,

10  defendant, who had been associated with the white nationalist

11  organization Identity Europa[3], began to formulate his vision for the

12  DIY Division, later rebranded as RAM.  (PSR ¶ 23.)  In messages with

13  the founder and leader of Identity Europa, defendant articulated his

14  vision for RAM as a "militant wing of [Identity Europa]" which would

15  target "blue collar" guys in the "alt right" who "aren't college

16  going or really on the intellectual side of [things]."  (Id. ¶ 24.)

17        True to that vision, RAM represented itself publicly as a

18  combat-ready, militant group of a new nationalist white supremacy and

19  identity movement.  (Id. ¶ 25.)  RAM regularly held hand-to-hand and

20  other combat training to prepare to engage in violent confrontations

21  with protestors and other individuals at political rallies.  (Id.

22  ¶ 26; Plea Agreement ¶ 9.)  Defendant organized several such

23  trainings, with other associates recognizing him as "the boss" and

24  the trainings as "[his] show."  (Id.; PSR ¶ 27.)  Throughout the

25  ─────────────

26        [2] (Hate on Display/88, Anti-Defamation League,
    https://www.adl.org/resources/hate-symbol/88 (last visited November
27  17, 2024).)

        [3] (Identity Evropa/American Identity Movement, Anti-Defamation
28  League, https://www.adl.org/resources/profile/identity-
    evropaamerican-identity-movement  (last visited November 22, 2024).)

summer of 2017, defendant directed the messaging about RAM's trainings, instructing other associates when to "change the message" about trainings and when to "put up . . . announcement[s]" about training times.  (Id.)  Defendant also set up Rightbrand Clothing, RAM's clothing line, where he hired employees to run the website and perform additional tasks.  (PSR ¶ 28.)

On various social media platforms, defendant and his co-conspirators posted messages and photographs of themselves preparing for or engaging in violence, accompanied by statements such as "When the squad's not out smashing commies," "#rightwingdeathsquad," and "#goodnightleftside."  (Id. ¶ 26; Plea Agreement ¶ 9.)  RAM would often post photographs of its members with their faces partially concealed, such as the photograph below from RAM's Twitter account, in which defendant is shown front and center.



Communications between members of RAM reflect that many, including defendant's co-founder, Ben Daley, regarded defendant as a decisionmaker with respect to a range of issues, such as who to allow into the group, what actions to take as a group, and what to post on

(or remove from) social media.  (PSR ¶ 28.)  For example, in April

2017, Daley messaged another member, Michael Miselis: "[Defendant's]

kind of big on image so maybe don't hit up the big boy. . . ."  (Id.)

In July 2017, Daley and Miselis texted about the group getting

"doxed," with Daley noting, "we are going to drastically increase

security measures and never go to events without full coverage."

Daley then followed up with: "Just heard back from [defendant] he

said not to tell anybody else until we figure out what to do."  (Id.)

Later that same month, Daley and Miselis texted about a RAM

promotional video being published online.  Miselis asked, "so what

are we gonna do about guys that want to join from Twitter?"  Daley

wrote: "Scope him and if he looks solid put him in contact with me. .

. . I forward to [defendant]."  (Id.)

     **C.**    **Defendant and His Followers Intentionally Engage in
Violence at Various Rallies**

As part of their membership in RAM, defendant and his co-

conspirators agreed to attend rallies with the intent to provoke and

engage in violent physical conflicts.  (PSR ¶ 26; Plea Agreement

¶ 9.)  As defendant's co-founder later admitted, following these

events, RAM would use their violence as a recruitment tool.  (Ex. 3

at 3.)  For example, RAM maintained a Twitter account which posted

videos and photographs of RAM members conducting training in hand-to-

hand combat, often interspersed with video clips of RAM members

assaulting people at political events with their faces partially

obscured by skeleton or American flag masks.  (PSR ¶ 25.)  Defendant

personally appeared in several of those videos and photographs.

(Id.)

1                1.  Huntington Beach[4]

2       In March 2017, defendant and his co-conspirators attended a

3  political rally in Huntington Beach, California.  (Plea Agreement ¶

4  9; PSR ¶ 30.)  Ten days before the event, defendant attended a RAM

5  combat training in preparation to engage in violence at the rally.

6  (Id. ¶ 29; Plea Agreement ¶ 9.)

7       At the rally, RAM members carried signs that read "Defend

8  America" and "Da Goyim Know," a phrase used by white supremacist

9  extremists referring to their supposed knowledge of a Jewish

10  conspiracy to control world affairs.[5]  (PSR ¶ 30.)  Throughout the

11  morning, attendees engaged in various peaceful activities, including

12  chanting and making speeches.  (Dkt. 1 ("Compl.") ¶ 20.)  As those

13  activities were ongoing, a small group of protestors gathered nearby

14  on the beach.  (Id.)  Defendant and his co-conspirators did not join

15  the hundreds of rally attendees marching south along the beach, but

16  instead broke away from the group and confronted the protestors.

17  (Id. ¶ 21; PSR ¶ 30.)  Rally attendees confronted, pushed, and then

18  punched two journalists from a local news publication.  (Compl.

19  ¶ 22.)  As one of the journalists stumbled backward, defendant's co-

20  conspirator, Tyler Laube, grabbed the journalist's shoulder with his

21

22

23

24       [4] The facts concerning the Huntington Beach rally are provided
25  to supplement and, to the extent necessary, correct the
    characterization in the PSR, which implies that defendant engaged in
26  violence with respect to a single protestor and only did so in
    response to the protestor using pepper spray on a female protestor.
27  (PSR ¶ 30.)

         [5] (The Goyim Know/Shut It Down, Anti-Defamation League,
28  https://www.adl.org/resources/hate-symbol/goyim-knowshut-it-down
    (last visited November 18, 2024).)

left hand and punched the journalist three times in the face.[6]  (Id.)
A protestor then released pepper spray, leading the crowd to
momentarily disperse.  (Id.; PSR ¶ 30.)

Approximately three to five protestors then turned away from the
group of rally attendees and headed north along the beach.  (Compl.
¶ 23.)  A small group led by defendant, Daley, Laube, and co-
defendant Robert Boman pursued them.  Boman caught up to one of the
protestors and kicked him in the back.  (Id. ¶ 24.)  A second
protestor turned and approached Daley, who shoved the protestor in
response.  (Id. ¶ 25.)  The protestors continued walking north, away
from the RAM members, as defendant and his co-conspirators continued
pursuing them.  (Id.)  Another rally attendee walking alongside the
RAM members approached one of the protestors and punched him in the
face, knocking him to the ground.  (Id.)



Seconds later, defendant
approached another protestor from
behind and punched him in the back
of the head.  (Id. ¶ 26.)  Boman ran
up behind defendant toward the
protestor, but turned back after a
second protestor released pepper
spray.  (Id.)  Defendant then turned
to the second protestor, punched him
in the back of the head, grabbed the
back of his neck, and threw him to the ground, landing on top of him.

---

[6] Laube later admitted that he and his associates assaulted
counter-protestors and that he intentionally and willfully
intimidated and interfered with the journalist by punching the
journalist several times in the head and body.  (Dkt. 262 ¶ 9.)

(Id.) As shown here, defendant then held the protestor down with his
left hand and threw several punches at the protestor's head while
other RAM members looked on, cheered, and prevented others from
intervening.  (Id.)  After several seconds, the protestor again
released pepper spray, leading defendant to back away from him.  (Id.
¶ 27.)  The protestor then ran northeast into a parking lot while
other rally attendees pursued him, pushing him and hitting him with
flag poles.  (Id.)  According to eyewitnesses, another RAM member
pursued the protestor and threw a large rock at him, striking him in
the chest.  (Id.)

    Defendant and his followers viewed the event as a success.
Discussing RAM with the leader of Identity Europa after the event,
defendant noted: "I think it all worked out pretty well in
Huntington[.]"  (PSR ¶ 24.)  Defendant and his co-conspirators
celebrated the assaults over social media.  (Plea Agreement ¶ 9.)
For example, Boman posted to his Facebook page a Daily Stormer[7]
article titled "Trumpenkriegers Physically Remove Antifa Homos in
Huntington Beach," commenting: "We did it fam."  (Compl. ¶ 29.)  As
shown below, RAM's Instagram account posted a photo showing defendant
punching a counter-protestor from behind with the words "Physical
Removal" superimposed across the top.  (Id. ¶ 30.)  And in February
2018, defendant posted a photograph on the RAM Twitter account

---

    [7] The Daily Stormer is a news website and online community forum
that is well known among neo-Nazis and white supremacist extremists.
(Dkt. 392-2 at 221.)  (See Andrew Anglin, SPLC,
https://www.splcenter.org/fighting-hate/extremist-
files/individual/andrew-anglin (last visited November 26, 2024).)



showing several RAM members at the Huntington Beach rally with the message: "Shortly after this pic antifa was btfo [blown the fu*k out] in Huntington Beach." (Plea Agreement ¶ 9.)

     2.   Berkeley

     Shortly after the Huntington Beach rally, RAM associates began preparing for an unpermitted "Free Speech" demonstration at a public park in Berkeley, California. In advance of the event, defendant talked to an associate about the need to "get more serious" with training sessions, including getting people to train "more than one day a week." (PSR ¶ 27.) In April 2017, defendant and his co-conspirators rented a van and drove together to northern California to participate in the rally. (Id. ¶ 32.)

     Defendant and his co-conspirators showed up to the rally with their faces partially obscured by skeleton masks and their hands taped in the manner of boxers or martial arts fighters. (Compl. ¶ 37; Ex. 11 at 1-3.) At the rally, there were various violent clashes between opposing groups throughout the day. (PSR ¶ 33.) As a police officer on the ground noted, RAM was not "attempting to defend speakers," but was rather "on the frontline of the Right-side instigating the violence against the Left-side." (Ex. 4 at 1.) In one such instance, defendant and his co-conspirators crossed the

barrier that police had erected to separate the opposing groups and
punched and kicked several people.  (PSR ¶ 33; Plea Agreement ¶ 9;
Ex. 11 at 4-5.)  Defendant, Boman, and Daley attempted to pull away a
banner held by several counter-protestors.  (Compl. ¶ 39.)  After one
counter-protestor fell to the ground, defendant began throwing
punches at multiple people, including punching one defenseless person
repeatedly in the head.  (Id.; Plea Agreement ¶ 9.)  When a police
officer tried to subdue defendant, he resisted and punched the
officer twice in the head before officers arrested him.  (Compl.
¶ 39.)  After defendant was taken into custody, his co-conspirators
continued to climb over barricades and hit and kick counter-
protestors, eventually chasing them out of the park through the
streets chanting "hey, hey, hey, goodbye."  (Id. ¶ 40.)  Reflecting
on the event afterwards, another police officer observed that
"[t]hroughout the day, the RAM group would antagonize and then fight
with counter-protestors.  On multiple occasions, they would pick a
person and then go after the person as a group, pulling the person
out, isolat[ing] them, and then attacking them."  (Ex. 4 at 4.)

     As they did after the Huntington Beach rally, defendant and his
co-conspirators publicly celebrated their violence in Berkeley,
posting photographs and videos of their assaults to social media and
lauding their own violent exploits internally.  (PSR ¶ 34; Plea
Agreement ¶ 9.)  In one conversation the day after the protest, a RAM
member wrote to another describing how "our guys were just wrecking
them, like not even any room to get a hit in," and how he had "found
a video on that site where you can see me breaking [my hand] on a
guys head lol."  (Compl. ¶ 43.)  The other RAM member responded,
"I've been looking at videos.  There's a grey-shirted storm trooper

10

1    at the fucking front every, single, time." (Id.)  The first RAM

2    member agreed: "Total Aryan victory." (Id.)  In January 2018, the

3    RAM Twitter account posted a message describing itself as "the only

4    alt right crew that actually beats antifa senseless and wins

5    rallies." (Ex. 3 at 4.)  The following month, the RAM Gab account

6    posted a photograph of a RAM member punching a protestor at the rally

7    with the caption: "Talk shit get hit!" (Plea Agreement ¶ 9.)  As

8    Daley later admitted, RAM celebrated the media coverage and used the

9    internet to post photographs and videos of assaults committed by RAM

10   members in order to recruit members to engage in violent

11   confrontations at future events. (Ex. 3 at 4.)  Defendant similarly

12   bragged to a podcaster seeking to interview RAM leaders about

13   Berkeley: "Maybe if there [is] enough time could mention [Berkeley]

14   how we [RAM] were the first guys to jump over the barrier and engage

15   and . . . that had a huge impact." (Compl. ¶ 45.)

16            3.   San Bernardino

17        In June 2017, defendant and his co-conspirators attended an

18   "Anti-Islamic Law" rally in San Bernardino, California. (PSR ¶ 35;

19   Compl. ¶ 49.)  Leading up to the event, Daley sent a Facebook message

20   to an associate that he and 30 others were planning to "take over"

21   the upcoming march. (Dkt. 47 at 8.)  As shown in a screen grab from

22   a RAM promotional video below, defendant and his followers once again

23   arrived at the rally with their faces covered and their knuckles

24   taped.

25

26

27

28





Rise Above Movement - American Nationalists

,781 views                                    👍 237    👎 2    ➜ SHARE    ≡₊    •••

Rise Above Movement
Published on Dec 17, 2017                    SUBSCRIBE 1.2K

Our old video is back, including some new footage from our training and Berkely!

For updates, follow us on our GAB and join the movement

At the rally, while hundreds of attendees marched peacefully,
defendant and his co-conspirators violently confronted and pursued a
group of counter-protestors who were standing on an opposite street
corner.  (Plea Agreement ¶ 9; Compl. ¶ 49.)  As defendant and his co-
conspirators began to harass the counter-protestors, the rally
organizer contacted police providing security at the rally and said
that a group of young men who were not part of her group, and whom
she believed were white supremacists, (later identified as RAM) were
"acting aggressively toward the counter protestors."  (Ex. 10 at 1.)
According to a police officer on scene, on several occasions, police
saw RAM members "walking aggressively toward the counter protestors
in an apparent attempt to provoke and intimidate them."  (Id.)  The
counter-protestors sought police protection as they tried to leave
the area and the officers saw RAM members running across the street,

"chasing counter protestors to their vehicles" and "hitting their
vehicles with flag poles." (Id. at 1-2). Officers arrested three
individuals, all of whom were wearing the distinctive DIY
Division/RAM skull masks.

Afterwards, Daley texted an associate: "We smashed some antifa
as they were leaving." (Compl. ¶ 49.) The associate responded: "If
it wasn't for the White Nationalists nothing would ever get done."
(Id.) Daley responded: "this is true would've been no victory in
Huntington or Berkeley." (Id.) Defendant confirmed Daley's account
in separate messages. When an associate asked him if he had filmed
his activities at the San Bernardino rally, defendant wrote: "some
girl got us smashing the antifa car and chaseing [sic] then [sic]."
(Plea Agreement ¶ 9.) Defendant added: "the next time I will get
someone to film for us to get all the action." (Id.)

4.    Charlottesville

As shown below, between August 11 and 12, 2017, several RAM
members, including defendant's co-founder, Daley, attended the "Unite
the Right" rally in Charlottesville, Virginia. As with the previous
rallies, the RAM members who attended did so expecting that they



would engage in violent confrontations with counter-protestors. (Ex. 3 at 4.) In advance of the rally, Daley posted on a public platform for Charlottesville attendees that he and his co-defendants were "experienced at these events" and that "all were in [the] Berkeley riots," bragging in a separate message that one of the RAM members with them was an "excellent fighter" and that Daley was "[s]toked to have him with us." (Id. at 4-5.) When an online group discussed whether or not the event was permitted, Daley wrote: "I'm flying out from CA with a handful regardless [of whether the group had a permit]. Fuck these jews." (Compl. ¶ 51.)

Although defendant did not attend, he helped set up lodging for his co-conspirators. For example, in late July 2017, defendant sent a text message to one co-conspirator stating, "Hey, if you can get in touch with ben, I may have a place for you guys to stay in Charlottesville." (Id. ¶ 52.) At the rally, defendant's co-conspirators, representing RAM, once again committed multiple violent acts over the course of two days, consistent with their training and preparation. In one instance, the RAM members attacked a group of students holding a banner rejecting white supremacy. (Ex. 3 at 5.) The following day, and as shown here, RAM attacked counter-protestors so violently they left them bleeding in the street. (Ex. 3 at 5.)



14

1    Based on their conduct on behalf of RAM in Huntington Beach,

2    Berkeley, and Charlottesville, Daley and the other RAM members who

3    attended the Charlottesville rally later pleaded guilty in the

4    Western District of Virginia to conspiracy to riot; they received

5    sentences between 27 and 37 months' imprisonment.  (United States v.

6    Daley et al., No. 3:18-cr-00025-NKM-JCH (W.D. Va. Jul. 19, 2019)

7    Dkts. 149-153, 157-163.)  As defendant's co-conspirators admitted in

8    their plea agreements, they went to each of these events with the

9    intent to engage in violence and carried out violent assaults which

10   were not in self-defense.  (Daley, Dkts. 59, 99, 108, and 111.)

11   In the immediate aftermath of the Unite the Right event,

12   defendant took steps to distance RAM from the Unite the Right event

13   in the media.  For example, shortly after the event, defendant

14   messaged a co-conspirator: "Take Down any cville stuff off twitter

15   and any pics of me."  (PSR ¶ 28.)  But neither defendant nor RAM

16   slowed down on training or recruitment efforts.  The month after the

17   Unite the Right event, the RAM Twitter account posted a picture of

18   defendant and another RAM member assaulting counter-protestors at the

19   Berkeley rally with the accompanying text: "#antiantifa

20   #goodnightleftside #riseabovemovement."  (Compl. ¶ 54.)  In November

21   2017, defendant orchestrated the creation of a promotional video for

22   RAM which combined videos of defendant and other RAM members

23   assaulting counter-protestors with photographs and videos of RAM

24   members training in hand-to-hand combat.  (Id. ¶ 56.)  In January

25   2018, the RAM Twitter account wrote: "What's up with giving a

26   shoutout to the only alt right crew that actually beats antifa

27   senseless and wins rallies."  (Id. ¶ 57.)

28

15

**D.  Defendant Tries to Flee to Europe to Evade Prosecution**

In October 2018, the FBI executed a search warrant at defendant's home, which he shared with another nazi sympathizer. (See 2:18-MJ-2592 (C.D. Cal.).)  In his home, defendant kept various RAM items, as well as other items demonstrating his commitment to violent white supremacist ideology, such as drawings of swastikas, a Nazi eagle ornament, and a framed portrait of Adolf Hitler in the living room.  (Ex. 5 at 1-3.)

Two days after the search of his home, defendant tried to leave the country.  (Dkt. 390 at 14-15.)  After being denied entry in London and returned to the United States, defendant withdrew a few thousand dollars in cash and, over the course of two weeks, booked thirteen one-way flights, sometimes changing his gender or birth year on his flight reservations, hoping to evade detection.  (Id.; Dkt. 392-2 at 78-151.)  As defendant admitted to both agents and personal contacts, his goal was to get out of the United States to avoid what he believed was his impending arrest.  (Ex. 6; Dkt. 390 at 15.)  In late October 2018, defendant was deported from El Salvador and returned to the United States, where he was arrested in this case.

**E.  Defendant Moves to Europe and Continues to Advocate for Militant White Nationalism[8]**

In June 2019, ruling that the Anti-Riot Act was facially overbroad, the prior district judge (The Honorable Cormac J. Carney)

---

[8] These facts are provided to supplement and, to the extent necessary, correct the PSR, which suggests that the media attention from defendant's participation in this offense "marked a turning point in his life" that inspired him to move to Serbia to "reset his life, disassociate from RAM, and turn to Christianity."  (PSR ¶¶ 93-94.)  In reality, and as detailed in this section, defendant hid from law enforcement in Europe while continuing to publicly advance RAM

*(footnote cont'd on next page)*

16

dismissed the indictment and released defendant from custody.  (Dkt.
146.)  Defendant left the country around December 2019.  (Dkt. 392-2
at 154.)  But defendant did not, as he apparently represented to
Probation, "reset his life, disassociate from RAM, and turn to
Christianity."  (PSR ¶¶ 93-94.)  To the contrary, defendant continued
to actively and publicly advocate for the same violent extremist
ideology that led him to commit the crimes in this case.

While in Europe, defendant started Media2Rise[9], a media outlet
for the white nationalist movement comprised of "well-known figures
with a strong history as frontline activists" dedicated to combating
"decades of increasingly anti-white policies and an intentional
deterioration of national identity among western nations."[10]  The
Media2Rise website features videos documenting defendant's attendance
at white nationalist rallies throughout Europe following the June
2019 dismissal of this case.[11]

In a December 2020 post on the site, defendant advocated for the
creation of "Active Clubs," or "small-styled local clubs combin[ing]
fitness and nationalist activism" which could "fill the gap" left by

---

its violent extremist ideology and to profit from the publicity he
received by creating it.

[9] In a video titled "Message to our Supporters," defendant
identifies himself as the founder of Media2Rise.  (Videos,
Media2Rise, https://media2rise.com/videos/ (last accessed November
21, 2024).)  Media2Rise has an affiliated merchandize company,
Will2Rise, which sells white nationalist apparel and currently
features a video depicting defendant engaging in violence at
Huntington Beach and Berkeley and describing him as a "political
prisoner."  (Media, Will2Rise, https://shopw2r.com/media/ (last
accessed November 21, 2024).)

[10] (About Us, Media2Rise, https://media2rise.com/about-us/ (last
accessed November 21, 2024).)

[11] (Videos, Media2Rise, https://media2rise.com/videos/ (last
accessed November 21, 2024).)

17

institutions which "give little or no regard for white youth today."[12] Defendant lamented that "[b]oy scouts no longer teach boys how to be men, instead softening them up, discouring [sic] any forms of competition, accepting girls, and promoting LGBT values," and encouraged Active Clubs to "put out propaganda" to "let[] our own know the fight is not over."  (Id.)  Defendant also extolled the "brush fire effect" of these grassroots clubs, such that new ones would constantly catch on as "the system and media [would] waste tons of energy and resources to put [them] out[.]"  (Id.)  Defendant explained that "[e]ven if the system and their dogs manage to put out one fire, it will lead to minimal results because these clubs are generally small and local, helping to shield it from infiltrators and broader law enforcement actions."  (Id.)  Active Clubs fulfilling defendant's vision have since proliferated across the United States, with defendant largely credited for their establishment and growth.[13]

In a post from June 2021, defendant authored an article titled "Bad Boys Good Habits," in which he explained that in a "modern domesticated world where man is trapped in a cage made up of rules, laws, and bureaucracy, we all wish to break free from the chains of society and be the bad boy that blazes his own trail."[14]  Defendant explained that "radical change only happens with determination and

---

[12] (The Idea Behind "Active Club" Part 1, Media2Rise, https://media2rise.com/2020/12/07/active-club/ (last accessed November 21, 2024).)

[13] (See, e.g., 'Active club' hate groups are growing in the U.S. – and making themselves seen, NPR, https://www.npr.org/2023/07/19/1188111769/active-club-hate-groups (last accessed November 21, 2024).)

[14] (Bad Boys Good Habits, Media2Rise, https://media2rise.com/2021/06/24/bad-boys-good-habits/ (last accessed November 21, 2024).)

. . . creativity," describing favorably the Nazi Party's role in the nationalist movement under "creative leadership" and extolling the likability and relatability of antiheroes who perpetrate violence out of "loyalty to race and country."  (Id.)

Notably, defendant did not distance himself from RAM while living overseas, as he later claimed to the Probation Office, but spoke and wrote proudly of his role in founding it.  For example, defendant appeared on multiple podcasts in the spring of 2021 to discuss his role in RAM, the white nationalist movement, his ongoing projects to further that movement in Europe, and his "battle with the feds."[15]  Defendant similarly publicized his role as RAM's founder on his media site, which included various articles and videos about RAM.[16]  Defendant bragged that RAM had succeeded in "getting many out behind the keyboard and into the real world of activism" and referred back to RAM repeatedly throughout his posts, including citing it as an "example" of how to "reach the masses and set an example for others to follow."  (Id.)  In an April 2021 post commemorating the "Battle of Berkeley," defendant described nostalgically the experience of being there and bragged that the prosecution of RAM's members "was too late [because] an example was set, a flame was lit

---

[15] (See, e.g., Free RAM with Rob Rundo, Nordisk Radio, https://podcastaddict.com/nordisk-radio/episode/122992215 (last accessed November 22, 2024); Conversation with Robert Rundo of Media2Rise, Spreaker, https://www.spreaker.com/episode/conversation-with-robert-rundo-of-media2rise-ep-30--43770451 (last accessed November 22, 2024).)

[16] (The Idea Behind "Active Club" Part 1, Media2Rise, https://media2rise.com/2020/12/07/active-club/ (last accessed November 21, 2024).)

that many saw and took up the torch."[17]   The post includes various photographs of defendant at the Berkeley riot, including one of defendant and his co-conspirators standing with their "Defend America" and "Da Goyim Know" signs and another in which defendant, Daley, Boman, and others rip a banner away from counter-protestors. (Id.)

### F.    Defendant Travels Through Europe Using Fake Travel Documents and Bragging About Evading Law Enforcement

In February 2022, the Ninth Circuit reversed the dismissal order and remanded the case for further proceedings.  (Dkts. 158-161.)  The district court issued an arrest warrant in April 2022 after defendant did not appear at a status conference the previous month.  (Dkt. 168.)  Meanwhile, defendant traveled throughout various countries in Europe, including Bulgaria, Bosnia, and Serbia, using a fake passport with a fake name and bragging in public posts that he "might be the only man on the no-fly list to find a way around it and get to travel the world."  (Ex. 7 at 2; Ex. 9 at 1; Dkt. 392-2 at 154-55; 392-1 ¶ 31.)  In January 2023, in response to an article titled "California White Supremacist Robert Rundo Hunted by Police in Europe," defendant posted on social media: "How's that hunt going ??? [sunglasses emoji]."  (Ex. 7 at 1.)

In March 2023, nearly a year after the government obtained a warrant for his arrest, defendant was arrested in a Romanian gym in possession of identification cards bearing fake names.  (Ex. 8 at 1.) In August 2023, after serving approximately four months in custody in

---

[17] (Remembering the "Battle of Berkeley", Media2Rise, media2rise.com/2021/04/17/remembering-the-battle-of-berkeley/ (last accessed November 21, 2024).)

Romania, defendant was extradited on the First Superseding Indictment and transported back to the United States.  Nearly a year later and following significant pretrial litigation, including another dismissal, appeal, and Ninth Circuit remand of the case,[18] defendant pled guilty in September 2024 to conspiring to riot.  (Dkt. 435.)

## III.  PROBATION'S PRESENTENCE REPORT AND RECOMMENDATION

The Probation Office correctly calculated defendant's base offense level as 14 under U.S.S.G. § 2A2.2(a) and correctly applied both a two-level enhancement for more than minimal planning under U.S.S.G. § 2A2.2(b) and a three-level aggravating role adjustment under U.S.S.G. § 3B1.1(a).  (PSR ¶¶ 44-52.)  Factoring in a three-level reduction for timely acceptance of responsibility, Probation correctly calculated defendant's total offense level as 16 and his criminal history category as II, resulting in a Guidelines range of 24 to 30 months' imprisonment and a term of one to three years of supervised release.  (Id. ¶¶ 56-57, 60, 69, 117, 120.)  Citing the nature of the offense and conditions of defendant's upbringing as warranting a downward variance, the Probation Office recommended that defendant be sentenced to an 18-month term of imprisonment and two years of supervised release.  (Id. ¶ 131; Recommendation at 1-2.)

---

[18] The PSR incorrectly suggests that the district court dismissed the case a third time on April 18, 2024.  (PSR ¶ 18.)  While the procedural history over the last year is complex and largely irrelevant to defendant's sentencing, the government respectfully clarifies that on April 18, 2024, the Ninth Circuit dismissed as moot the government's appeal of a second release order, having already held on March 13, 2024, that (1) the Court's February 2024 order dismissing the indictment was stayed pending appeal; and (2) defendant would remain in custody pending a bail determination under the Bail Reform Act.  (United State of America v. Rundo, 24-1054 (9th Cir. 2024), Dkt. 7 (Apr. 18, 2024).)

**IV.  A 3-LEVEL ENHANCEMENT IS WARRANTED TO ACCOUNT FOR DEFENDANT'S ROLE CREATING AND LEADING THE RISE ABOVE MOVEMENT**

The government agrees with the Probation Office that a three-level enhancement is warranted under U.S.S.G. § 3B1.1(a) to account for defendant's aggravating role in the offense.  The Guidelines provide for a four-level enhancement when a defendant was either "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" and a three-level enhancement when a defendant "was a manager or supervisor (but not an organizer or a leader) and the criminal activity involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1.  In deciding whether to apply a leader/organizer or a manager/supervisor enhancement, the Court can consider the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  Id.

Here, as detailed above, defendant's communications with his own followers, as well as his followers' communications with each other, reflect that defendant was a primary founder and leader of RAM. Defendant articulated the vision of RAM to serve as a militant wing of Identity Europa, conceived of an "exact plan" for recruiting and training a particular demographic of members, and dictated what they wore and how they appeared at public events.  (PSR ¶ 24.)  His followers recognized him as "the boss" and followed his directives with respect to planning trainings, admitting members into the group,

22

and posting to social media.  (Id. ¶¶ 27-28.)  The violence and chaos inflicted by defendant and other RAM members in Huntington Beach, Berkeley, San Bernardino, and Charlottesville would not have occurred but for defendant forming RAM and training his followers to fight under its banner.  Accordingly, the government submits that a three-level enhancement is warranted to account for defendant's aggravating role in the offense.

**V.   A 24-MONTH SENTENCE IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO ACCOMPLISH THE ENUMERATED GOALS OF 18 U.S.C. § 3553[19]**

A 24-month sentence is sufficient, but not greater than necessary, to account for the factors enumerated in 18 U.S.C. § 3553, including the nature and circumstances of the offense, defendant's history and characteristics, the need to promote respect for the law, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  Based on the facts set forth above, and as detailed below, the downward variance to 18 months proposed by the Probation Office is not warranted.

**A.   The Nature and Circumstances of the Offense**

The nature and the circumstances of the offense warrant a 24-month sentence.  Defendant and his co-conspirators engaged in violent confrontations at public protests.  They attended those protests not for the purpose of engaging in constitutionally protected speech, but to engage in physical conflicts and drive out those with whom they

---

[19] Probation suggests that defendant is entitled to a downward variance in part due to the four months defendant spent in custody in Romania, (Recommendation at 5), but the government already factored the time defendant spent in Romanian custody when making its 24-month recommendation.

disagreed or disliked.  While defendant and his co-conspirators were
not the only agitators at those events, police on the ground
confirmed that it was defendant and his co-conspirators who would
repeatedly antagonize and then fight with protestors, picking
individuals out, isolating them, and then physically attacking them.
Defendant and his co-conspirators did not act defensively, but rather
charged over barricades, punched and kicked people from behind,
smashed cars, and turned what should have been public demonstrations
into public street fights to be won through group violence.

In recommending a downward variance, Probation significantly
downplays the seriousness and extent of defendant's conduct.
Specifically, Probation notes that "[d]uring an ensuing riot at one
of the rallies, [defendant] assaulted one protestor multiple times."
(Recommendation at 4.)  But, as an initial matter, defendant
physically attacked multiple individuals at both the Huntington Beach
and Berkeley rallies.  Defendant charged them, body-slammed them, and
hit them repeatedly from behind, at one point throwing punches so
indiscriminately that he repeatedly punched a police officer.  He did
not find himself in the middle of a riot, as Probation suggests;
rather, he intentionally and repeatedly provoked the riots.  And he
led a group of co-conspirators who similarly punched, kicked, and
otherwise assaulted people.  Defendant formed the group, spread the
ideology, trained his followers to fight, and led them to events
where they engaged in violence that was reasonably foreseeable in
furtherance of the conspiracy.

Notably, defendant's Guidelines would be the same if his conduct
were in fact limited to attending a single rally and punching one
counter-protestor there, as Probation suggests.  In such a case, a

24

downward variance may be warranted.  Here, it is not.  A 24-month

sentence is warranted to account for the nature and circumstances of

defendant's offense.

### B.    Defendant's History and Characteristics

A 24-month sentence is also sufficient but not greater than

necessary to account for defendant's history and characteristics.

This was not the first time defendant participated in a violent group

assault, having previously stabbed someone repeatedly as part of a

gang attack.  Again, the PSR and Recommendation Letter significantly

downplay this conduct, seemingly excusing defendant's prior felony

conviction as a "result of [his] negative associations."

(Recommendation at 4.)  Undoubtedly, aspects of defendant's history

are mitigating, including his relationship with his parents and the

gang culture to which he was exposed at an early age.  But there is a

significant delta between acting out or getting into fights as a

teenager and stabbing someone repeatedly, and the government's

proposed sentence of 24 months accounts for the mitigating aspects of

defendant's upbringing.

Moreover, while defendant is entitled to his views, the fact

that he carried out his criminal conduct in this case in furtherance

of his violent white supremacist ideology, which is largely absent

from Probation's analysis, is relevant to a fulsome analysis of

defendant's history and characteristics.  Defendant did not abandon

that ideology upon his initial release, disassociate from RAM, or

turn to religion, as he seems to have claimed to Probation, but

rather fled to Europe to continue advancing those causes.  A 24-month

sentence properly balances these aggravating factors against the

mitigating factors in defendant's personal history.

1    **C.    The Need to Promote Respect for the Law and Afford Adequate Deterrence**

A sentence of 24 months' imprisonment is also necessary to promote respect for the law and afford adequate deterrence.  When he believed that charges were imminent, defendant embarked on a determined campaign to avoid the criminal justice system by fleeing to any country he could get to.  After his case was dismissed for the first time, he publicly expressed his desire to break free from the "cage" of rules and laws and advocated for the proliferation of grassroots extremism that would successfully subvert law enforcement. And despite knowing his case had been reinstated, he ducked from country to country throughout Europe using fake travel documents and publicly bragged about his ability to circumvent flight restrictions and evade capture.  In sum, defendant's conduct -- both the criminal conduct to which he has pleaded guilty and his conduct after his indictment in this case -- reflect that he has little respect for the law.  Affording him a downward variance will do little to promote any such respect.

A within-Guidelines sentence of 24 months' imprisonment is also warranted to deter defendant from engaging in further criminal conduct.  Such a sentence is sufficient, provided defendant is placed on a two-year term of supervised release that will allow the Court, through Probation, to monitor his conduct.  But the government respectfully disagrees with Probation's assessment that defendant "led a law-abiding life until this offense" and that "[r]ecidivism does not appear to be a concern."  (Recommendation at 5.)  First, defendant is already a recidivist, having committed violent acts in this case which echo conduct for which he sustained a prior felony

26

conviction.  Furthermore, for years since his arrest in this case,
defendant has continued to promote the same violent extremist
ideology that motivated his violent crimes in this case.  For these
reasons, a downward variance will not provide sufficient deterrence.
A 24-month sentence and two-year term of supervised release are
warranted to deter defendant from further criminal conduct and
promote respect for the law.

### D.    The Need to Avoid Unwarranted Sentencing Disparities

Finally, a sentence of 24 months' imprisonment would avoid an
unwarranted sentencing disparity between this and other defendants
with similar records who have been convicted of similar conduct.
Based on their violence at the events they attended with defendant in
California, as well as the violence they inflicted in
Charlottesville, defendant's co-conspirators received sentences
between 27 and 37 months' imprisonment in the Eastern District of
Virginia, with defendant's co-founder, Daley, receiving a 37-month
sentence.

Factoring in the time he spent in Romania, which the government
does not anticipate BOP will credit, the government's 24-month
recommendation would result in defendant serving approximately 28
months in custody, which would be consistent with the sentences
afforded to his co-conspirators who did not found and lead the group.
As defendant did not attend the Unite the Right rally, it stands to
reason that his sentence would be lower than that of his co-founder.
But a downward variance to 18 months -- less than half the sentence
served by Daley -- would create an unwarranted disparity.

**VI.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 24 months' imprisonment, two years of supervised release, and a $100 special assessment.