**Exhibit A**

# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

    v.

ROBERT RUNDO AND
ROBERT BOMAN,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 24-932
D.C. No. 18-CR-759-CJC
(Central Dist. Cal.)

**GOVERNMENT'S REPLY IN
SUPPORT OF MOTION TO
CONTINUE DEFENDANT
RUNDO'S DETENTION
PENDING APPEAL;
DECLARATIONS;
ADDENDUM**

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division

BRAM M. ALDEN
Chief, Criminal Appeals Section
1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-3898
Email: bram.alden@usdoj.gov

ALEXANDER P. ROBBINS
Assistant United States Attorneys
Deputy Chief, Criminal Appeals
Section

ELANA SHAVIT ARTSON
Assistant United States Attorneys
Criminal Appeals Section

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

II.    ARGUMENT ................................................................................. 3

    A.    The Bail Reform Act Authorizes Detention Pending the
        Government's Appeal, and Detention Is Warranted Here ..... 3

        1.    The law permits a defendant's detention pending a
               government appeal from the dismissal of an
               indictment. ................................................................... 3

        2.    Defendant should be detained based on his extreme
               risk of flight and serious danger to the community ...... 8

    B.    If Necessary to Detain Defendant Pending Appeal, This
        Court Should Stay the Dismissal of the Indictment ........... 12

        1.    The government has a strong likelihood of success on
               appeal ........................................................................ 13

            a.    There was no discriminatory effect because
                   defendants pointed to no similarly situated
                   lawbreaker ........................................................... 15

            b.    There was no discriminatory intent because
                   defendants point to no constitutionally protected
                   speech for which they were targeted ................... 20

        2.    The government will suffer irreparable harm if
               defendant is released and again leaves the country ... 23

        3.    Issuance of a stay will not harm any other parties to
               the proceeding but will be in the public interest ......... 24

    C.    The Government Did Nothing Improper to Effectuate This
        Court's Order and Permit Orderly Appellate Briefing
        Regarding Bail Pending Appeal ........................................... 25

III.    CONCLUSION ............................................................................ 32

# TABLE OF AUTHORITIES

## Federal Cases

*Clay v. United States,*
    537 U.S. 522 (2003)............................................................................5

*Nken v. Holder,*
    556 U.S. 418 (2009)......................................................................2, 12

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377 (1992)..........................................................................23

*United States v. Aguilar,*
    883 F.2d 662 (9th Cir. 1989).................................................16, 17, 19

*United States v. Arenas-Ortiz,*
    339 F.3d 1066 (9th Cir. 2003)..........................................................15

*United States v. Arias,*
    575 F.2d 253 (9th Cir. 1978).............................................................15

*United States v. Armstrong,*
    517 U.S. 456 (1996)...................................................................passim

*United States v. Barber,*
    603 F. App'x 643 (9th Cir. 2015)......................................................15

*United States v. Bass,*
    536 U.S. 862 (2002)..........................................................................20

*United States v. Bourgeois,*
    964 F.2d 935 (9th Cir. 1992).............................................................15

*United States v. Candia-Veleta,*
    104 F.3d 243 (9th Cir. 1996).............................................................15

*United States v. Davis,*
    793 F.3d 712 (7th Cir. 2015)...............................................................6

*United States v. Ford,*
    821 F. App'x 742 (9th Cir. 2020)......................................................15

# TABLE OF AUTHORITIES

*United States v. Garcia,*
    210 F.3d 1058 (9th Cir. 2000) ............................................................... 5

*United States v. Gentile,*
    782 F. App'x 559 (9th Cir. 2019) ....................................................... 15

*United States v. Gilbert,*
    807 F.3d 1197 (9th Cir. 2015) .............................................................. 5

*United States v. Gonzalez-Torres,*
    309 F.3d 594 (9th Cir. 2002) ............................................................. 16

*United States v. Hastings,*
    126 F.3d 310 (4th Cir. 1996) ............................................................. 18

*United States v. Lewis,*
    517 F.3d 20 (1st Cir. 2008) ............................................................... 18

*United States v. Little,*
    485 F.3d 1210 (8th Cir. 2007) ........................................................... 25

*United States v. Martinez,*
    589 F. App'x 371 (9th Cir. 2015) ....................................................... 15

*United States v. Montalvo-Murillo,*
    495 U.S. 711 (1990) ......................................................................... 25

*United States v. Ness,*
    652 F.2d 890 (9th Cir. 1981) ..................................... 19, 21, 22, 23

*United States v. Nixon,*
    418 U.S. 683 (1974) ......................................................................... 13

*United States v. Olson,*
    504 F.2d 1222 (9th Cir. 1974) ........................................................... 14

*United States v. Ortega-Lopez,*
    988 F.2d 70 (9th Cir. 1993) .............................................................. 27

*United States v. Rundo,*
    990 F.3d 709 (9th Cir. 2021) ...................................................... 1, 5

# TABLE OF AUTHORITIES

*United States v. Sambasivam,*
2023 WL 4980932 (S.D. W.Va. Aug. 3, 2023) ...................................... 7

*United States v. Schwartz,*
274 F.3d 1220 (9th Cir. 2001) .................................................... 5

*United States v. Scott,*
521 F.2d 1188 (9th Cir. 1975) ................................................... 15

*United States v. Shareef,*
907 F. Supp. 1481 (D. Kan. 1995) ............................................... 8

*United States v. Smith,*
231 F.3d 800 (11th Cir. 2000) ............................................... 16, 17

*United States v. Solorio-Mendoza,*
731 F. App'x 583 (9th Cir. 2018) ............................................... 15

*United States v. Turner,*
104 F.3d 1180 (9th Cir. 1997) .......................................... 14, 15, 21

*United States v. Wayte,*
710 F.2d 1385 (9th Cir. 1983) ................................................. 15

*United States v. Wilson,*
639 F.2d 500 (9th Cir. 1981) .................................................. 23

*Wayte v. United States,*
470 U.S. 598 (1985) ...................................................... passim

*Wisconsin v. Mitchell,*
508 U.S. 476 (1993) .................................................. 21, 22, 23

*Wood v. Moss,*
572 U.S. 744 (2014) .......................................................... 19

**Federal Statutes**

18 U.S.C. 3731 .............................................................. 2, 7

18 U.S.C. § 2101 ............................................................... 17

# TABLE OF AUTHORITIES

18 U.S.C. § 3142 ............................................................................ passim

18 U.S.C. § 3143 ............................................................................ passim

18 U.S.C. § 3145(a) ............................................................................... 2

**Federal Rules**

Federal Rule of Criminal Procedure 4 .................................................... 7, 8

**Federal Regulations**

28 C.F.R. § 0.20(b) ............................................................................... 2

## I.    <u>INTRODUCTION</u>

Defendant-Appellee Robert Rundo is a militant white supremacist charged with leading a combat-ready clan of extremists to political rallies at which they attacked demonstrators to silence their speech. The United States has a compelling interest in prosecuting defendant and his co-defendants for their reprehensible crimes and has pursued that interest forcefully but fairly.  Contrary to the defense's mischaracterizations, the United States has at all times acted to enforce this Court's orders and uphold the rule of law.

Defendant is now detained and should remain so pending the government's appeal from the district court's order dismissing his indictment.  This is the second time the district court has dismissed the indictment.  The first time, this Court reversed.  *United States v. Rundo*, 990 F.3d 709, 712 (9th Cir. 2021), *cert. denied,* 142 S. Ct. 865 (2022).  In the interim, defendant left the United States and had to be extradited from Romania to face prosecution.  Detaining him is essential to protect against the extreme likelihood that he will otherwise flee or resume his campaign of violence.

Defendant's position is that this Court is powerless to prevent his release. That is untenable and incorrect. The Bail Reform Act is unambiguous: 18 U.S.C. § 3143(c) provides that pending an appeal by the United States under 18 U.S.C. § 3731, as here, release or detention is either controlled by any prior release or detention order or governed by 18 U.S.C. § 3142, which, in turn, requires evaluation of flight risk and dangerousness. And the government has a right to appeal from any release order, 18 U.S.C. § 3145(a), ensuring that this Court can exercise its role of appellate review. Here, because defendant represents an obvious flight risk and a serious danger to the community, he should be detained pending the government's appeal from the district court's dismissal of the indictment.

Though the statute's plain text permits detention pending appeal, if it is necessary to stay the district court's order of dismissal for the purpose of continuing defendant's detention, then this Court should do so. The factors enumerated in *Nken v. Holder*, 556 U.S. 418 (2009), weigh decidedly in favor of a stay. The government is likely to prevail on the merits because defendant came nowhere close to satisfying the "demanding" and "rigorous" standard to warrant dismissal of his

2

indictment on selective prosecution grounds.  *See United States v.
Armstrong*, 517 U.S. 456 (1996).  And the risk of irreparable harm to
the government absent a stay is substantial because defendant, by
absconding, could avoid prosecution altogether.  Counterbalanced
against that risk, the harm to defendant is a harm the law permits by
authorizing his detention pending the government's appeal.  The public
interest, moreover, overwhelmingly supports a stay, both to ensure that
defendant does not evade prosecution and to protect the community
from his violence.

## II.  <u>ARGUMENT</u>

### A.  The Bail Reform Act Authorizes Detention Pending the Government's Appeal, and Detention Is Warranted Here

1.  <u>The law permits a defendant's detention pending a
government appeal from the dismissal of an indictment</u>

Defendant's argument rests on the premise that once a district
judge dismisses an indictment, no matter how erroneous that ruling, no
court has the power to detain the defendant or order any conditions of
release pending the government's appeal of the dismissal order because
the defendant is no longer "charged with an offense" pursuant to 18

3

U.S.C. § 3142(a).  (Docket No. 18.1 ("Opposition") 21-26.)[1]  Thus, the

defense contends that defendant must be released and is free to avoid

the consequences of the government's likely successful appeal by

relocating to a location that lacks an extradition treaty with the United

States.  Fortunately, the law empowers this Court to safeguard against

such an injustice.

Section 3143(c), governing "[r]elease or detention pending appeal

by the government," provides that the court "shall *treat* a defendant in a

case in which *an appeal has been taken by the United States under*

*section 3731* . . . in accordance with section 3142 of this title, unless the

defendant is otherwise subject to a release or detention order."  18

U.S.C. § 3143(c) (emphasis added).  Although § 3731 explicitly includes

an "order of a district court dismissing an indictment," defendant

---

[1] "Docket No." refers to entries on this Court's docket; "GEX"
refers to the exhibits that were attached to the government's
"Emergency Motion" at Docket No. 3.1; "GFEX" refers to the further
exhibits filed with this brief; "Warrant" refers to the search warrant
excerpts filed provisionally under seal with this brief; and "CPD" refers
to the confidential probation document at Docket No. 4.1.  An
"Addendum" and the Declarations of Bram M. Alden and Scott
Bierwirth are attached hereto; the government, in its haste, failed to
attach the latter declaration to its Emergency Motion and apologizes for
that oversight.

argues that appeals of such orders are not covered by § 3143(c)—or any

other statue—because § 3142(a) applies only to a person "charged with

an offense," which he no longer is.  (Opposition 26.)  That is wrong for

multiple reasons.

First, defendant remains charged with an offense.  If the district

court's order is reversed on appeal, the government will not have to re-

file the charges; the case will simply proceed on the present First

Superseding Indictment.  *See Rundo*, 990 F.3d at 721 (simply reversing

dismissal and remanding for further proceedings).  That is because, as

the government previously explained (Emergency Motion 9-10), the

dismissal order, like a conviction, should not be deemed final until the

government's appeal of that order is resolved.[2]  Contrary to defendant's

contention (Opposition 25-26), the logic for applying that principle here

_____

[2] "If the movant pursues a direct appeal to the Court of Appeals
but does not file a petition for writ of certiorari with the United States
Supreme Court, the conviction becomes final when the time for filing
such a petition lapses. *See Clay v. United States*, 537 U.S. 522, 532
(2003); *United States v. Garcia*, 210 F.3d 1058, 1060 (9th Cir. 2000).
However, if the movant does not pursue a direct appeal to the Court of
Appeals, the conviction becomes final when the time for filing a direct
appeal expires. *See United States v. Schwartz*, 274 F.3d 1220, 1223 & n.
1 (9th Cir. 2001) (citing Fed. R. App. P. 4); *United States v. Gilbert*, 807
F.3d 1197, 1199 (9th Cir. 2015).

does not depend upon whether the dismissal was with or without

prejudice. In light of the government's appeal, the charges in the First

Superseding Indictment continue to provide a basis to invoke § 3142.

Second, defendant misreads § 3143(c). The plain text of § 3143(c)

includes *all* appeals taken under § 3731; it does not distinguish among

different grounds for government appeal or contain a carve-out for

appeals of an order dismissing an indictment. On the contrary, the

plain language establishes that when the government takes an appeal

pursuant to § 3731, including of a dismissal order, § 3143(c) "requires

the district court to treat the defendant as if the case were still active

and apply the criteria set forth in 18 U.S.C. § 3142." *United States v.*

*Davis*, 793 F.3d 712, 729 n.5 (7th Cir. 2015) (Rovner, J., dissenting). By

using the word "treat," the cross-reference to § 3142 serves to establish

only that release or detention pending a pre-trial appeal arising under

§ 3731 should be determined based on the pre-trial standards set forth

in section 3142, not the stricter standards governing bail pending

sentence, 18 U.S.C. § 3143(a), or bail pending appeal by a defendant

following a conviction, 18 U.S.C. § 3143(b). It does not eliminate a

court's authority to detain a defendant or order conditions of release

6

pending the government's appeal of a dismissal order. *See United States v. Sambasivam*, 2023 WL 4980932, at *2 (S.D. W.Va. Aug. 3, 2023) (rejecting claim that dismissal of all charges required termination of all bond conditions because "[f]ollowing the statutory guidance to refer to Section 3142, only to determine that it is entirely inapplicable, would essentially ask the Court to reject the guidance set forth in Section 3143").

The legislative history of § 3143(c) confirms that interpretation:

> Subsection (c) concerns release pending appeal by the government from orders of dismissal of an indictment or information and suppression of evidence pursuant to 18 U.S.C. 3731. As both of these kinds of appeals contemplate a situation in which the defendant has not been convicted, the defendant is to be treated under section 3142, the general provision governing release or detention pending trial. Subsection (c) is a new provision derived from 18 U.S.C. 3731. *Use of the term "treated" removes an ambiguity in the current statute and makes it clear that the judicial officer may release or detain the defendant as provided in section 3142.* In such cases, the defendant, of course, would not have been convicted, and he thus should be treated in the same manner as a person who has not yet stood trial, as opposed to a person who has been tried and convicted.

S. Rep. 98-225 at 27 (1983) (emphasis added and footnote deleted). (*See* Addendum 31.) The legislative history makes clear that subsection (c) applies to a government appeal of an order dismissing the indictment

and that a judge may detain a defendant pending the government's
appeal if the criteria for pretrial detention in section 3142 are satisfied.

Accordingly, defendant's illogical claim that no court has legal
authority to detain him, or even impose any conditions of release, must
be rejected.

2.  <u>Defendant should be detained based on his extreme risk of
flight and serious danger to the community</u>

Because defendant was "otherwise subject to a . . . detention
order" at the time the district court dismissed the First Superseding
Indictment, 18 U.S.C. § 3143(c), the government argued in its
Emergency Motion that the magistrate judge's August 2, 2023 detention
order should remain in place.  Defendant maintains that this language
must refer to a detention order in a different case, not the present case
(Opposition 17-18), but the statute contains no such additional
language.  The better reading of this clause is that "the court is not
required to conduct a detention hearing when a release or detention
order is otherwise in effect.  However, when the court does consider
detention issues following an appeal by the government, such
consideration should be under the provisions of 18 U.S.C. § 3142."
*United States v. Shareef*, 907 F. Supp. 1481, 1483 (D. Kan. 1995)

(adopting this construction). A court may reopen a detention hearing

based on changed circumstances pursuant to 18 U.S.C. § 3142(f), but

defendant did not argue below that the circumstances have changed

with respect to flight or danger since the magistrate judge's August 2,

2023 order. Thus, no further detention hearing was or is necessary.

But even if analysis of the § 3142 factors is warranted at this

point, those factors firmly support detention. Indeed, defendant did not

contest his detention and never appealed from the magistrate judge's

order of detention, which found that defendant was both a danger to the

community and a serious risk of flight. (GEX-27-30.)

As the government previously described, given defendant's travel

history and numerous foreign contacts, he presents a grave risk of

flight. (Emergency Motion 2-3, 4, 7.) There is every reason to believe

that if released, defendant will again leave the United States and will

likely seek refuge in a country that lacks an extradition treaty with the

United States. Defendant fled the United States on multiple occasions

prior to his initial arrest. (*See* CPD-14.) On October 2, 2018, law

enforcement officers arrested four of defendant's co-conspirators and

searched defendant's home. (Warrant 4-5.) On October 5, 2018,

9

defendant traveled to London but was denied entry and sent back to the

United States. (*Id.* at 5.) On October 9, 2018, defendant attempted to

leave the United States again on a flight to Kiev, Ukraine, but was

denied boarding. (*Id.* at 6.) That same day or the following day, he

crossed the border into Mexico and flew to Cuba, where he attempted to

board a flight to Moscow, but was denied entry. (*Id.*) Defendant then

traveled back to Mexico City and flew to El Salvador, where he was

detained attempting to board a flight to Moscow. (*Id.* at 6-7.) Law

enforcement authorities in El Salvador transferred defendant to the

custody of FBI agents on an outstanding arrest warrant and defendant

was returned to the United States. (*Id.*) More recently, following the

district court's prior dismissal order, defendant again fled the United

States and was ultimately arrested in Romania in possession of false

identification documents and extradited to the United States. (GEX-29;

CPD-2, 31; Declaration of Scott Bierwirth, Exhibits 1 and 2.)

Defendant argues for the first time on appeal that when he

previously traveled abroad to evade arrest, he was not under any court

order preventing such travel, and that he did not manage to leave the

United States on February 21, 2024 before the government was able to

arrest him and return him to custody. (Opposition 10-11.) Those
arguments ring hollow in light of defendant's repeated circuitous travel
and use of a false passport and identification documents while abroad,
demonstrating the extraordinary measures to which defendant will
resort to evade prosecution. And the fact that he did not abscond
immediately upon his recent release from custody does little to show
that he will not be more successful during the period of months before
the government's appeal of the dismissal order is resolved.

The evidence also proves that defendant is a danger to the
community. The passage of time since the events underlying the
present charges is immaterial given defendant's criminal history. He
has a 2010 conviction for a gang-related assault causing serious
physical injury (CPD-13), and the violent attacks underlying the
present charges occurred years later, in 2017. The First Superseding
Indictment further alleges that in April 2018, defendant and other
members of the white nationalist "Rise Above Movement" (RAM)
traveled to Germany, Ukraine, and Italy, where they engaged in combat
training with other white supremacists. (GFEX-237.) There is no

evidence that defendant's long-standing violent activities as part of a
criminal organization will cease now.

## B.  If Necessary to Detain Defendant Pending Appeal, This Court Should Stay the Dismissal of the Indictment

Even if it were necessary for this Court to consider the *Nken*
factors and separately stay the district court's order dismissing the
indictment, those factors would readily be met here.

A stay is "an exercise of judicial discretion, and the propriety of its
issue is dependent upon the circumstances of the particular case."
*Nken*, 556 U.S. at 433.  The factors enumerated in *Nken* weigh
decidedly in favor of a stay, individually and taken together.  Each
factor is met here, although the first two "are the most critical"—
"(1) whether the stay applicant has made a strong showing that he is
likely to succeed on the merits; (2) whether the applicant will be
irreparably injured absent a stay; (3) whether issuance of the stay will
substantially injure the other parties interested in the proceeding; and
(4) [whether] the public interest lies" in favor of a stay.  *Id.* at 434.

1.    <u>The government has a strong likelihood of success
on appeal</u>

Meritorious selective-prosecution claims are extraordinarily rare,

as they should be.  The "Attorney General and United States Attorneys

retain broad discretion to enforce the Nation's criminal laws."

*Armstrong*, 517 U.S. at 464.  A "presumption of regularity supports

their prosecutorial decisions and, in the absence of clear evidence to the

contrary, courts presume that they have properly discharged their

duties."  *Id.* (cleaned up).  As a result, "[i]n the ordinary case, so long as

the prosecutor has probable cause to believe that the accused committed

an offense defined by statute, the decision whether or not to prosecute,

and what charge to file or bring before a grand jury, generally rests

entirely in his discretion."  *Id.*

That presumption of regularity "also stems from a concern not to

unnecessarily impair the performance of a core executive constitutional

function."  *Id.* at 465.  "[T]he Executive Branch has exclusive authority

and absolute discretion to decide whether to prosecute a case," *United

States v. Nixon*, 418 U.S. 683, 693 (1974), and in all but the most

extraordinary circumstances, the separation of powers commands "that

the courts are not to interfere with the free exercise of the discretionary

13

powers of the attorneys of the United States in their control over
criminal prosecutions," *United States v. Olson*, 504 F.2d 1222, 1225 (9th
Cir. 1974); *see also Wayte v. United States*, 470 U.S. 598, 607 (1985)
("Judicial supervision in this area, moreover, entails systemic costs of
particular concern.").

    The Supreme Court therefore imposes a "demanding" and
"rigorous" standard on selective-prosecution claims, requiring proof
"that the federal prosecutorial policy had a discriminatory effect *and*
that it was motivated by a discriminatory purpose." *Armstrong*, 517
U.S. at 463, 465, 468 (emphasis added). "Both prongs"—discriminatory
effect and discriminatory purpose—"must be demonstrated for the
defense to succeed." *United States v. Turner*, 104 F.3d 1180, 1184 (9th
Cir. 1997). Following *Armstrong* (which reversed a Ninth Circuit
decision requiring discovery on a selective-prosecution claim, *see* 517
U.S. at 461), this Court has time and again rejected such claims. *See
Turner*, 104 F.3d at 1184 (reversing a district court's order); *see also*

14

*United States v. Wayte*, 710 F.2d 1385 (9th Cir. 1983) (same), *aff'd*, 470
U.S. 598 (1985).[3]

Neither of the two required prongs for a selective-prosecution
claim is even close to being met here. Defendant and his co-defendant
failed to establish either discriminatory effect or discriminatory
purpose, *Turner*, 104 F.3d at 1184, and the district court's analysis was
legally erroneous as to both prongs.

    *a.*   *There was no discriminatory effect because defendants
           pointed to no similarly situated lawbreaker*

To prove discriminatory effect, a defendant bears the burden of
showing that "others similarly situated generally have not been
prosecuted for conduct similar to that for which he was prosecuted."
*United States v. Scott*, 521 F.2d 1188, 1195 (9th Cir. 1975); *see also*
*United States v. Arias*, 575 F.2d 253, 255 (9th Cir. 1978) (same). The

---

[3] *See also, e.g.*, *United States v. Ford*, 821 F. App'x 742, 746 (9th
Cir. 2020) (affirming denial of a selective-prosecution claim); *United
States v. Gentile*, 782 F. App'x 559, 560 (9th Cir. 2019) (same); *United
States v. Solorio-Mendoza*, 731 F. App'x 583, 587 (9th Cir. 2018)
(same); *United States v. Barber*, 603 F. App'x 643 (9th Cir. 2015)
(same); *United States v. Martinez*, 589 F. App'x 371 (9th Cir. 2015)
(same); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir.
2003) (same); *United States v. Candia-Veleta*, 104 F.3d 243, 246 & n.3
(9th Cir. 1996) (same); *United States v. Bourgeois*, 964 F.2d 935, 936
(9th Cir. 1992).

similarly situated comparator, or "control group," must be the same as
the defendant "in all relevant respects, except that defendant was, for
instance, exercising his first amendment rights." *United States v.
Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989), *superseded by statute on
other grounds as stated in United States v. Gonzalez-Torres*, 309 F.3d
594, 599 (9th Cir. 2002).  Lawbreakers are not "similarly situated"
unless they "committed the same basic crime in substantially the same
manner," such that their prosecutions "would have the same deterrence
value and would be related in the same way to the Government's
enforcement priorities and enforcement plan." *United States v. Smith*,
231 F.3d 800, 810 (11th Cir. 2000).

The district court found nothing of the sort.  The court simply
criticized the government for not federally prosecuting (more) members
of a left-wing militant group, "Antifa," without any showing that
particular Antifa members were similarly situated to defendants.[4]  The

_____

[4] As the government noted below (GFEX-215 & n.9), it is currently
appealing a mirror-image selective-prosecution order from a different
district judge in the Central District of California, who faulted the
government for discriminating *against* Antifa and other "far left
extremists."  *See United States v. Wilson & Beasley*, C.A. No. 23-50016.
That case—which presents very similar legal issues to this one—is set
for argument before this Court on May 6, 2024.

district court erroneously compared groups, not individuals: it reasoned

that "RAM and Antifa" "both appear to use violence to silence protected

speech" and are therefore "identical in material respects." (GEX-59.)

With respect to similarly situated *individual lawbreakers*,

however—people who could potentially be prosecuted, *see Aguilar*, 883

F.2d at 706; *Smith*, 231 F.3d at 810—the district court identified only

three Antifa members who had committed crimes within the Central

District of California, by assaulting people at a rally in Huntington

Beach in March 2017. (GEX-60-61.) There was no evidence that those

three Antifa members, like defendants, had rioted at multiple rallies or

had coordinated with each other over an extended period of time.

Indeed, there was no evidence that these Antifa members could have

been federally prosecuted at all—the Anti-Riot Act charges in this case

require use of a facility of interstate commerce, 18 U.S.C. § 2101, and

the district court simply assumed that the three Antifa members must

have done so when they "contacted" each other "before the event to

make sure that they were going." (GEX-61.) But speculation is not

evidence and does not allow the government to convict a defendant

beyond a reasonable doubt of using a facility of interstate commerce to

instigate and engage in a riot.  *See Wayte*, 470 U.S. at 612 (strength of
the evidence is a legitimate prosecutorial consideration).  Nor did
defendants establish whether those three Antifa rioters inflicted similar
harm on their victims, had similar criminal histories, or were similarly
dangerous to society in comparison to defendants.

All of those unknown facts mattered.  While the government may
not defeat a selective-prosecution claim by invoking distinctions that
have no bearing on the decision whether to prosecute, a "multiplicity of
factors legitimately may influence the government's decision to
prosecute one individual but not another," *United States v. Lewis*, 517
F.3d 20, 27 (1st Cir. 2008), and lawbreakers are not similarly situated
unless "their circumstances present no distinguishable legitimate
prosecutorial factors that might justify making different prosecutorial
decisions with respect to them," *United States v. Hastings*, 126 F.3d
310, 315 (4th Cir. 1996).[5]

---

[5] Indeed, defendants have not even established that focusing
resources on RAM versus Antifa at that particular time and place—
even if that were the correct level of analysis, which it is not—would be
impermissibly politically discriminatory.  The "deterrence of
widespread" criminal activity is a "proper prosecutorial consideration,"
*(footnote cont'd on next page)*

In short, a selective-prosecution "claimant must show that

similarly situated *individuals* . . . were not prosecuted." *Armstrong*, 517

U.S. at 465 (emphasis added).  The "showing of failure to prosecute

similarly situated individuals" is an "absolute requirement." *Id.*  And

that requirement was not met here—defendants did not demonstrate

that any single lawbreaker who was "the same in all relevant respects,"

*Aguilar*, 883 F.2d at 706, had gone unprosecuted by the federal

government.  Rather, without any "solid, credible evidence" to go on

about whether any other riot suspect was similarly situated in "all

relevant respects," *Bourgeois*, 964 F.2d at 940; *Aguilar*, 883 F.2d at 706,

the district court resorted to "personal conclusions based on anecdotal

---

*United States v. Ness*, 652 F.2d 890, 892 (9th Cir. 1981), and there may
be deterrence value in focusing on particular criminal organizations at a
particular time.  *See, e.g.*, Attorney General William P. Barr, "Task
Force on Violent Anti-Government Extremists" (June 26, 2020),
https://www.justice.gov/archives/ag/page/file/1327271/download
(focusing on violent extremist groups, including Antifa); *cf. Wood v.
Moss*, 572 U.S. 744, 761–62 (2014) (Secret Service agents can treat
different groups of protestors differently if they any "objectively
reasonable security rationale for" doing so, as long as they are not
"act[ing] solely to inhibit the expression of disfavored views").  Although
there is no evidence that they did so here, the Attorney General and
U.S. Attorney at the time would have had the discretion to focus on
RAM over Antifa for any legitimate law-enforcement reason.

evidence" of the sort rejected in *Armstrong*, 517 U.S. at 470, speculating

that surely some Antifa members must have violated the Anti-Riot Act

at some point and making organization-level comparisons between

Antifa and RAM.  The Supreme Court has repudiated such a 30,000-

foot-view approach.  *United States v. Bass*, 536 U.S. 862, 864 (2002)

("raw statistics regarding overall charges say nothing about charges

brought against *similarly situated defendants*" (emphasis in original)).

The district court pointed to no example—and defendants provided

none—of a single person similarly situated to either of them who was

not federally prosecuted.

> b.   *There was no discriminatory intent because defendants*
>       *point to no constitutionally protected speech for which*
>       *they were targeted*

The discriminatory-intent prong was not satisfied, either, because

defendants did not produce any evidence of a discriminatory purpose—

their argument (adopted by the district court) was merely that the

circumstantial evidence of *discriminatory effect* was so overwhelmingly

strong that it satisfied the discriminatory-intent prong.  (GEX-59-60.)

As explained above, however, the evidence of discriminatory effect was

deficient, not overwhelming; it wholly failed to satisfy the "demanding"

and "rigorous" standard *Armstrong* established, *see* 517 U.S. at 463,

468.  And the district court's reasoning effectively collapsed the two

required prongs—discriminatory effect and discriminatory purpose,

*Armstrong*, 517 U.S. at 463, 465, 468; *Turner*, 104 F.3d at 1184—into a

single prong.

Defendants also cannot meet the discriminatory-intent

requirement because they cannot show they were targeted based on

their *non-criminal* protest activity.  "The First Amendment does not

protect violence." *Wisconsin v. Mitchell*, 508 U.S. 476, 484

(1993).  Rioting is not protected merely because it may be politically

motivated or expressive.  The government is allowed to prosecute

politically motivated violence and cannot be assumed to have been

motivated by an unconstitutionally discriminatory purpose merely

because some politically motivated rioters were prosecuted while others

were not.  Neither law nor common sense prevents federal prosecutors

from using a federal riot statute against politically motivated rioters.

The government is allowed to have "enforcement priorities," *Wayte*, 470

U.S. at 607, including deterring politically motivated criminal conduct,

*see United States v. Ness*, 652 F.2d 890, 892 (9th Cir. 1981) (tax defiers).

21

Speech and political activity are constitutionally protected; political
*motives* for violent crime are not.

The district court erroneously conflated the two, finding that
defendants (and other members of RAM) "engaged in violent acts" at
rallies and protests but nonetheless faulting the government for
"singl[ing] out and punish[ing]" RAM's "speech."  (GEX-32; *see also id.*
("The government cannot prosecute RAM members such as Defendants
while ignoring the violence of members of Antifa and related far-left
groups because RAM engaged in what the government and many
believe is more offensive speech.").)  That was a critical mistake:
defendants' *rioting* was not speech.  Violence is not constitutionally
protected *even when* it is expressive.  *See Mitchell*, 508 U.S. at 484; *see
also Ness*, 652 F.2d at 892 ("Tax violations are not a protected form of
political dissent."); *Wayte*, 470 U.S. at 614 (the "First Amendment
confers no . . . immunity from prosecution" on a defendant who overtly
breaks the law and then "claim[s] that he did so in order to 'protest' the
law").

As the government argued before the district court, the
constitutionally protected expressive activity must be *separate* from the

22

crime.  (GFEX-210-14.)  Otherwise, the government could not prosecute

defendants who openly refused to register for the draft or pay taxes.

*But see Wayte*, 470 U.S. 598 at 610; *United States v. Wilson*, 639 F.2d

500 (9th Cir. 1981); *Ness*, 652 F.2d at 892.  To be sure, the government

cannot engage in "content discrimination" that is "unrelated" to the

"proscribable" conduct at issue.  *R.A.V. v. City of St. Paul, Minn.*, 505

U.S. 377, 385 (1992).  But here there is no evidence of any separate

speech by defendants—the only evidence of their political motivation

was the rioting itself.   And a criminal's "motive" for committing a crime

is not protected by the First Amendment.  *Mitchell*, 508 U.S. at 485-86.

> ### 2.   The government will suffer irreparable harm if defendant is released and again leaves the country

As explained above, defendant is a clear and obvious flight risk;

the last time the district court dismissed the indictment, he relocated to

Romania.  If he once again relocates and thereby avoids prosecution

altogether, the harm to the government will be permanent and

irreparable.  By contrast, if the briefing and argument in this appeal is

expedited (which the government would not oppose on a reasonable

timetable), the additional detention will be minimal and within this

Court's power to control.  And, as also explained above, defendant's

pretrial detention pending resolution of the government's appeal is a

harm that the law expressly contemplates, *see* 18 U.S.C. § 3143(c).

> 3.    Issuance of a stay will not harm any other parties to the
>        proceeding but will be in the public interest

The third and fourth prongs also favor the government.  There are

no other affected parties to the litigation who could be harmed by a

stay, and there is a strong public interest in allowing the government to

prosecute defendants' violence.  Indeed, if this case were to further

languish (because, for example, defendant again leaves the United

States), while the government's appeal in the mirror-image case of

*Wilson*, C.A. No. 23-50016, goes forward to argument in May 2024 and a

decision soon thereafter, that disparity might affirmatively undermine

the appearance of fair and evenhanded justice.  Both appeals arise from

cases prosecuted by the United States Attorney's Office for the Central

District of California—this one, where the district court faulted the

government for "ignoring" Antifa (GEX-32), and *Wilson*, where the

district court faulted the government for *targeting* "Antifa" and "far left

extremists" (C.A. No. 23-50016, ER-12–13).  To avoid even the potential

perception that the government might be prosecuting violent felons on

only one side of the political spectrum—which it was not—defendant

24

should not be afforded an opportunity to flee or commit additional
violence while the government pursues this appeal.

**C.   The Government Did Nothing Improper to Effectuate This
Court's Order and Permit Orderly Appellate Briefing
Regarding Bail Pending Appeal**

Nothing about the bail analysis is altered by the actions the
government took to return defendant to custody.  Just as the failure to
observe the Bail Reform Act's requirement of a timely hearing "does not
defeat the Government's authority to seek detention of the person
charged," *United States v. Montalvo-Murillo*, 495 U.S. 711, 717 (1990),
any supposed impropriety in the manner by which the government
secured defendant's re-arrest has no bearing on the statutory bail
factors: flight risk and dangerousness.  "[T]here is no reason to bestow
upon the defendant a windfall and to visit upon the Government and
the citizens a severe penalty by mandating release" in these
circumstances.  *See id.* at 720; *cf. United States v. Little*, 485 F.3d 1210,
1211 (8th Cir. 2007) (per curiam) ("We also fail to see any connection
between the circumstances of the appellee's arrest by the government
and a determination of whether he should be free to self-surrender
following conviction and sentence.").

More importantly, however, the government did nothing wrong. The government acted expeditiously, determinedly, and appropriately to exercise its appellate rights, prevent defendant's flight, and enforce this Court's unambiguous intent that defendant remain in custody pending appellate adjudication of his bail status. Prosecutors represented the United States with integrity. Because the defense and the lower courts have leveled astonishing allegations, impugning attorneys who were diligently doing their job, the attached Declaration of Bram M. Alden ("Alden Decl.") lays out the factual chronology in detail to set the record straight.

To avoid distracting from the merits of this brief, however, the government addresses only the gravamen of defendant's claims of wrongdoing—namely, that the government took inconsistent positions before this Court and the magistrate judge. (*See* Opposition 14-15.) That is not true. Prosecutors sought relief on two tracks to remedy the extreme exigency that the district court created when it denied the government's stay request and directed defendant's forthwith release, resulting in his release before this Court ordered that he remain detained. To achieve this Court's objective of detaining defendant so as

26

to permit orderly appellate review of the district court's release order,
prosecutors sought relief from the district court and this Court,
exercising an abundance of caution even in the face of an emergency.

First, rather than arrest defendant immediately after this Court's
stay order (Docket No. 5.1), the government sought an arrest warrant
from the district judge, who referred prosecutors to the duty magistrate
judge.  (Alden Decl. ¶ 8.)  "Consistent with the every possible precaution
approach," the government explained to the magistrate judge that if
defendant were arrested pursuant to a warrant, it would "ask for an
initial appearance" in the district of arrest.  (GFEX-168-69.)  When
asked whether any such initial appearance would include a detention
hearing, the prosecutor—before being cut off by the judge—responded,
"I would believe so, and that we would ask --."  (GFEX-174.)  The
prosecutor then explained that the government would make two
arguments at any new detention hearing: (1) the 18 U.S.C. § 3142
factors—flight risk and dangerousness—warranted detention, and
(2) "we have an order from the Ninth Circuit that clearly intends for
this -- the Defendant to remain in custody."  (GFEX-174-75.)

"Accordingly, it would not be appropriate to release him either due to that order or under the 3142 factors. And, in fact, both." (GFEX-175.)

Second, after the magistrate judge took the warrant application under submission, exhorting the government "to seek some kind of clarification from the Motions Panel in the meantime" (GFEX-176, 182), the government immediately drafted a second emergency motion with this Court, and filed it 47 minutes later (Docket No. 6.1). (*See* Alden Decl. ¶¶ 8-11.) Therein, the government asked for an order that would obviate the need for an arrest warrant and definitively preclude defendant's re-release. (Docket No. 6.1 at 3.) The government proposed the following language: "The government is authorized to arrest appellee Robert Rundo and immediately return him to the custody of the Bureau of Prisons and/or the United States Marshals Service in the Central District of California where he must remain in custody pending resolution of appellant's motion to stay release pending appeal." (*Id.*)

Thereafter, the magistrate judge issued the warrant but added that it was granted "without prejudice to Defendant's rights to seek bail pending appeal" and directed that "the government should continue to seek further appropriate instructions from the Ninth Circuit." (GFEX-

138.)  Consistent with that directive, the government returned to this Court, renewing its "request for emergency relief" on the same terms it had proposed before the warrant issued.  (Docket No. 7.1.)  The government offered two arguments for granting such an order notwithstanding the warrant.  First, the warrant "leaves open the question of whether defendant must once again appear before a magistrate" for an initial appearance, "which should not be necessary." (*Id.* at 2.)  Second, defendant should not be allowed to request "bail pending appeal" from a lower court; because that was already the subject of the government's appeal, the lower courts should have been deemed stripped of jurisdiction to adjudicate the issue.  (*Id.*)

The following morning, this Court directed the government to provide a status update and identify "what relief, if any," it was "still requesting."  (Docket No. 10.1.)  The government reported that defendant had been arrested and that "[a]bsent further order of this Court," he would "have another initial appearance and detention hearing," at which the government would make the arguments it had indicated to the magistrate judge a day earlier.  (Docket No. 11.1 at 3.) However, the government again requested an order that would require

29

defendant's temporary detention and prohibit any lower court judge

from ordering his release absent further order of this Court.  (*Id.* at 4.)

This Court subsequently issued such an order.  (Docket No. 13.1.)

The government's positions before this Court and the lower courts

were consistent and compatible, attempting only to keep defendant in

custody while seeking appellate review of the district court's release

order.  The government sought two forms of emergency relief: an arrest

warrant from the magistrate judge and an order from this Court.  If

defendant were arrested pursuant to a warrant without an order from

this Court, the government intended to go forward with an initial

appearance and detention hearing in an abundance of caution.

However, the government posited that the outcome of any such

detention hearing would be "preordained" because, as the prosecutor

consistently explained, re-releasing defendant would contravene this

Court's order that he remain detained pending adjudication of the

government's bail appeal.  (*See* GFEX-113, 174-75.)  Both before and

after the warrant issued, the government requested an order from this

Court that could obviate the need for any further detention hearing

and/or prevent the lower courts from defying this Court's intent by releasing defendant yet again.

Prosecutors explained that position to the magistrate judge repeatedly and respectfully.  (*See* GFEX-84-89, 94-95, 106, 109, 111-116.)  Although the government believed that defendant "should not be entitled to" another detention hearing, that remained "an open question" for which there had not yet been "a clear enough directive from the Ninth Circuit in its precedent or in its orders in this case," and thus, the government was prepared to go forward with another detention hearing unless this Court issued "a clear directive that would allow us to obviate the need for" one.  (GFEX-85-87.)  There was nothing improper about that approach.  It ensured that defendant would be afforded any process to which he might be entitled while simultaneously seeking a higher court order directing that no such process was required.  That was reasonable, fair, and above reproach.

## III.   CONCLUSION

This Court should order defendant detained pending appeal.

DATED: March 5, 2024                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney

                                        MACK E. JENKINS
                                        Assistant United States Attorney
                                        Chief, Criminal Division

                                        CAMERON L. SCHROEDER
                                        Assistant United States Attorney
                                        Chief, National Security Division

                                         /s/ *Bram M. Alden*

                                        BRAM M. ALDEN
                                        Assistant United States Attorney
                                        Chief, Criminal Appeals Section

                                        ALEXANDER P. ROBBINS
                                        Assistant United States Attorney
                                        Deputy Chief, Criminal Appeals
                                        Section

                                        ELANA SHAVIT ARTSON
                                        Assistant United States Attorney
                                        Criminal Appeals Section

                                        Attorneys for Plaintiff-Appellant
                                        UNITED STATES OF AMERICA

## DECLARATION OF BRAM M. ALDEN

I, Bram M. Alden, hereby declare and state as follows:

1.      I am an Assistant United States Attorney in the Central
District of California and the Chief of my office's Criminal Appeals
Section.  I am responsible for overseeing the government's appeals in
*United States v. Rundo and Boman,* C.A. Nos. 24-932 and 24-1054.  I
make this declaration both to support the government's motion for
detention pending appeal and to correct the misstatements and
allegations that have been leveled against me in the proceedings below.

2.      On February 21, 2024, at 10:22 a.m., the district court issued
a written order dismissing the indictment in this matter for the second
time.  (Dist. Ct. Docket No. 333 (GEX-31-65).)  At 10:53 a.m., the
government filed its notice of appeal.  (Dist. Ct. Docket No. 334 (GEX-
68).)  At 11:05 a.m., the district court entered a minute order directing
that defendant Rundo was to be released forthwith and denying the
government's requests for detention and a stay.  (Dist. Ct. Docket No.
335 (GEX-66-67).)  Shortly thereafter, the district court entered a
"Judgment of Discharge."  (Dist. Ct. Docket No. 336.)

3.     I dropped all of my other work and immediately turned my attention to this matter.  I apprised the Office of the Solicitor General, which must authorize proceeding with any appeal, 28 C.F.R. § 0.20(b), and simultaneously contacted the National Security Division's Appellate Unit and the Department of Justice's Criminal Appellate Section so that they, too, could weigh in on pursuing an appeal.  Shortly thereafter, I emailed opposing counsel to alert the defense that, before the close of business, the government might file an emergency motion to stay defendant's release.  One of my colleagues in the Criminal Appeals Section and I then drafted an emergency motion.  I also continued communicating about this matter with other AUSAs in my office and collecting, reviewing, and emailing case-related materials to the Office of the Solicitor General and the National Security Division's Appellate Unit.  I did not eat lunch.

4.     At approximately 3:25 p.m., I called this Court's emergency motions phone number and left a message indicating that I might need to file an emergency motion.  I did not receive a response.  At 3:53 p.m., I received Solicitor General authorization to file the government's emergency motion.  However, because this Court had not yet opened an

2

appeal in this matter, I could not yet file the government's motion. At

4:01 p.m., I sent an email to this Court's emergency motions email

address. Around the same time, my paralegal called the district court's

appellate department and emphasized the time-sensitive nature of this

matter. She spoke to a district court employee who then emailed this

Court. Around the same time, I called this Court's Docketing

Department and was told that I could not file my motion via email and

that the only thing I could do was leave another voicemail with the

emergency motions phone number. Meanwhile, my paralegal managed

to reach this Court's Operations Supervisor, who immediately helped

get an appeal opened.

    5.    The Clerk's Office opened appeal number 24-932 at 4:32 p.m.

(Docket No. 1.1), and, at 4:35 p.m., the government received an

automated notification that the appeal had been opened. I filed the

government's emergency motion two minutes later, at 4:37 p.m. (Docket

No. 3.1), and, as an extra measure, served my filings on defense counsel

shortly thereafter. Before going home for dinner, I emailed my

colleagues about the filing of our stay motion and turned to other work

matters that I had not be able to address that day.

6.    At some point that evening, one of my colleagues called to

tell me that defendant had been released from custody.  We discussed

how to return him to custody if this Court ruled that he should remain

detained and decided that the most reasonable and expedient manner

would be to seek an arrest warrant.  At 10:21 p.m., however, I emailed

my colleagues that, in the morning, I intended to file an "update and

revised request for relief" with the Ninth Circuit, informing this Court

that defendant had been released and requesting "an order authorizing

agents to arrest Rundo and return him to BOP custody," which might

"obviate the need for an arrest warrant."

7.    I was back at my desk shortly before 7:24 a.m. on February

22, 2024 (when I sent my first email of the day).  However, I was not

able to update this Court before it entered its temporary stay order.  At

7:27 a.m.,* this Court entered an order stating: "The district court's

February 21, 2024 judgment of discharge authorizing appellee Robert

Rundo's immediate release is temporarily stayed pending resolution of

appellant's motion to stay release pending appeal."  (Docket No. 5.1.)

---

* Some filings through the Court's ACMS system list two different
"entered" times.  Docket No. 5.1, for example, lists 7:27 and 7:38 a.m.
Herein, I rely on the earlier listed time for all such docket entries.

4

As soon as the government received notice of that order, my colleagues

began preparing an arrest warrant application, exhibit, and proposed

warrant, while I updated others in my office, the Solicitor General's

Office, and the National Security Division's Appellate Unit.

8.     Around 9:30 a.m., the district court's courtroom deputy

instructed my office to seek the arrest warrant from the duty

magistrate, Magistrate Judge Steve Kim.  (*See also* GFEX-148

(magistrate judge confirmed that district court directed government to

submit its warrant application to the duty magistrate).)  Consistent

with standard practice, the government submitted its arrest warrant

application ex parte; alerting the defense that the government is

seeking an arrest warrant enhances the risk of flight, which was

already extreme in this case, given that defendant had previously

traveled with fake identification documents, had been extradited from

Romania, and, according to the FBI, had traveled south toward San

Diego after his release.  Shortly after the government emailed the

magistrate judge's chambers the arrest warrant materials, an AUSA

followed up by email to alert the magistrate judge to the unique "time

sensitivities" and the serious flight risk defendant posed.  The AUSA

noted that this Court had "stayed defendant's immediate release" and
the government was "therefore requesting that an arrest warrant be
issued so that defendant can be returned to custody pursuant to his
initial detention order," which the AUSA attached.

9. The magistrate judge set a Zoom hearing for 12:00 p.m. and
instructed the government to alert defense counsel as to the arrest
warrant application, which the government then emailed to defense
counsel. The hearing convened at 12:00 p.m. but due to technical
difficulties, the magistrate judge asked the parties to return 15 minutes
later. The hearing began at 12:17 p.m. (GFEX-145.) I attended with
three of my colleagues. Defendant was represented by four Deputy
Federal Public Defenders. (*See* GFEX-146, 147.) The following
occurred at the hearing:

a. The magistrate judge began by expressing his
"tentative view" that issuing an arrest warrant would "preserve the
status quo ante" and thereby "provide the remedy that the Ninth
Circuit put into effect with the administrative stay." (GFEX-149.) That
was correct, and, as the judge noted, "intuitive." (GFEX-149-50.)

b.     There was no dispute, I explained, about "[t]he obvious import" of this Court's order: "that this Defendant should be in custody." (GFEX-163.) "Everyone here understands what the Ninth Circuit intended." (GFEX-177.) The magistrate judge seemed to agree: "it is 100 percent accurate that the Ninth Circuit intended to preserve the status quo ante, which meant that they did not want him released pending the appeal of the order that he be released." (GFEX-171.)

c.     Still, the magistrate judge expressed concern at to whether he had the authority to issue an arrest warrant where this Court's stay of release was ordered after release had happened.  (GFEX-150.)  My colleague and I pointed to multiple sources for that authority: this Court's order; the rule of the mandate; the statute permitting detention pending appeal, 18 U.S.C. § 3143(c); the indictment that remained pending while the government pursued its appeal from the district court's dismissal order; and Federal Rule of Criminal Procedure 4.  (GFEX-150, 153-54, 166-67, 169, 173-74, 180-81.)

d.     The defense took the position that this Court's order "was issued too late," and "[t]here is no legal mechanism to enforce it." (GFEX-159.)  The defense further claimed that there were "no charges

pending," and when asked whether there was an "appeal pending from
the dismissal of the indictment," the defense responded incorrectly:
"There isn't, your Honor." (GFEX-154-55.) In fact, the government had
appealed from the dismissal order within "minutes" (GFEX-5), and as I
explained to the magistrate judge, "as long as that appeal is pending,
there is an indictment" (GFEX-166-67).

      e.    The magistrate judge asked me what would happen "if
an arrest warrant issues and he's arrested." (GFEX-168-69.) While I
did not think "it's necessary to have any further appearance," consistent
with the government's "every possible precaution approach," my
colleagues and I intended to "ask for an initial appearance" in the
district of arrest. (*Id.*)

      f.    The magistrate judge asked me whether defendant
would get a detention hearing "when he makes an initial appearance on
an arrest warrant." (GFEX-174.) I responded, "I would believe so," but
the judge cut me off before I could finish my answer. (*Id.*) I then
explained that the government would advance two arguments at any
new detention hearing: (1) detention was warranted based on the
traditional bail factors under 18 U.S.C. § 3142—flight risk and

dangerousness, and (2) "we have an order from the Ninth Circuit that
clearly intends for this -- the Defendant to remain custody." (GFEX-174-
75.) "Accordingly," I said, "it would not be appropriate to release him
either due to that order or under the 3142 factors. And, in fact, both."
(GFEX-175.)

      g.    The magistrate judge took the warrant application
under advisement after stating: "I think it behooves the Government to
seek some kind of clarification from the Motions Panel in the meantime,
and obviously as soon as you hear something, let me know." (GFEX-
176, 182.) The hearing ended at 1:08 p.m. (GFEX-145.)

    10.    Thirteen minutes after the hearing ended, I emailed this
Court's emergency email address, copying defense counsel and noting
that the government intended to file another emergency motion within
an hour. I explained that "because the defendant has been released
from custody," the government's new emergency motion would "be
requesting an order authorizing the government to arrest him and
return him to custody forthwith."

    11.    I filed the government's new emergency motion at 1:55 p.m.
(Docket No. 6.1.) Therein, I explained that defendant had been released

before this Court's stay order and that while the government had

attempted to secure an arrest warrant to return defendant to custody,

"[n]o such warrant has issued as of the time of this filing." (*Id.* at ii.)

Operating under an extreme exigency, I laid out facts succinctly to

explain the urgency of the situation and the proceedings that had

continued to delay defendant's return to custody. (Docket No. 6.1 at 1-

2.) Because defendant remained out of custody, I reported that the

"clear objective" of this Court's stay order "remain[ed] unrealized, and

defendant remain[ed] an extremely serious flight risk." (*Id.* at 2.)

Accordingly, the government requested an order stating: "The

government is authorized to arrest appellee Robert Rundo and

immediately return him to the custody of the Bureau of Prisons and/or

the United States Marshals Service in the Central District of California

where he must remain in custody pending resolution of appellant's

motion to stay release pending appeal." (*Id.* at 3.)

    12.    At 2:34 p.m., the magistrate judge's chambers emailed the

signed arrest warrant to my office. In issuing the arrest warrant, the

magistrate judge ordered that it was granted "without prejudice to

Defendant's rights to seek bail pending appeal" and directed that "the

government should continue to seek further appropriate instructions
from the Ninth Circuit."  (GFEX-138.)

13.    After attending to other work matters, including two
separate meetings, I returned to my desk and drafted an updated
Status Report, which I filed with this Court at 5:16 p.m.  (Docket No.
7.1.)  Therein, I renewed the government's request for "emergency
relief" on the same terms I had proposed before the arrest warrant was
issued.  (*Id.* at 2-3.)  I offered two reasons for why this Court should
issue such an order notwithstanding the warrant:

a.    First, I explained that the warrant "leaves open the
question of whether defendant must once again appear before a
magistrate" for an initial appearance, which I argued "should not be
necessary" given that (1) defendant already had an initial appearance
after he was extradited from Romania and (2) defendant would have
had no right to another initial appearance had this Court's stay order
been issued prior to his release from custody yesterday evening."
(Docket No. 7.1 at 2.)

b.    Second, I argued that defendant should not be allowed
to request "bail pending appeal" from a lower court when that was

11

already the subject of the government's appeal, and therefore, the lower courts had "no jurisdiction to entertain another motion for bail pending appeal." (*Id.*) "Moreover," I noted, "if the district court were to once again order defendant's release, the government would be forced to file yet another emergency motion, repeating this cycle." (*Id.*)

14.    At 5:24 p.m., my colleagues informed me that we had received confirmation that defendant had been arrested. I continued updating my colleagues about this matter and working on other matters until some time after 7:00 p.m. and then sent additional emails related to this matter around 8:30 p.m. At 11:45 p.m., the defense filed its own status report, indicating that defendant had been taken into custody and accusing me of taking inconsistent positions. (Docket No. 8.1.)

15.    I resumed working on this matter at around 8:00 a.m. the following morning, February 23, 2024, and began drafting another status report to respond to defendant's report. The following happened during my first two hours of work that morning:

a.    At 8:10 a.m., the magistrate judge set a Zoom status conference for 11:00 a.m.

b.      At 9:08 a.m., this Court issued an order directing the
government to confirm whether defendant had been returned to custody
and to indicate "what relief, if any, appellant is still requesting of this
court prior to its resolution of appellant's motion to stay Rundo's release
pending appeal." (Docket No. 10.1)

c.      At 9:37 a.m., a deputy federal public defender emailed
the district judge's chambers: "I am reaching out because we have an
11am status conference before Magistrate Judge Kim on this matter.
Depending on what happens in that proceeding, we may very soon after
request an emergency hearing before Judge Carney.  We wanted to see
the Court's availability for that."

d.      At 10:01 a.m., I completed the status report that I had
begun drafting before this Court's order and filed it in response to the
Court's inquiry.  I reported that defendant had been taken into custody
the prior evening, the magistrate judge had set another Zoom status
conference, and the defense had already asked the district court to be
prepared for an "emergency hearing."  (Docket No. 11.1 at 1-2.)  I
further explained that, as I had told the magistrate judge before any
warrant was issued, because defendant had been arrested by warrant,

"[a]bsent further order of this Court," the government was prepared to go forward with an initial appearance and detention hearing, even though such a hearing "should not be necessary." (*Id.* at 2.) I also maintained the same position I had previously taken before the magistrate judge: that at any new detention hearing, the government would argue against release based on both this Court's clear intent, as evidenced by its prior order, and the traditional bail factors. (*Id.* at 3.) However, there was an obvious risk that the lower courts would defy this Court's intent, and by contacting Judge Carney's chambers, the defense had laid bare its aim of procuring re-release in contravention of this Court's prior order. (*Id.* at 4-5.) Accordingly, the government requested an order that would, in the clearest possible terms, prevent defendant's re-release. I proposed language (with a missing word that this Court later corrected): "Defendant-Appellee Robert Rundo is to remain in custody pending resolution of appellant's motion to stay release pending appeal. No lower court may order his release absent further [order] of this Court." (*Id.* at 4 (emphasis omitted).)

e.    At 10:15 a.m., Judge Carney's courtroom deputy responded to the defense's request that the district court be prepared to hold an emergency hearing: "We are available.  It must be in person."

16.    The magistrate judge's Zoom hearing began at 11:02 a.m. and lasted over an hour and a half.  (GFEX-63.)  Multiple times, the judge voiced strong criticisms against the government and me in particular, accusing me of, among other things, "condescension and contempt for the Court," "an abuse of power," "running roughshod over process," "mispresenting things" to the courts, and taking "disingenuous" and "dishonest" positions.  (GFEX-80, 97-99, 113, 120.)  Those comments were deeply upsetting to me, and I strongly disagree with them.  As I told the magistrate judge, "I am a representative of the United States, and I take that very seriously."  (GFEX-101.)  My colleagues and I were "trying to the best of our abilities to achieve what the Ninth Circuit wanted and what the Government thought was best for its prosecutive priorities when this Defendant risked fleeing to another country."  (GFEX-98.)  Having carefully reviewed the transcripts and record, I offer the following additional responses to the magistrate judge's statements:

15

a.      When asked whether I believed that this Court's order attempting to stay defendant's release left any question as to this Court's intent "given that [he] had already been released," I responded that I believed there was no ambiguity.  (GFEX-81.)  I had articulated that same belief to the magistrate judge at the preceding hearing (GFEX-163-64, 172, 177), and I stand by that belief.

b.      The magistrate judge "fault[ed]" me for failing to update this Court after defendant's release.  (GFEX-81.)  I learned about that release on the evening of February 21 and, as confirmed by an email I sent my colleagues at 10:21 p.m. that night, my intention was to "update" this Court on the morning of February 22.  This Court's stay order was issued before I could prepare and file that update, and following the stay order, I believed that seeking an arrest warrant from the lower courts would be the most expedient and appropriate manner of effectuating this Court's intent.  Multiple attorneys in my office, including supervisors, agreed with that assessment.

c.      The magistrate judge said that I had been "fighting [him] tooth and nail" against seeking further relief from this Court the preceding day.  (GFEX-81-82.)  I respectfully disagree.  It is true that I

16

pleaded with the judge to act on this Court's stay order, told him it is
more difficult to obtain emergency relief from this Court, and explained
that I could not simply "reach the Motions Panel." (GFEX-170, 175.)
However, I also said that I "could" file something further with this
Court (GFEX-171), and when the judge said, "I haven't ruled yet, but in
the meantime, I don't know why you don't want to seek some kind of
relief from them," I responded, "I can go and do that, your Honor," even
though I hoped it would not dissuade him from acting on the
government's warrant application (GFEX-178). I later added: "I
completely agree with the Court that the longer that we delay, the
greater the risk. So, I will pursue any mechanism possible." (GFEX-
181.) I emailed this Court's emergency docketing email 13 minutes
after the hearing ended and filed the government's new emergency
motion 34 minutes after that.

      d.    The magistrate judge suggested that I had not filed
anything further with this Court before he issued the arrest warrant.
(GFEX-83-84.) That was incorrect. I filed my second emergency motion
with this Court (Docket No. 6.1) 39 minutes before the signed arrest
warrant was emailed to my office. I referenced that second emergency

17

motion when asked what else I had filed with this Court following the
stay order: "Docket Number 6 on the Ninth Circuit's docket." (GFEX-
84.) The judge responded: "That's after our hearing. I'm talking about
after the stay but before I issued the arrest warrant, what had you filed
with the Ninth Circuit?" (*Id.*) I was confused by that question because
I had already cited Docket Number 6, which was indeed filed "after our
hearing" but was also filed "before [the judge] issued the arrest
warrant." (*Id.*) In light of that confusion, my response that we had filed
"[n]othing" after the stay but before the arrest warrant (*id.*) was
inaccurate; the second emergency motion preceded the arrest warrant.

      e.    The magistrate judge claimed I had taken inconsistent
positions before him and this Court. (GFEX-85-87.) I explained
repeatedly that I "believed" (but was not sure) defendant would be
entitled to a detention hearing if arrested on the warrant—that was
"my best guess" on an "open question"—and that I had asked this Court
for a "clear directive" that would "obviate the need" for any such
hearing. (GFEX-85-87, 94-95, 109, 111-16.) The magistrate judge was
not satisfied with my explanation (GFEX-86-87) and suggested that I
was "just throwing legal spaghetti on the wall for anything that might

stick" (GFEX 94). However, I maintain that there is nothing improper

about affording a defendant process to which he might not be entitled

while simultaneously asking a higher court to rule that no such process

is required.

   f. Though I had described the scenario the preceding day

as "extraordinarily unorthodox" (GFEX-172) and had also agreed that

we were in "uncharted" territory as to whether a new initial appearance

was necessary (GFEX-87), when I reiterated that "I recognize this was

uncharted territory," the magistrate judge interrupted me: "Do you

though?" (GFEX-89).

   g. The magistrate judge took issue with the following

paragraph of my second emergency motion:

> On the morning of February 22, 2024, after this Court issued
> its temporary stay and after determining that defendant had
> been released from custody, the government sought an
> arrest warrant to effectuate this Court's order. The district
> court directed the government to seek the arrest warrant
> from a magistrate judge. Then, rather than issue an arrest
> warrant, the magistrate judge set a Zoom hearing for 12:00
> p.m. on February 22, 2024, at which four lawyers for
> defendant were present. Following a delay due to
> magistrate court technical difficulties, the magistrate judge
> questioned whether he had authority to issue an arrest
> warrant. The judge has not yet decided whether to issue a
> warrant and suggested that the government seek further
> relief from this Court.

(Docket No. 6.1 at 2; GFEX-90-91.)  The judge said that paragraph was

"quite astonishing" and "dripping with condescension if not contempt

for [his] Court," including by "talking about" and "derid[ing]" the

technical difficulties "in such denigrating terms."  (GFEX-91, 132.)  I do

not believe that was a fair characterization.  Though I drafted and filed

the government's second emergency motion with all possible haste, I

enumerated the facts succinctly, accurately, and dispassionately.  "My

intention," I explained to the magistrate judge, "was to set out the facts

and explain why things had not yet happened and why we were

operating under emergency circumstances and asking the Ninth Circuit

for continued relief after what I believed was a directive from the Ninth

Circuit that should have resulted in this Defendant's detention

immediately."  (GFEX-95.)  My briefs were not intended to be

condescending nor did I use any denigrating terms to describe the

magistrate court's technical difficulties.  I responded respectfully to the

judge that "I did not intend to be condescending," and "I apologize[d] to

the Court" if my statements were perceived that way.  (GFEX-92-94,

100-01.)  When I reiterated my apology, the magistrate judge

interjected: "Not really, Mr. Alden.  What you've said are the fake

apologies that people say on these things." (GFEX-98.)  Although I felt

that comment was unfair, I continued to repeatedly apologize.  (GFEX-

98, 100, 116.)

    h.  When the magistrate judge asked me whether

defendant would have an opportunity to argue for bail pending appeal,

"whether it's before the Circuit or otherwise" (GFEX-96), this colloquy

followed:

> MR. ALDEN: Yes, before the Circuit. That is exactly[,] and the
> only[,] relief that I have asked from this Court and from the Ninth
> Circuit is that this process go forward in an orderly fashion where
> the Defendant is absolutely entitled --
>
> THE COURT: Mr. Alden, stop taking my words and trying to
> make them your own. You were not asking for an orderly
> proceeding on this. You came in asking for an ex parte arrest
> warrant that you wanted issued without by or leave.
>
> MR. ALDEN: And that would have been what would have
> facilitated an orderly process by securing the Defendant in
> custody so that the order was --

(GFEX-96.)  Contrary to the judge's comments, all along, I had in fact

been attempting to secure defendant's detention merely to allow an

orderly appellate review process, consistent with this Court's order

directing that defendant remain in custody pending this Court's

resolution of the government's motion to stay defendant's release and

continue his detention pending appeal.  (*See also* GFEX-99-100
(reiterating that point).)

   i. The magistrate judge ordered me to take the
transcripts of his hearings to my front office (i.e., senior management)
for a discussion "about lessons learned in post-mortem from this" "in
lieu of any other kind of sanction."  (GFEX-104-05, 133.)

   j. While the hearing was still ongoing, this Court issued
an order requiring that defendant remain in custody pending resolution
of the government's motion to stay release pending appeal.  (Docket No.
13.1.)  The order prohibited any lower court from once again ordering
release absent further order of this Court.  (*Id.*)  I alerted the
magistrate judge immediately, reading this Court's order aloud.
(GFEX-127-28.)  Before the magistrate judge adjourned the hearing, he
added a final criticism of the government: "the manner in which they
have gone about it has astonished me in a way that I have not see in my
eight years on the bench"; "I am truly almost speechless in a way that I
can't describe as to the context of this case."  (GFEX-131-32.)

  17. The hearing ended at 12:40 p.m.  (GFEX-63.)  At 1:04 p.m.,
one of the deputy federal public defenders emailed Judge Carney's

chambers asking for an immediate hearing and stating, "I believe we are all in LA and would be able to drive down as soon as possible." The DFPD added, "If this does not work for the Court, we can make ourselves available on Monday." At the time, I was actually not in Los Angeles or Santa Ana (where Judge Carney sits), because I had driven two hours away the night before to visit my parents and spend the weekend with them. At 1:29 p.m., I responded to the DFPD's email that I would not be able to attend a hearing that Friday afternoon but could attend on Monday. Thirty minutes later, at 1:59 p.m., Judge Carney's courtroom deputy alerted the parties that Judge Carney had set a hearing for 3:00 p.m. that day. My colleagues attended without me.

18.    At the hearing before Judge Carney, the DFPD, joined by Judge Carney, continued to accuse the government of misconduct. Because I was not present to respond to those allegations, I offer the following responses:

a.    The DFPD criticized the government for failing to "update the Ninth Circuit" after defendant was released. (GFEX-26, 30-31.) "That's your obligation as an officer of the Court. They didn't do that." (GFEX-26.) That comment overlooks the actions I had taken to

23

keep this Court updated and the obvious exigencies of this case.  I worked almost nonstop to file the government's emergency stay motion on February 21, learned of defendant's release that evening *after* I filed the emergency motion, and emailed my colleagues that night that I intended to update this Court the following morning.  I was unable to file any update before this Court's stay order.

   b. The DFPD repeated the claim that the government's positions before the magistrate judge and this Court were "exactly the opposite" and added that the government procured the arrest warrant under "false pretenses."  (GFEX-28-29, 36, 37.)  That is not correct.  The government's position all along was that absent a clear directive from this Court stating that no initial appearance or detention hearing was required, the magistrate judge should have conducted such a hearing in an abundance of caution.  Nonetheless, the DFPD stated: "I can speak for myself as an officer of the Court, that I think that if I engaged in even a fraction of that kind of gamesmanship, I don't know that I'd have my license anymore."  (GFEX-29.)  I did not engage in any "gamesmanship" or take inappropriate or inconsistent positions.  Rather, under difficult and fast-paced circumstances, I took what I

believed were appropriate steps to effectuate this Court's order that defendant remain in custody pending the resolution of the government's motion before this Court.

      c.    The DFPD claimed that this Court's stay order was "very ambiguous" as to whether it supported defendant's re-arrest. (GFEX-31.)  I disagree.  This Court's clear intent—which the defense did not initially dispute—was that defendant remain in custody pending this Court's adjudication of the government's motion to stay his release.

      d.    The DFPD said that the government's "mere act of applying ex parte for an arrest warrant in these circumstances was very troubling." (GFEX-33.)  I disagree.  In my view and the view of other supervisors on the case, that was the most expedient, appropriate, safest, and cautious approach of effectuating this Court's intent.  My colleagues and I believed that seeking the warrant through an ex parte application was consistent with standard practice and especially appropriate under the circumstances, as alerting the defense that the government was seeking an arrest warrant would enhance the grave risk of flight.

e.      The DFPD criticized the government for not

"inform[ing] the Ninth Circuit about the actual facts of what was

happening as they were happening.  They know how to do it.  They

know how to file status reports.  They didn't do it here."  (GFEX-35.)

That comment again overlooks the government's subsequent filings in

this Court and gives too short shrift to the exigencies of the moment.

The government filed a second emergency motion after its hearing with

the magistrate judge (Docket No. 6.1), a first status report after the

magistrate judge issued the warrant (Docket No. 7.1), and a second

status report responding to this Court's order the following morning

(Docket Nos. 10.1, 11.1).  I began drafting that second status report

before this Court's order and revised and filed it as soon as I could after

the order—though the Court issued its order at 9:08 a.m. and directed

the government to file a report by 4:00 p.m. (Docket No. 10.1), I filed the

report at 10:01 a.m. (Docket No. 11.1).

f.      The DFPD disputed my argument that the lower courts

lacked "jurisdiction to entertain a bail hearing pending appeal."

(GFEX-37.)  She claimed, "That's just absolutely not correct," "[a]nd so

for the Government to do that, I think that is another act that this

26

Court should be very concerned with." (*Id.*)  I stand by the legal

position that I argued to this Court: the government's notice of appeal

from the denial of its request for detention pending appeal "'confer[red]

jurisdiction on the court of appeals and divest[ed] the district court'" of

any authority to issue bail pending appeal.  (Docket No. 7.1 (quoting

*United States v. Ortega-Lopez*, 988 F.2d 70, 72 (9th Cir. 1993)).)  I

argued that legal position to the magistrate judge too.  (*See* GFEX-88,

111.)  However, I did not have an order from this Court adopting that

position in this specific scenario, and, in the exercise of caution, I

believed the magistrate judge should conduct an initial appearance,

including a detention hearing at which the government would have

argued that this Court's order precluded release and that the

traditional bail factors also supported detention.

       g.    The DFPD initially recognized that the government

had never asked this Court to issue "an arrest warrant" but then

adopted that mischaracterization after the district court suggested it.

(GFEX-51-52, 54, 57.)  As my colleague explained, the government

sought two forms of relief: an arrest warrant from the magistrate judge

and an order from this Court "that the defendant doesn't have to appear

27

on any sort of arrest warrant." (GFEX-51, 52-54.)  That latter order

would have obviated the need for an initial appearance.

      h.    The DFPD, acknowledging that her memory might be

wrong, did not recall "that the Government actually requested to stay

the dismissal order." (GFEX-58.)  The government did in fact make

that request.  (*See* Dist. Court Docket No. 358 at 48.)

    19.    On February 26, 2024, the district court issued an "Order

Releasing Robert Rundo" but stayed that order "pending further

direction from the Ninth Circuit." (GFEX-4-14.)  The government filed

a new appeal from that order.  (GFEX-15.)  That appeal has been

designated as Appeal No. 24-1054.  The government will move to

consolidate that appeal with this one.

    20.    I was not afforded an opportunity to review the record or

respond before the district judge issued his stayed release order, which

also repeated allegations of misconduct against me.  To avoid repetition,

I offer only two further factual responses:

      a.    The government did not wait until "after receiving the

arrest warrant and using that to arrest Mr. Rundo" before requesting

further relief from this Court.  (GFEX-7.)  Rather, I filed the

government's second emergency motion for relief from this Court before the arrest warrant was issued, and I filed a status report renewing the government's request before learning that defendant had been arrested (and possibly before defendant actually was arrested).

   b. The district judge adopted the defense attorney's claim that the government "did not inform the Ninth Circuit that the status quo had changed." (GFEX-5-6.)  However, as explained above, the night before this Court issued its stay order, I emailed my colleagues that I intended to update this Court in the morning.  I was unable to do so before the stay order issued.  My colleagues and I then shifted our attention to seeking an arrest warrant, but I updated this Court as soon as I learned that the magistrate judge might not issue the warrant.

 21. Following all of the foregoing events, my colleagues and I provided transcripts of the hearings to the leadership of our office and debriefed with them.  My office leadership disagrees with the misconduct allegations lodged against me.

 22. On February 27, 2024, defendant filed a motion with this Court repeating many of the misconduct allegations against me and requesting defendant's immediate release.  (Docket No. 19.1.)  I again

dropped other work so that I could respond to that motion.  I was in the

process of drafting the government's opposition when, on February 28,

2024, this Court summarily denied defendant's motion.  (Docket No.

21.1.)

I declare under penalty of perjury that the foregoing is true and

correct.

EXECUTED on March 5, 2024 in Los Angeles, California.

/s/ *Bram M. Alden*

BRAM M. ALDEN
Assistant United States Attorney

## DECLARATION OF SCOTT BIERWIRTH

I, Scott Bierwirth, declare as follows:

1.    I am a Special Agent with the Federal Bureau of
Investigation.  I am one of the case agents assigned to United States
v. Rundo et al., No. CR 18-759-CJC.  I have knowledge of the facts
set forth herein and could and would testify to those facts fully and
truthfully if called and sworn as a witness.

2.    Based on my conversation with Romanian law enforcement,
attached as **Exhibit 1** is a true and correct copy of identification
cards that were found on defendant Robert Rundo's person when he was
arrested by Romanian law enforcement in Bucharest on March 29, 2023.
The identification cards list the aliases "Pavic Roman" and "Marko
Rodić," which are not defendant's legal name.

3.    Based on my conversation with Bulgarian law enforcement,
attached as **Exhibit 2** is a true and correct copy of a United States
passport that defendant presented to a real estate broker in
connection with a property lease application in Bulgaria.  The
passport lists the alias "Robert Lazar Pavic," which is not
defendant's legal name, and a passport number and birthdate that do
not belong to defendant.

4.    I declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and correct and
that this declaration is executed at Covina, California, on February
21, 2024.

/s/
_____
SCOTT BIERWIRTH

## Exhibit 1



## Exhibit 2

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

PASSPORT
PASSEPORT
PASAPORTE

UNITED STATES OF AMERICA

Type / Type / Tipo
P

Code / Código    Passport No. / No. du Passeport / No. de Pasaporte
USA                833523915

Surname / Nom / Apellidos
PAVIC

Given Names / Prénoms / Nombres
ROBERT LAZAR

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
28 Apr 1994

Place of birth / Lieu de naissance / Lugar de nacimiento
NEW YORK, U.S.A.

Date of issue / Date de délivrance / Fecha de expedición
31 Oct 2013

Date of expiration / Date d'expiration / Fecha de caducidad
30 Oct 2023

Endorsements / Mentions Spéciales / Anotaciones
SEE PAGE 27

Sex / Sexe / Sexo
M

Authority / Autorité / Autoridad
United States
Department of State

USA

P<USAPAVIC<<ROBERT<LAZAR<<<<<<<<<<<<<<<<<<<<<
8335239151USA9404285M2310308759621048<754858