# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,               )
                                        )
                    Plaintiff,          )   **CERTIFIED TRANSCRIPT**
                                        )
         vs.                            )
                                        )   Case No.
1) ROBERT PAUL RUNDO,                   )   CR-18-00759-CJC
2) ROBERT BOMAN,                        )
                                        )
                    Defendants.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

MONDAY, FEBRUARY 12, 2024

9:24 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, RPR, CRR, RMR, CRC**
FEDERAL COURT REPORTER PRO TEMPORE
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF:**

> BILL ESSAYLI
> United States Attorney
> BY:  SOLOMON KIM
>      KATHRYNNE SEIDEN
>      Assistant United States Attorneys
> 312 North Spring Street
> Suite 1100
> Los Angeles, California 90012
> 213-894-2450

**FOR DEFENDANT ROBERT PAUL RUNDO:**

> CUAUHTÉMOC ORTEGA, FEDERAL PUBLIC DEFENDER
> BY:  JULIA DEIXLER
>      ERIN MURPHY
>      Deputy Federal Public Defenders
> 312 North Spring Street
> Suite 1200
> Los Angeles, California 90012
> 213-894-0631

**FOR DEFENDANT ROBERT BOMAN:**

> PETER C. SWARTH LAW OFFICES
> BY:  PETER C. SWARTH, ESQ.
> 6442 Platt Avenue
> Suite 557
> West Hills, California 91307-3216
> 818-887-8800

**UNITED STATES DISTRICT COURT**

SANTA ANA, CALIFORNIA; MONDAY, FEBRUARY 12, 2024

9:24 A.M.

- - -


THE COURTROOM DEPUTY:  Calling Item Number 1, CR-18-759, United States of America vs. Robert Paul Rundo; United States of America vs. Robert Boman.

Counsel, please state your appearances.

MS. SEIDEN:  Good morning, Your Honor.  Kathrynne Seiden and Solomon Kim on behalf of the United States.

THE COURT:  Good morning to both of you.

MS. MURPHY:  Good morning, Your Honor.  Erin Murphy and Julia Deixler from the Federal Public Defender's for Mr. Rundo, who is present in custody.

MR. SWARTH:  Good morning, Your Honor.  Peter Swarth on behalf of Robert Boman.  He's present in court on bond.

THE COURT:  Good morning to both of you. Unfortunately, we got a much later start.  I guess there was some issues with transportation of Mr. Rundo.

What is the update on the discovery?

MS. SEIDEN:  Yes, Your Honor.  So the -- and assume the Court is specifically asking about the declassification process we talked about last time?

THE COURT:  Correct.

MS. SEIDEN:  So the Government is making good

progress on that front.  We have asked for declassification -- does the Court want me to provide numbers?  Would that be helpful?

THE COURT:  Please.

MS. SEIDEN:  So last time we were talking about 350 serials that were affected by this issue and about 80 of those were duplicates.  FBI was able to help us quickly identify which ones were sensitive and which ones were not sensitive.  The not sensitive ones, which were about 100, we asked for declassification of all of them, even when they have nothing to do with this case just so defense counsel has peace of mind seeing as many of them as we can provide to them.  That process is well underway.

FBI has about three different teams on working with declassifying those documents, which is a process that involves redactions and circulating it up the chain to headquarters to get approval to then produce those documents with redactions. We sent over about 150 of those documents to defense counsel, which comprises about 20-something serials so far, and there are another 100 or so in the pipeline ready to go.  All the processes are up and running now.  So it's -- the train is moving, so to speak.

There were -- there's a subset of documents that are more sensitive because they involve foreign Government communications of some kind.  So with those we took a more

discerning approach. If they touch on defendant or the investigation or RAM at all, we've asked for declassification. What we're seeing is most of those involve a very high-level summary of Rundo or RAM or the case and its procedural posture that's repeated over and over again throughout the discovery, including the discovery that's already produced, but, nonetheless, we're seeking declassification so we can get it into defense counsel's hands. So that's where we are. And we're pleased with the progress so far.

THE COURT: Couple questions.

MS. SEIDEN: Yes.

THE COURT: In your review so far, have you seen anything exculpatory?

MS. SEIDEN: We have not seen anything that we think is exculpatory, Your Honor.

THE COURT: And can you give me an estimate on how much longer you think the process is going to take before everything's turned over to the defense?

MS. SEIDEN: Yes, Your Honor. And just to be clear, there are some documents, again, that we don't intend to produce because they have nothing to do with this case or investigation. But of the ones we do intend to produce, because they do have some mention of the case or investigation, the initial estimate we got from the FBI was three to four weeks. That was about a week and change ago. So at this rate,

I think we're still on track to meet that.

THE COURT: Okay. What's the defense position?

MS. MURPHY: Thank you, Your Honor. Just so it's clear, we have completed the process of purging at least our records of the classified materials. Just want to make that clear. We've been trying to let the Government kind of do its work on its end. This morning the Government did disclose us about 150 pages worth of documents. So while we were waiting, we started to review them. It's -- I understand that one of the purposes of having the status conference is, one, not just to get a sense of where we are but where can we expect to be going.

One of the concerns I have after seeing some of these documents, and also just the earlier representations that have been made, is that some of these materials clearly relate not just to Mr. Rundo but to evidence at the time of the offense conduct, social media and also financial analysis. This is just in the small subset that we've gotten.

I also understand that there may be some items -- even very few items, but there may be some items that potentially may not be able to get to the point of declassification where they can even be turned over to us redacted. So we may be in a situation where we're litigating potentially what's the form.

So I don't want to belabor kind of the practical

issues here.  I just want to come up with a practical solution that's going to make sure that while the Government is doing what it needs to do, we are also not being put in a position where we're scrambling at the last minute or we're doing a ton of last-minute litigation on what's discoverable, what's not discoverable.  Because, you know, the Government may have a view of what they think is discoverable.

And earlier, they made representations that they didn't think there was anything Rule 16 discoverable in these materials, but clearly there is just based on what we received this morning.  So I'm not trying to attribute any intentional withholding or anything.  I think it's just kind of the nature of how the Government may see things versus how the defense does, but we're still entitled to these things.

So my -- I'm trying to think of a practical solution that can get us to where we need to go.  One thought is we still don't have a very good sense of what exactly the Government's case is going to be because the scope of materials and discovery is so broad.  It implicates international conduct.  It implicates social media of dozens of people, interviews of dozens of people, hundreds of videos.  And so with motions *in limine* coming up, we've reached out to the Government to ask for a proffer at least on what witness -- what client statements are they planning to introduce, co-conspirators statements, which videos are they planning to

**UNITED STATES DISTRICT COURT**

introduce and through which witnesses, and what evidence of any international conduct they'd like to introduce, because we want to understand how much their case-in-chief at trial will implicate some of these materials that we may or may not be receiving in a couple weeks.

To me, having it earlier, like an early good faith list from the Government of what their intended exhibits are and who their witnesses are going to be, I think, to me, presents as a very reasonable way for us to better assess these claims that the materials that they may or may not be able to produce in time for trial are not actually germane to the case.

THE COURT:  And what is the Government's response to your inquiry or suggestion?

MS. MURPHY:  Well, candidly, I don't think I've made this particular request to the Government on this issue.  I requested early disclosure before, but that was before I think some of these issues came up.  We have made requests for these proffers.  We haven't heard back from the Government.  We've also -- we haven't received any pretrial disclosures.  So we don't know if the Government's planning on calling an expert or anything like that.

So given that this situation is, through no fault of Mr. Rundo's, going to take up a lot of time, and we don't want to litigate anything unnecessarily, our goal in reaching out to the Government to get a better sense of its exhibits and

witnesses is actually to avoid unnecessary motions *in limine* because there are so many statements that could be introduced. There are so many videos that could be used. There are so many witnesses who could be called. We just need to have a better sense of what's what so we can better assess how much of an issue are these materials that haven't been disclosed yet.

THE COURT: Understood. All right.

MS. MURPHY: Thank you.

THE COURT: Mr. Swarth, do you have anything to add, sir?

MR. SWARTH: I'm sorry, my mic was off.

I have nothing to add.

THE COURT: Very well.

Well, let me give some very general thoughts. I am of the firm belief that the Government should fear no fact. I've always felt that. What that means as applied is there's no reason why the Government, in my opinion, shouldn't provide an early list of witnesses and an early exhibit list.

Now, I understand that the law, particularly the Ninth Circuit, has held you don't have to give a witness list early, you don't have to give an exhibit list early. And I believe the basis for that thinking is, well, you have the speedy trial clock. And defense could say, "We want to go to trial within 90 days of the Indictment." And so the law says you can't put the Government in that position. So this is the

UNITED STATES DISTRICT COURT

way it is.  That makes sense to me.

But in a case that's been filed in 2018, I know we've played ping-pong with the Ninth Circuit on some legal issues, but we really should cooperate and confer and everybody knows what's going on.  And, candidly, likewise, I think the defense should tell the Government, "Okay, now we have an idea of what your case is.  Let's tell you what our witnesses are, what our exhibits are going to be," so then we can have an efficient, fair trial.  It's not *Perry Mason,* you know, big surprise.

So what I would appreciate is if the Government did give an early witness list and an early exhibit list.  I understand final trial preparation, things come up, you might want to add to that list.  You might want to add to the exhibit list.  I get it.  But we can focus on the motions *in limine*.  I can focus on the jury instructions.  And on that, one of the motions that the defense has brought is to strike certain allegations from the Indictment.  Not sure if --

Mr. Swarth, you've had trials with me.

But the Indictment never sees the light of day at the jury trial.  So I'm going to be denying that motion.  But I think the motion raises a very interesting issue about what is going to be the scope of evidence at the trial.  And from where I'm sitting, I haven't made a final decision.

Charlottesville is not coming in.  It's last in

time.  The Government didn't charge Mr. Rundo with that.  I have a hard time believing that's part of the conspiracy that Mr. Boman should be responsible for.  And I just think it's a can of worms, and it's going to create some very prejudicial issues to the defense.

I understood from the Government's opposition that they have some emails or social media statements by Mr. Rundo.  So, again, maybe there is some marginal relevance to it, but I think it's outweighed by the prejudicial impact, and I don't want the defense to have to spend hours of testimony trying to limit the impact of Charlottesville to this case.  I think this case is about Berkeley, Huntington Beach, and San Bernardino, and that's what we should focus on.

So I said a lot.  First of all, Ms. Seiden, can you produce a witness list, tentative witness list and exhibit list so the defense has a sense of what the scope of the evidence is going to be at trial?

MS. SEIDEN:  Thank you, Your Honor.  And there are a few other points that defense counsel raised I'd love to touch on if the Court would permit it.  But to answer the Court's question, I think it's certainly not our intention to hide the ball or play *Perry Mason* or do anything of that matter.  We've been very focused on responding to the discovery request.  Because this case is older, because there is a lot of discovery, defense counsel has -- they're very diligent and

**UNITED STATES DISTRICT COURT**

have sent over a lot of discovery requests, we've been doing our best to respond to those and, again, exceed what we think are the scope of our discovery obligations and go back through and find anything that defense counsel wants.  So that's been a time-consuming process.  So we're hoping that we're nearing the end of that.  We're not in a position right now to give over an exhibit list.  We can work to gather that as quickly as we can, but it's not that we're hiding it.  We don't have it yet.  So we can work expediently to get that ready.

But for now, we are six weeks out from trial, Your Honor.  We've just gotten through responding to the motions to dismiss.  We have motions *in limine* coming up, so we're happy to meet and confer about general contours of what conduct we do or don't expect to get into.  For example, the international matters, I understand that can open a can of worms.  We can talk about what we expect to get into or not with defense counsel.

I think a witness list is probably a more feasible thing to be able to turn over in a shorter period of time, but there is a lot of discovery in this case, Your Honor.  So an exhibit list we would ask for at least a few more weeks before we are turning over an exhibit list.

THE COURT:  I appreciate that, but it would seem to me, Ms. Seiden, I'm not in any way commenting or criticizing the past.  I get it.  You're getting hit with a lot of things

and you probably haven't had a chance to really focus on your final trial preparation.  I get that.  But my sense is you have a general sense of who the witnesses are going to be, what statements of the defendants, if any, you're going to use, and that, I think, would be very helpful if the defense know that so then they're not making any unnecessary motions *in limine* that you have to take time and be distracted from your trial preparation to respond to.

So with that, I'm going to take you up on your willingness to -- again, it's a tentative list.  There could be changes as you make your final trial preparation.  And you have my word, I'm not going to hold you to it that this is a -- the final list that, "Oh, you didn't mention that."  I'm going to rely on your good faith.  But if you could give them a sense who you think the key witnesses are going to be, again, I think you probably have a general sense what, if any, international evidence you're going to use.

You've heard my comments about Charlottesville.  I don't know if you want to have further meet and confer on it. I will keep an open mind, but I want to make this trial fair to both sides.  And I just see Charlottesville being prejudicial to the defense.  And I'm not sure it has much, if any, probative value from where I'm sitting.

MS. SEIDEN:  I understand that, Your Honor.

THE COURT:  So could you get a general list to them

in the next couple weeks?

MS. SEIDEN:  Absolutely, Your Honor.  Is the Court referring to -- definitely a witness list.  Is the court also asking for a tentative exhibit list in the next couple of weeks?

THE COURT:  If you could, that would even be better.  And again, I'm not holding you to this.  It's just giving them a general sense of then they can focus their efforts and maybe not have to hit you with so many discovery requests, right?

MS. SEIDEN:  I understand, Your Honor.

THE COURT:  And again, I'm going to expect them to share with you what they're thinking.  And again, not holding them to who are their witnesses going to be, including the defendants.  Again, they have a constitutional right to testify at the trial, and they have a constitutional right not to testify.  And I'm not going to hold them to any representation that they make to you during this pretrial process.  But again, for planning purposes, it makes a difference.  So I'm going to ask the defense to do the same.

MS. SEIDEN:  I understand, Your Honor.  Does the Court have a particular date in mind that we should aim for?  Or we're back here in a week and a half, we can tell the Court where we are in the process?

THE COURT:  It would be great if you could get a tentative witness and exhibit list to them in two weeks.

**UNITED STATES DISTRICT COURT**

MS. SEIDEN:  And if --

THE COURT:  And if you could also indicate to them specifically what statements of the defendants you intend to use.  If you could also indicate to them what evidence of international activity you intend to present at trial.

MS. SEIDEN:  Understood.  Thank you, Your Honor.

THE COURT:  And then I would ask the defense to -- can you get something back to the Government in a week?  Or do you need two weeks after you get their list?

MS. MURPHY:  Your Honor, I do want to distinguish the difference between the defense's case-in-chief versus impeachment of Government witnesses.  I think even under the goals of trying to work with the Government on this, which we will make every effort to, there may be certain types of witnesses and documents that we would not even use, depending on what the Government witnesses say.  I think that's distinct from what our particular case-in-chief might be.

So, for example, if we want to call an expert witness in our case-in-chief, of course, we have an obligation to turn that over.  A witness or an exhibit that is only being used on cross-examination, I don't think they're entitled to see until we get to trial.  However, we will, of course, work with the Government on -- of course we have reciprocal discovery obligations too.  So if there are discovery witnesses that are outside of impeachment, we will work with the

Government during this period of time.

THE COURT:  And that was my understanding.

MS. MURPHY:  Understood.

THE COURT:  So I appreciate the clarification.

And likewise, the Government, if it's purely impeachment, that doesn't need to be on it.  But at the same time, I think it's in everybody's best interest that we have this reciprocal early discovery or pretrial disclosures so then you can focus on your arguments and, you know, putting on a good interesting trial for the jury.

I think this is a very interesting case.  I think you're going to have the jurors' attention.  So let's not mess it up by tripping over documents or having delays.

MS. SEIDEN:  Understood, Your Honor.  Thank you.

Does the Court want -- would the Court permit me to address some of the points the FPD roughly made about the specifics of what we produced?  I just want to assure the defense counsel and the Court that, first of all, to the extent there's analysis of social media or financial records in what's being turned over now, those financial records and social media accounts have already been provided to the defense years ago, and we're happy to help navigate where those things might be in discovery.  But our position is that a report analyzing some of those materials is -- assuming that defense counsel has the materials themselves, that's not necessarily discoverable.

The second part that I wanted to address is just that we took a look at the documents and prioritized things that we think are the most pertinent and the things that defense counsel would want to have the most.  So that is why there is in this first batch things that I understand FPD Murphy's position of "I want to have this document," and that is, in fact, why we got those ones out the door first because they have the most meat to them.

THE COURT:  I appreciate that.  And I can tell both sides are acting in good faith and professional.  But one comment I would have is I sure hope that we're spending time and energy on stuff that matters.  I would hate to think that you're spending this valuable time on academic issues.  So what do I mean specifically?  Is this stuff coming in at trial?

MS. SEIDEN:  No, Your Honor.  We've not seen a single document that we would use in our case-in-chief.

THE COURT:  So it just seems to me that our time would be so better spent if we were focusing on stuff that really matters, i.e., that's going to be raised at trial.  I hate to see that done.  Trial is stressful enough.  Why spend your time on stuff that's never going to come up to see the light of day?

MS. SEIDEN:  Understood.  Thank you, Your Honor.

THE COURT:  All right.  So we'll get that tentative witness list and exhibit list from the Government in two weeks.

18

Defense will, hopefully in a week after that disclosure, give them their tentative witness list, exhibit list.  Again, nothing about impeachment has to be on either side's witness list or exhibit list, more just the case-in-chief of what you know.

I think we're going to be getting together next Wednesday.  You've heard what I've said on the third motion.  You know, again, the Indictment is not going to come in.  I'm not going to allow that to be shown to the jury.  So it's really an academic issue.  So I wasn't even planning on granting that motion, but I was planning on saying, "Hey, this is a very important issue of evidence that's raising, and I don't see why Charlotte [sic] should come in."  So I'd like you to meet and confer on that to see if you can get a general understanding whether that's in or not.

If it's not coming in, if you'd please advise me so then I don't have to worry about this third motion.  If the Government still wants to present it, then one party is going to have to file a motion to exclude it.  So if you would meet and confer over the next few days about that and then whoever you decide is going to be filing the motion, file the motion on it.

What about the other motions *in limine* that I thought the defense were thinking about whether they should file or not?

**UNITED STATES DISTRICT COURT**

Ms. Murphy, do you need a little relief in the deadline?

MS. MURPHY:  I think, Your Honor, that might make some good sense given -- my hope is that through continuing to meet and confer about the Government's case-in-chief, we can narrow it down significantly.  As it stands right now, there are many we plan to file.

THE COURT:  Okay.

MS. MURPHY:  So I think currently the deadline is February 26, which is the following Monday after the hearing on the pretrial motions.  I just want to pull up my calendar so I can think of a day that doesn't give too little time for the Court.  We have -- our hearing on motions *in limine* is March 18th.  So that's --

THE COURT:  That's the pretrial conference.

MS. MURPHY:  Yeah, that's at the pretrial conference.  And I think the current motions deadline is stacked in weeks.  So I think what we would have to do is if we kicked the motions *in limine* deadline out a week, for example, we would have to probably split the time between the oppositions and the replies, which I understand would cut both ways for the defense and the Government, assuming the Government has any motions *in limine* that they intend to file. So that would be my proposition.

THE COURT:  I could work with that.  What I'd like

UNITED STATES DISTRICT COURT

you to do is you're going to be talking about international evidence.  You're going to be talking about Charlottesville. Would you get with Ms. Seiden and Mr. Kim on a briefing and hearing schedule on the motions *in limine*.  It would be great if we could keep the March 18 pretrial conference.

And I'm going to add one other thing I'd like to you add to your list.  I don't see, with one exception, the jury instructions being that complicated here.  What I do see that I would like a little thought in is the substantive count violation of the Anti-Riot Act.  I have, in my own mind, how that instruction should read.  And I will -- if it would be helpful -- well, let me ask this question:  Has the Government even thought about that jury instruction yet?

MS. SEIDEN:  We certainly thought about it and talked about it loose.  I don't know that we have an agreed-upon written-down proposal yet.  But yes, of course, in responding to the motions and preparing this case, we thought about it.

THE COURT:  Okay.  Would it be helpful if I shared with you what I envision that instruction looking like given the Ninth Circuit's ruling?  I know one of the motions that I have to decide is the statute as edited by the Ninth Circuit vague under the Constitution.  I get that.  But just for trial purposes, you know, we need to move.

And I don't -- once we've impaneled a jury, I do not

like having to fight over and have discussions about jury instructions. That's one of -- I don't want to say my pet peeves. I just don't operate that way. I realize most judges in the Central District don't operate that way, but I don't like impaneling a jury unless I have those jury instructions finalized.

And everybody knows what the scope of evidence is. They know what the important legal issues are. And I think it's a very effective trial management tool. And again, I don't see the jury instructions in this case being complicated except for that one.

MS. SEIDEN: I think it would be helpful to hear what the Court has in mind.

THE COURT: Okay. I'll work on that. And I'll get that out to both sides hopefully within a week.

MS. SEIDEN: Thank you.

MS. MURPHY: Very well, Your Honor. Thank you.

THE COURT: Okay. Is there anything further we need to talk about this morning?

MS. SEIDEN: Nothing from the Government, Your Honor. Thank you.

MS. MURPHY: Nothing from the defense, Your Honor. Thank you.

THE COURT: All right. See you next week.

THE COURTROOM DEPUTY: All rise. This court is in

recess.

(Proceedings conclude at 9:54 a.m.)

--oOo--

UNITED STATES DISTRICT COURT

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  February 8, 2026*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Court Reporter* Pro Tempore

**UNITED STATES DISTRICT COURT**